# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

IN RE LORD ABBETT MUTUAL FUNDS FEE
LITIGATION

)
)
)
)
)
)
)

MASTER FILE:  04-cv-559 (WJM)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Jeffrey B. Maletta
Nicholas G. Terris
Jon A. Stanley
KIRKPATRICK & LOCKHART LLP
1800 Massachusetts Avenue, N.W.
Washington, DC  20036
(202) 778-9100

Christopher A. Barbarisi (CB 8716)
KIRKPATRICK & LOCKHART LLP
One Newark Center, Tenth Floor
Newark, NJ  07102
(973) 848-4000

*Counsel for Defendants Lord Abbett & Co. LLC, Lord Abbett Distributor, LLC, Robert S. Dow, and the Persons Identified in the Complaint as "the Partners"*

Dated:  November 16, 2004

## Table of Contents

PRELIMINARY STATEMENT ................................................................ 1

SUMMARY OF ARGUMENT ............................................................... 2

THE PARTIES ................................................................................... 6

    1.   The Named Plaintiffs and the Putative Class ................................ 6

    2.   The Defendants ......................................................................... 7

ARGUMENT .................................................................................... 10

PART I: PERVASIVE DEFECTS OF THE COMPLAINT ........................... 10

I.      PLAINTIFFS COMPLAIN OF PERMISSIBLE AND LEGAL
      INVESTMENT COMPANY PRACTICES THAT THEY
      SIMPLY  CHARACTERIZE IN PEJORATIVE TERMS ................ 10

    A.  "Revenue Sharing" Payments Were Permissible and
       Disclosed. ......................................................................... 10

    B.  The Complaint's Allegations Regarding "Excessive"
       Commissions Fail to State a Claim. ...................................... 12

    C.  Plaintiffs' Allegations Regarding Soft Dollars Fail to State a
       Claim. .............................................................................. 17

    D.  Plaintiffs Fail to Allege any Impropriety in Connection with
       the Funds' 12b-1 Plans. ...................................................... 19

II.    PLAINTIFFS' CLAIMS ARE DERIVATIVE RATHER
      THAN  DIRECT. ............................................................... 24

III.   PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED
      BY  SLUSA. ..................................................................... 27

IV.   PLAINTIFFS LACK STANDING TO PURSUE CLAIMS
      RELATING  TO FUNDS IN WHICH THEY NEVER
      OWNED SHARES. ............................................................ 34

PART II: COUNT BY COUNT ANALYSIS ............................................. 36

I.      COUNT I OF THE COMPLAINT ASSERTING A
      VIOLATION OF  SECTION  34(b) OF THE ICA FAILS TO
      STATE A CLAIM. .............................................................. 36

II.      COUNT II OF THE COMPLAINT ASSERTING A
         VIOLATION OF  SECTION  36(a) OF THE ICA FAILS TO
         STATE A CLAIM. ............................................................................. 38

         A. The Text of Section 36(a) Forecloses an Implied Private Right
            of Action. ................................................................................... 41

         B. The Legislative History Need Not Be Considered and, in any
            Event, Offers No Support for an Implied Private Right of
            Action under Section 36(a). ......................................................... 44

III.     COUNT III OF THE COMPLAINT ASSERTING A
         VIOLATION OF SECTION  36(b) OF THE ICA FAILS TO
         STATE A CLAIM. ............................................................................. 50

         A. The Complaint Attacks Payments Outside the Scope of Section
            36(b). ......................................................................................... 50

         B. Any Excessive Brokerage Commissions and Soft Dollars Were
            Received by Brokers and Therefore Cannot Be the Basis for a
            Section 36(b) Claim. .................................................................. 54

         C. Plaintiffs Have Failed to Allege Excessive Fees. .................................. 55

            1.   The Complaint Lacks Adequate Allegations of Excessive
                 Brokerage Commissions. .................................................. 56
            2.   The Complaint Lacks Allegations of Excessive 12b-1 Fees........ 57

         D. Plaintiffs May Not Seek Damages Under Section 36(b) for Any
            Period Prior to One Year Before the Filing of the Lawsuit............. 60

IV.      COUNT IV OF THE COMPLAINT ASSERTING A
         VIOLATION OF  SECTION 48(a) OF THE ICA FAILS TO
         STATE A CLAIM. ............................................................................. 61

V.       COUNT V OF THE COMPLAINT ASSERTING A
         VIOLATION OF  SECTIONS 206 AND 215 OF THE
         ADVISERS ACT FAILS TO  STATE A CLAIM. ............................ 61

         A. Section 215 is Inapplicable Because Plaintiffs Have Not Alleged
            that the Advisory Contract is Unlawful................................. 62

         B. Plaintiffs Have Failed to Properly Plead Demand Futility............... 63

         C. Plaintiffs May Not Pursue Derivative Actions on Behalf of
            Funds in Which They Do Not Own Shares. ........................................ 63

VI.      COUNT VI OF THE COMPLAINT HAS BEEN
         WITHDRAWN. ................................................................................. 64

**VII.    COUNT VII OF THE COMPLAINT ALLEGING A BREACH OF FIDUCIARY DUTY AGAINST THE INVESTMENT ADVISER DEFENDANTS FAILS TO STATE A CLAIM.............. 64**

**VIII.   COUNT VIII OF THE COMPLAINT ALLEGING BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS FAILS TO STATE A CLAIM.................................. 65**

**IX.     COUNT IX OF THE COMPLAINT ALLEGING AIDING AND  ABETTING A BREACH OF FIDUCIARY DUTY FAILS TO STATE  A CLAIM. ........................................................... 65**

**X.      COUNT X OF THE COMPLAINT ALLEGING UNJUST ENRICHMENT FAILS TO STATE A CLAIM. ............................... 67**

**CONCLUSION ................................................................................... 68**

# TABLE OF AUTHORITIES

## CASES

ABF Capital Mgmt. v. Askin Capital Mgmt., 957 F. Supp. 1308 (S.D.N.Y. 1997) .......................................................................................... 64

Alexander v. Sandoval, 532 U.S. 275 (2001) .................................. *passim*

American Tel. & Tel. Co. v. M/V Cape Fear, 967 F.2d 864 (3d Cir. 1992) .......... 38

Bancroft Convertible Fund, Inc. v. Zico Investment Holdings, Inc., 825 F.2d 731 (3d Cir. 1987)........................................................... *passim*

Basic, Inc. v. Levinson, 485 U.S. 224 (1988) ...................................... 25

Benak v. Alliance Capital Mgmt. L.P., 2004 WL 1459249 (D.N.J. Feb. 9, 2004) ................................................................................ 49, 52

Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975)..................... *passim*

Blum v. Yaretsky, 457 U.S. 991 (1982)............................................. 4, 44

Bonano v. East Caribbean Airline Corp., 365 F.3d 81 (1st Cir. 2004)................... 30

Brouk v. Managed Funds, Inc., 286 F.2d 901 (8th Cir.), cert. granted, 366 U.S. 958 (1961) judgment vacated for mootness, 369 U.S. 424 (1962) ...... 43

Central Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164 (1994) ........................................................................ *passim*

Ciresi v. Citicorp, 782 F. Supp. 819 (S.D.N.Y. 1991)............................... 14

Cogan v. Johnston, 162 F. Supp. 907 (S.D.N.Y. 1958)............................... 43

Cohen v. Fund Asset Mgmt., 1981-1982 CCH Dec. ¶ 98,433, 1980 WL 1988 (S.D.N.Y. March 31, 1980) ............................................... 51

Correctional Servs. Corp. v. Malesko, 534 U.S. 61 (2001)....................... 38

Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 03-47996.................. 30

Deutschman v. Beneficial Corp., 761 F. Supp. 1080 (D. Del. 1991) ................ 31

Dorchester Investors v. Peak Intern. Ltd., 134 F. Supp. 2d 569 (S.D.N.Y. 2001) ................................................................................ 34

Finkel v. Stratton Corp., 962 F.2d 169 (2d Cir. 1992)............................. 35

Fogel v. Chestnutt, 533 F.2d 731 (2d Cir. 1975) .................................. 50

Fogel v. Chestnutt, 668 F.2d 100 (2d Cir. 1981) .................................. 43

GAF Corp. v. Heyman, 724 F.2d 727 (2d Cir. 1983) ............................... 14

GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189 (3d Cir. 2001)............... 5, 60

Gonzaga University v. Doe, 536 U.S. 273 (2002)................................... 40

Grandon v. Merrill Lynch & Co., 147 F.3d 184 (2d Cir. 1998) .................... 15

Green v. Fund Asset Management, L.P., 147 F. Supp. 2d 318 (D.N.J. 2001), aff'd, 286 F.3d 682 (3d Cir. 2002) .......................................... 58

Green v. Fund Asset Management, L.P., 19 F. Supp. 2d 227 (D.N.J. 1998) ......... 33

Green v. Fund Asset Management, L.P., 286 F.3d 682 (3d Cir. 2002)................ 47

iv

Green v. Nuveen Advisory Corp., 186 F.R.D. 486 (N.D. Ill. 1999)................. 35, 48

Green v. Nuveen Advisory Corp., 295 F.3d 738 (7th Cir. 2002) ...................... 51, 56

Halligan v. Standard & Poor's Intercapital, Inc., 434 F. Supp. 1082
    (E.D.N.Y. 1977)............................................................................... 51

Hardy v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 189 F. Supp. 2d 14
    (S.D.N.Y. 2001)................................................................................ 31

Herman v. Steadman, 50 F.R.D. 488 (S.D.N.Y. 1970)............................................ 24

Horn v. Thoratec Corp., 376 F.3d 163 (3d Cir. 2004) ............................................ 30

IJG Invs., L.P. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 03-7458 .............. 30

In re Advanta Corp. Sec. Litig., 180 F.3d 525 (3d Cir. 1999)................................ 45

In re Alger, Columbia, Janus, MFS, One Group, and Putnam Mut. Fund
    Litig., 320 F. Supp. 2d 352 (D. Md. 2004)............................................... 27, 31

In re Carl L. Shipley, 45 SEC Docket 589, 590-93, 1974 WL 161761 (1974) ...... 40

In re Ionosphere Clubs, Inc., 17 F.3d 600 (2d Cir. 1994)................................. 23, 24

In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527 (D. Del. 1994)...... 27, 44

In re Merrill Lynch & Co., Inc. Research Reports, 272 F. Supp. 2d 243
    (S.D.N.Y. 2003)........................................................................... 34, 35

In re New Times Sec. Servs., Inc., 371 F.3d 68 (2d Cir. 2004).............................. 30

In re Nuveen Fund Litig., 1996 WL 328006 (N.D. Ill. June 11, 1996)...... 35, 48, 56

In re TCW/DW N. Am. Gov't Income Trust Sec. Litig., 941 F. Supp. 326
    (S.D.N.Y. 1996)............................................................................. 48

In re Worldcom, Inc. Sec. Litig., 336 F. Supp. 2d 310 (S.D.N.Y. 2004)........... 6, 25

Johnston v. HBO Film Mgmt'., Inc., 265 F.3d 178 (3d Cir. 2001)......................... 63

Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030 (2d Cir. 1992)....... 57, 59

Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727 (3d Cir. 1970)............ 23, 33, 57, 60

Kramer v. Western Pacific Industries, Inc., 546 A.2d 348 (Del. 1988) ................. 22

Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140 (3d Cir. 2002),
    cert. denied, 537 U.S. 113, 123 S. Ct. 928 (2003).................................. passim

Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472 (S.D.N.Y. 1988), aff'd,
    875 F.2d 404 (2d Cir. 1989) ................................................................. 20

Malpiede v. Townson, 780 A.2d 1075 (Del. 2000) ................................................ 63

Manzo v. Rite Aid Corp, No. Civ. A. 18451- NC, 2002 WL 319 26606 (Del.
    Ch. Dec. 19 2002), aff'd, 825 A.2d 239 (Del. Sup. 2003) .......................... 24

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353
    (1982)........................................................................................ 38

Metro Communication v. Advanced Mobilecomm Techs., Inc., 854 A.2d
    121 (Del. Ch. 2004) ...................................................................... 25

Meyer v. Oppenheimer Mgmt. Corp., 764 F.2d 76 (2d Cir. 1985) ........................ 48

Meyer v. Oppenheimer Mgmt. Corp., 895 F.2d 861 (2d Cir. 1990) ...................... 48

Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321 (4th Cir. 2001) ........ passim

Mills v. Elec. Auto-Lite Co., 396 U.S. 375 (1970)................................................. 60

Monheit v. Carter, 376 F. Supp. 334 (S.D.N.Y. 1974)........................................ 37

Marquit v. Williams, 2000 WL 1529918 (2d. Cir. Oct. 13, 2000)........................ 37

Munford v. Valuation Research Corp., 98 F.3d 604 (11th Cir. 1996)................... 62

Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 283 (1993)...... 29

O'Gilvie v. United States, 519 U.S. 79 (1997)..................................................... 46

Olesh v. Dreyfus Corp., 1995 WL 500491 at 7 ................................................... 35

Olmstead v. Pruco Life Ins. Co. of New Jersey, 283 F.3d 429
      (2d Cir. 2002).......................................................................... *passim*

Oran v. Stafford, 226 F.3d 275 (3rd Cir. 2000) ..................................................... 7

PBGC Guar. Corp v. White Consolidated Industries, 998 F.2d 1192 (3rd
      Cir. 1993)................................................................................................... 7

Pegasus Fund, Inc. v. Laraneta, 617 F.2d 1335 (9th Cir. 1980) ........................... 34

Pfeiffer v. Bjurman Barry & Assocs., 2004 WL 1903075 (S.D.N.Y. August
      26, 2004) ................................................................................... 47, 51, 54

Pierce v. Underwood, 487 U.S. 552 (1988) .......................................................... 46

Prof'l Mgmt. Assocs. v. KPMG LLP, 335 F.3d 800 (8th Cir. 2003), cert.
      denied, 124 S. Ct. 1176 (2004) ................................................................ 31

Reeves v. Continental Equities Corp. of America, 912 F.2d 37 (2d Cir.
      1990) ......................................................................................................... 46

Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334 (11th
      Cir. 2002) .................................................................................................. 31

Rogers v. Cisco Sys. Inc., 268 F. Supp. 2d 1305 (N.D. Fla. 2003) ....................... 25

Rohrbaugh v. Inv. Co. Inst., Fed. Sec. L. Rep. ¶ 91,961, 2002 WL 31100821
      (D.D.C. July 2, 2002)........................................................................ 47, 48

Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004)........................................ 16, 52

Russello v. United States, 464 U.S. 16 (1983)...................................................... 42

SEC v. Zanford, 535 U.S. 813 (2002)................................................................... 28

Santa Fe Indus. v. Green, 430 U.S. 462 (1977) ................................................... 14

Shapiro v. UJB Financial Corp., 964 F.2d 272 (3d Cir. 1992) .................... 3, 16, 52

South Dakota v. Yankton Sioux Tribe, 522 U.S. 329 (1998).............................. 46

Stolz Family Partnership v. Smart World Techs., 355 F.3d 92 (2d Cir. 2004) ...... 30

Strougo v. Bassini, 112 F. Supp. 2d 355 (S.D.N.Y. 2000) ................................... 57

Strougo v. Bassini, 282 F.3d 162 (2d Cir. 2002) ................................................. 22

Tafflin v. Levitt, 608 A.2d 817 (Md. App. 1992)................................................ 25

Tannenbaum v. Zeller, 552 F.2d 402 (2d Cir. 1977) ........................................... 12

Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) ........................................ 27

Three Rivers Center for Independent Living, Inv. v. Housing Authority of
      the City of Pittsburgh, 382 F.3d 412 (3d Cir. 2004)........................... passim

Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031 (Del. 2004)........... 24

vi

Touche Ross & Co. v. Redington, 442 U.S. 560 (1979)........................................ 42

Transamerica Mort. Advisors, Inc. v. Lewis, 444 U.S. 11 (1979)................... 41, 58

United Mine Workers of America v. Gibbs, 383 U.S. 715 (1966)........................ 60

United States v. McClure, 305 U.S. 472 (1939) .................................................. 42

United States v. NASD, 422 U.S. 694 (1975) ...................................................... 55

Upton v. SEC, 75 F.3d 92 (2d Cir. 1996) ............................................................ 22

Veazey v. Doremus, 510 A.2d 1187 (N.J. 1986).................................................. 63

Waller v. Waller, 49 A.2d 449 (Md. 1946)........................................................... 23

White v. Heartland High-Yield Mun. Bond Fund, 237 F. Supp. 2d 982 (E.D.
  Wis. 2002)....................................................................................................... 34

White v. Melton, 757 F. Supp. 267 (S.D.N.Y. 1991) ............................................ 7

Winne v. The Equitable Life Assurance Society of the United States, 315 F.
  Supp. 2d 404 (S.D.N.Y. 2003)....................................................................... 29

Yadlosky v. Grant Thornton, 197 F.R.D. 292 (E.D. Mich. 2000)........................ 63

Yamplosky v. Morgan Stanley Inv. Advisers, Inc., 2004 WL 1065533
  (S.D.N.Y. May 12, 2004)................................................................................ 52

Zerman v. Jacobs, 510 F. Supp. 132 (S.D.N.Y. 1981), aff'd, 672 F.2d 901
  (2d Cir. 1981) ................................................................................................. 60

## STATUTES

15 U.S.C. § 77(p)(b)......................................................................................... 4, 26

15 U.S.C. § 77r(b)(2) ........................................................................................... 26

15 U.S.C. § 78bb(e)(1)......................................................................................... 17

15 U.S.C. § 80a-22(b)(1)...................................................................................... 55

15 U.S.C. §§ 80a-2(a)(19), 80a-10(a) ................................................................... 9

15 U.S.C. § 80a-35(b)(4).............................................................................. 5, 32, 47

28 U.S.C. § 1367(c)............................................................................................... 60

17 C.F.R. § 270.12b-1 ........................................................................................... 18

Investment Company Amendments Act of 1970, Pub. L. No. 91-547, 84
  Stat. 1413, 1413-36 (1970)............................................................................. 52

Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109
  U.S.L.W. 737 (1995), 15 U.S.C. § 78u-4(b)(1), (2) ......................................... 1

Securities Litigation Uniform Standards Act ("SLUSA"), Pub. L. No. 105-
  353, 112 Stat. 3227 (1998)..................................................................... passim

## OTHER MATERIALS

Fed. R. Civ P. 8(a) ..................................................................... 1, 3, 15

Fed. R. Civ P. 9(b) .......................................................................... 1

Fed. R. Civ P. 12(b)(6) ................................................................... 1

Fed. R. Civ P. 23.1 ...................................................................... 1, 6

Bearing of Distribution Expenses by Mutual Funds, Investment Company
Act Release No. 11414, 45 Fed. Reg. 73898 (November 7, 1980) .............. 50

Brokerage and Research Services, Release No. 34-23170, 51 Fed. Reg.
16004 (Apr. 30, 1986)................................................................... 17

Confirmation Requirements and Points of Sale Disclosure Requirements for
Transactions in Certain Mutual Funds and Other Securities, and Other
Confirmation Requirement Amendments, and Amendments to the
Registration Form for Mutual Funds, Release No. 8358, 69 Fed. Reg.
6438-01 (Jan. 29, 2004) 2004 WL 184973.................................................. 11

Division of Investment Management, SEC, Report on Mutual Fund Fees and
Expenses, Dec. 2000, available at
**http://www.sec.gov/news/studies/feestudy.htm#P1137_160078**.  .......... 21

Hearing on H.R. 2420 Before the House Subcomm. on Capital Markets, Ins.
And Gov't Sponsored Markets, 108th Cong. (June 18, 2003) ...................... 11

House Comm. On Interstate & Foreign Commerce, Investment Company
Amendments Act of 1970, H.R. Rep. No. 91-1382 (1970).......................... 44

Interpretive Release Concerning The Scope of Section 28(e), Release No.
34-23170, 51 Fed. Reg. 16004, 35 SEC Docket 703 (Apr. 30, 1986). ........ 14

Louis Loss & Seligman, Fundamentals of Securities Regulation (5th ed,
2004) (Sections 215 and 2a(b))...................................................... 60

Order Approving Proposed Rule Change and Related Interpretation under
Section 36 of the NASD, Release Nos. 17599, 11662, 46 Fed. Reg.
16012 (Mar. 10, 1981).................................................................. 13

Payment of Asset-Based Sales Loads by Registered Open-End Management
Investment Companies, Inv. Co. Act Release No. 16431, 53 Fed. Reg.
23258, 1988 WL 1000015 (June 13, 1988)................................................ 21

Prohibition on the Use of Brokerage Commissions to Finance Distribution,
69 Fed. Reg. 54728 (Sept. 9, 2004) (Final Rule)......................................... 13

Prohibition on the Use of Brokerage Commissions to Finance Distribution,
Inv. Co. Act, Release No. 26356, 69 Fed. Reg. 9726 (Mar. 1, 2004)
(Proposed Rule) ........................................................................ 10

Proposed Rule Change and Related Interpretation under Section 36 of the
NASD, Release Nos. 17599, 11662, 46 Fed. Reg. 16012 (Mar. 10,
1981) .................................................................................... 13

Proposed Rule Change by NASD Relating to the Limitation of Asset-Based
    Sales Charges as Imposed by Investment Companies, SEC Release
    No. 29070, 56 Fed. Reg. 16137 (April 19, 1991)......................................... 54
Registration Form Used By Open-End Management Inv. Co., Release No.
    IC-23064, 63 Fed. Reg. 13916-01, 1998 WL 107729 (Mar. 13, 1998) ....... 13
S. Rep. No. 91-184, at 36 (1970), <u>reprinted in</u> 1970 U.S.C.C.A.N. 4931 ........ 44, 55
Securities; Brokerage and Research Services, Release No. 34-23170, 51
    Fed. Reg. 16004 (Apr. 30, 1986) ........................................................... 17

The Defendants identified in the accompanying Notice of Motion submit this Memorandum in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Complaint" or "Compl.") pursuant to Fed. R. Civ. P. 8(a), 9(b), 12(b)(6), 23.1, and L. Civ. R. 7.1.

## PRELIMINARY STATEMENT

This is one of numerous virtually identical cases filed by plaintiffs' counsel against various mutual fund complexes.

Plaintiffs claim to be "holders" of shares in seven Lord Abbett mutual funds. Compl. ¶¶ 14-19, 136.   They allege that during a purported "class period," extending from February 6, 1999 to December 8, 2003, the two corporate defendants (the adviser and distributor of the mutual funds) wrongfully made "revenue sharing" payments *out of their own assets*, paid commissions on fund portfolio transactions that were "excessive," and received 12b-1 distribution fees from the funds that were "improper."   All of this conduct was allegedly part of a scheme to "pay brokers" to "push Lord Abbett Funds on … investors in order to increase the level of investments in Lord Abbett Funds." Compl. ¶¶ 2.  Plaintiffs purport to state claims against defendants for making such supposed payments and for failing to disclose that they did so.

Based on this alleged conduct, plaintiffs allege ten "counts."  Nine counts

purportedly assert direct (personal) causes of action held by individual shareholders. One count expressly alleges a shareholder derivative claim on behalf of the funds. Eschewing the well-established private right of action under Section 10(b) and Rule 10b-5, which is subject to the rigorous requirements of the Private Securities Litigation Reform Act of 1995,[1] plaintiffs instead allege an implied private right of action under Section 34(b) of the Investment Company Act of 1940 ("ICA") (Count I); an implied private right of action under Section 36(a) of the ICA (Count II); a claim under Section 36(b) of the ICA for excessive fees (Count III); an implied secondary "control" person claim under Section 48(a) of the ICA (Count IV); and a shareholder derivative claim seeking rescission of the funds' investment advisory contract under Sections 206 and 215 of the Investment Advisers Act of 1940 ("Advisers Act") (Count V). The remaining five counts are direct, state law "holders" claims (i.e., claims that plaintiffs were improperly induced to **hold** – rather than to **purchase or sell** – fund shares) (Counts VI-X).

## SUMMARY OF ARGUMENT

The Complaint suffers from four overarching and pervasive defects that compel dismissal with prejudice.

First, the Complaint fails to state a claim because it consists either of pejorative characterizations of clearly permissible conduct or wholly conclusory

---

[1]    Pub. L. No. 104-67, 109 U.S.L.W. 737 (1995), 15 U.S.C. § 78u-4(b)(1), (2).

allegations of improper conduct unsupported by any pleaded facts. For example, the SEC has authorized "revenue sharing," the practice of a fund adviser or distributor using its own assets to promote the sale of fund shares. Similarly, the SEC has authorized mutual funds to pay Rule 12b-1 distribution fees, subject to the approval of their independent trustees. The utterly conclusory allegation that defendants caused the funds to pay "excessive" commissions fails to meet even the liberal notice pleading requirements of Fed. R. Civ. P. 8. See, e.g., Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140, 143 (3d Cir. 2002), cert. denied, 537 U.S. 113, 123 S. Ct. 928 (2003). Plaintiffs' "excessive" commissions allegation in any event sounds in fraud and is therefore subject to the strict pleading requirements of Fed. R. Civ. P. 9(b). See, e.g., Shapiro v. UJB Financial Corp., 964 F.2d 272, 287-88 (3d Cir. 1992).

Second, the only injuries plaintiffs identify are injuries to the funds: the supposed "skimming" *of assets of the funds* or *charging to the funds* of "excessive" commissions. It cannot be disputed that any claim to redress injuries to the funds belongs to the funds in the first instance and may only be brought by individual shareholders in a derivative action. Such claims may not be brought directly by the plaintiffs either individually or as class representatives and, therefore, all plaintiffs' non-derivative claims must be dismissed.

3

Third, to the extent that plaintiffs seek to assert direct claims under state law for injuries to themselves personally and individually, the Securities Litigation Uniform Standards Act ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227 (1998), preempts plaintiffs' state law claims. See 15 U.S.C. § 77(p)(b); id. § 78bb(f)(1).

Fourth, although plaintiffs claim to be shareholders in only seven Lord Abbett mutual funds, they seek to sue on behalf of a class of shareholders in dozens of additional mutual funds.   Whether as individuals or as class representatives, however, the named plaintiffs have no standing to assert (and this Court lacks subject matter jurisdiction to entertain) claims on behalf of shareholders of funds in which they do not own shares.   See, e.g., Blum v. Yaretsky, 457 U.S. 991 (1982).

In addition to these overarching and pervasive defects, each of the ten counts of the Complaint suffers from additional specific deficiencies that compel dismissal of plaintiffs' claims.

Plaintiffs' claims under Sections 34(b), 36(a), and 48(a) of the ICA (Counts I, II, and IV of the Complaint) fail because there are no implied private rights of action under these provisions of the federal securities laws. See, e.g., Alexander v. Sandoval, 532 U.S. 275 (2001).   Even assuming *arguendo* that there were such implied private rights of action, "holders" of mutual fund shares would not be

entitled to assert them. <u>See</u> <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723 (1975).

Plaintiffs' claim under Section 36(b) of the ICA (Count III of the Complaint) also fails. In Section 36(b), Congress created a narrow remedy aimed specifically at curbing excessive *advisory fees.* Plaintiffs do not so much as mention the amount of advisory fees paid by any of the Lord Abbett mutual funds listed in the Complaint. Plaintiffs instead complain about allegedly excessive *commissions and Rule 12b-1 distribution fees* that are outside the scope of the statute. <u>See</u> 15 U.S.C. § 80a-35(b)(4). Equally contrary to the express terms of the statute, plaintiffs seek to recover allegedly excessive brokerage commissions *from persons other than the recipients of such compensation.* <u>See</u> 15 U.S.C. § 80a-35(b)(3). In addition, plaintiffs fail to offer any non-conclusory allegations that any fees or commissions were excessive as is required to state a claim under Section 36(b).

Plaintiffs' shareholder derivative claim seeking to rescind the advisory contracts of 52 Lord Abbett mutual funds under Section 215 of the Advisers Act (Count V of the Complaint) is similarly defective. This claim must be dismissed because Section 215 does not apply absent an allegation (which the Complaint lacks) that the advisory contract itself contained unlawful provisions. <u>See</u> <u>GFL Advantage Fund, Ltd. v. Colkitt</u>, 272 F.3d 189, 200-202 (3d Cir. 2001). Furthermore, plaintiffs have failed to demonstrate that it would be futile to make

demand on the funds' board of trustees as required by applicable Maryland and Delaware substantive law and Fed. R. Civ. P. 23.1.

Finally, each of plaintiffs' state law claims (Counts VI-X of the Complaint) suffers from numerous fatal deficiencies. Most significantly, plaintiffs' state law "holders" claims require allegations of individual reliance and non-conclusory allegations of damages. The Complaint lacks any such allegations, and plaintiffs could not maintain a class action were they to include them. <u>See, e.g.</u>, <u>In re Worldcom, Inc. Sec. Litig.</u>, 336 F. Supp. 2d 310, 322 (S.D.N.Y. 2004).

In short, although plaintiffs had months to shore up their hastily drafted initial complaints, their final attempt to state viable claims against these defendants has failed. Accordingly, for these reasons and for the additional reasons set forth in the Independent Directors' Memorandum of Law, the Complaint in its entirety must be dismissed with prejudice.

## THE PARTIES

### 1.   The Named Plaintiffs and the Putative Class

The Complaint[2] alleges that the six named plaintiffs held shares in seven Lord Abbett funds at some unspecified point during the period February 6, 1999, to December 8, 2003 (the purported "Class Period"). Compl. ¶¶ 1, 14-19.

---

[2]   In addition to the facts alleged in the Complaint, this Memorandum refers to the prospectuses and Statements of Additional Information ("SAIs") for the funds at issue. SAIs are mandatory mutual fund disclosure documents containing

6

Plaintiffs purport to bring their claims on behalf of themselves and a putative nationwide class of all persons or entities who held one or more shares of more than 50 different Lord Abbett funds during the Class Period. Id. at ¶¶ 1, 136.

### 2.    The Defendants

#### *The Lord Abbett Funds*

Although the named plaintiffs allegedly invested in only seven Lord Abbett mutual funds, they have named 52 different Funds as nominal defendants (collectively referred to herein as "the Funds") and purport to sue on behalf of

---

performance, cost, and other information.    The SEC permits registrants to incorporate the SAI into the prospectus by reference, and the SAI is then deemed to be part of the prospectus as a matter of law. See White v. Melton, 757 F. Supp. 267, 269 (S.D.N.Y. 1991). The prospectuses and SAIs are properly taken into account in a Rule 12(b)(6) motion. See Oran v. Stafford, 226 F.3d 275 (3rd Cir. 2000); Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192 (3rd Cir. 1993). The SEC's Form N-1A (a copy of which is attached as Ex. 30 to the Certification of Christopher A. Barbarisi, dated November 16, 2004 and filed herewith ("Barbarisi Certification" or "Barbarisi Cert.")) sets forth the requirements for mutual fund prospectuses and SAIs.

The named plaintiffs have only made allegations concerning certain prospectuses and SAIs relating to the funds in which they allegedly invested. Accordingly, defendants will likewise limit their discussion to those specific disclosure documents. Copies of certain 2003 and 2004 prospectuses and SAIs of the Lord Abbett Mid-Cap Value Fund, Lord Abbett Affiliated Fund, Lord Abbett Growth Opportunities Fund, Lord Abbett All Value Fund, Lord Abbett America's Value Fund, Lord Abbett Bond-Debenture Fund, and Lord Abbett California Tax-Free Fund, respectively, are attached as Exhibits 1 to 26 to the Barbarisi Certification. One or more plaintiffs allegedly own (or owned) shares in each of these funds.

7

shareholders in all 52 Funds. The Funds are organized under the laws of the State of Delaware and Maryland.[3]

### Lord, Abbett & Co. LLC

Lord, Abbett & Co. LLC ("Lord Abbett"), referred to in the Complaint as the "Investment Advisor Defendant," is a privately held Delaware limited liability company and a registered investment adviser. Id. at ¶ 20. Lord Abbett serves as investment adviser to the Funds. Id. at ¶¶ 20, 81.

### The Partner Defendants

Plaintiffs have also named as defendants forty-five individuals as partners of Lord Abbett (the "Partner Defendants"). Id. at ¶¶ 21-67.

### The Director Defendants

Plaintiffs have named as defendants seven of the current[4] and two former[5] directors of the Funds (the "Director Defendants"). Id. at ¶¶ 67-75. As of the date

---

[3]   Five of the seven Funds in which plaintiffs allegedly own(ed) shares – the Lord Abbett Mid-Cap Value Fund, the Lord Abbett Affiliated Fund, the Lord Abbett Growth Opportunities Fund, the Lord Abbett Bond-Debenture Fund, and the Lord Abbett California Tax-Free Fund – are Maryland corporations or series thereof. The remaining two Funds -- the Lord Abbett All Value Fund and the Lord Abbett America's Value Fund -- are organized as series of Delaware business trusts. The Maryland corporations are overseen by a board of directors and the Delaware business trusts by a board of trustees. For purposes of this memorandum, however, we will refer to both as directors.

[4]   The current directors named in the Complaint are Robert S. Dow, E. Thayer Bigelow, William H.T. Bush, Robert B. Calhoun, Jr., Franklin W. Hobbs, C. Alan MacDonald, and Thomas J. Neff. Compl. ¶¶ 67-70, 72-74.

of filing of the initial complaint in this case, the seven Funds in which the named plaintiffs allegedly own shares each had a board of directors consisting of eight directors.  As stated in the relevant Fund disclosure documents, seven of these eight directors were not employees or otherwise affiliated with Lord Abbett and are "non-interested" directors, see 15 U.S.C. §§ 80a-2(a)(19), 80a-10(a).[6]

For their service as directors during the Class Period, the non-interested Director Defendants are alleged to have received annual compensation ranging from $70,500 to $86,400.  Id. at ¶¶ 68-75.

### Lord Abbett Distributor, LLC

Lord Abbett Distributor, LLC ("Lord Abbett Distributor") is the principal underwriter and distributor of the Funds.  Id. at ¶ 77.  Lord Abbett Distributor is a registered broker-dealer that marketed and sold the Funds and provided information regarding the portfolio management services of Lord Abbett.  Id.  Lord Abbett Distributor was also responsible for implementing the Rule 12b-1 distribution plan between Lord Abbett Distributor and the Funds.  Id.

---

[5]    The former Fund directors named in the Complaint are Stewart S. Dixon and James F. Orr III.  Compl.  ¶¶ 71, 75.  Julie A. Hill was elected as director in February 2004.  See, e.g., Affiliated Fund SAI Dated March 1, 2004 at 11 (Barbarisi Cert. Ex. 10 at 11).

[6]    See, e.g., Affiliated Fund SAI Dated March 1, 2003 at 10-11 (Barbarisi Decl. Cert. Ex. 8 at 10-11).  The sole "interested" director is Robert Dow, who is an officer of Lord Abbett.

## ARGUMENT

## PART I: PERVASIVE DEFECTS OF THE COMPLAINT

The Complaint suffers from four overarching and pervasive defects that compel dismissal with prejudice.

## I.  PLAINTIFFS COMPLAIN OF PERMISSIBLE AND LEGAL INVESTMENT COMPANY PRACTICES THAT THEY SIMPLY CHARACTERIZE IN PEJORATIVE TERMS.

### A.  "Revenue Sharing" Payments Were Permissible and Disclosed.

At its core, the Complaint challenges what the SEC has referred to as "revenue sharing," the practice of making payments *from the assets of the investment adviser or distributor* to encourage distribution of fund shares by brokers. The Complaint contends that these payments were improper and that defendants failed to disclose such payments. Compl. ¶¶ 128-29. Plaintiffs employ inflammatory language to suggest that revenue sharing is sinister and secret, calling it "undisclosed payments to brokers to induce them to direct investors into Lord Abbett Funds," id. at ¶ 2, and "veiled payments," id. at ¶ 84. However, revenue sharing payments are unquestionably legal. See, e.g., Prohibition on the Use of Brokerage Commissions to Finance Distribution, Inv. Co. Act, Release No. 26356, 69 Fed. Reg. 9726, 9730 (Mar. 1, 2004) (Proposed Rule) (noting that conflicts of interest posed by revenue sharing are relatively minor, and that, even going forward, the SEC will likely continue to permit revenue sharing).

10

Additionally, there is ***no obligation under current SEC regulations*** for an investment company or its adviser to disclose the existence or extent of revenue sharing payments in a fund's prospectus or SAI. See, e.g., Hearing on H.R. 2420 Before the House Subcomm. on Capital Markets, Ins. and Gov't Sponsored Markets, 108th Cong. (June 18, 2003) (Statement of Paul F. Roye, Dir. Div. of Inv. Management, SEC (hereinafter "Roye Testimony") (a copy of which is attached to the Barbarisi Cert. as Ex. 27) (***"'Revenue sharing' payments are not a fund expense because they are made from the adviser's own resources, rather than fund assets.  As a result, mutual funds are not required to disclose these payments…"***). (Emphasis added.)

To the extent any disclosure obligations exist, they lie with the individual brokerage firm when selling shares to its customers.   See, e.g., SEC Rule 10b-10 (imposing certain disclosure obligations specifically on brokers when selling securities); Barbarisi Cert., Ex. 27, p.7 (Roye Testimony)("The Commission has recognized, however, ***that fund prospectuses are not designed to make the particular disclosures that broker-dealers must provide to their customers about their receipt of revenue sharing payments….***")[7] (Emphasis added.)

---

[7]      Indeed, even the SEC's recent proposal to amend Form N-1A to require for the first time prospectus disclosure of revenue sharing would only call for "brief disclosure … in order to direct investors to the disclosure regarding revenue sharing [to be made by brokers]."  Confirmation Requirements and Points of Sale Disclosure Requirements for Transactions in Certain Mutual Funds and Other

11

In any event, plaintiffs acknowledge that each of the Funds in which the named plaintiffs allegedly held shares disclosed the possibility of revenue sharing payments by defendants. See Compl. ¶ 128.

Accordingly, all of plaintiffs' allegations relating to revenue sharing -- whether the practice or the disclosure of that practice -- fail to state a claim.[8]

### B. The Complaint's Allegations Regarding "Excessive" Commissions Fail to State a Claim.

The Complaint repeatedly asserts in conclusory fashion that defendants caused the Funds to pay "excessive" brokerage commissions on fund portfolio transactions in order to induce brokers to "steer investors into Lord Abbett mutual funds." See, e.g., Compl. ¶¶ 1, 3, 4, 5, 12, 98, 103, 104, 107, 110, 112, 117.

The ability to select brokers to execute portfolio transactions and thereby pay commissions to certain brokers is an asset of the mutual fund. Use of this authority is entrusted to the informed discretion of the fund's independent trustees, who in turn delegate the day-to-day selection process to the fund's investment adviser. See, e.g., Tannenbaum v. Zeller, 552 F.2d 402, 417-18 (2d Cir. 1977). To the extent the Complaint alleges that the directors authorized the various funds'

---

Securities, and Other Confirmation Requirement Amendments, and Amendments to the Registration Form for Mutual Funds, Release No. 8358, 69 Fed. Reg. 6438-01 (Feb. 10 2004) 2004 WL 234308.

[8] Even assuming *arguendo* that the revenue sharing payments made by defendants were improper in some respect, plaintiffs as purported "holders" of fund shares could not have been injured by such payments and manifestly lack standing to sue concerning them.

investment advisers to consider sales of fund shares by a broker-dealer as a factor in the selection of broker-dealers to execute fund portfolio transactions, it manifestly fails to allege any improper conduct. Although the SEC has recently approved prospective changes to its regulations in this area,[9] the rule applicable during the "Class Period" expressly permitted this practice: "*it is not inappropriate for investment companies to seek to promote the sale of their shares through the placement of brokerage without the incurring of any additional expense.*" Order Approving Proposed Rule Change and Related Interpretation under Section 36 of the NASD, Release Nos. 17599, 11662, 46 Fed. Reg. 16012 (Mar. 10, 1981). (Emphasis added). See also NASD Conduct Rule 2830(k). Indeed, the SEC concluded in 1998 that the practice of allocating brokerage transactions based on the sale of fund shares was so routine in the investment company industry that its existence was "only of minimal importance to typical fund investors" and did not have to be disclosed in a fund's prospectus, but only in its SAI. See Registration Form Used By Open-End Management Inv. Co., Release No. IC-23064, Fed. Reg. 13916-01, 1998 WL 107729 at *25 (Mar. 13, 1998). Each of the SAIs of the relevant funds contains the required disclosures,[10] and plaintiffs do not allege otherwise.

---

[9]    See Prohibition on the Use of Brokerage Commissions to Finance Distribution, 69 Fed. Reg. 54728 (Sept. 9, 2004) (Final Rule).

[10]    For example, the 2003 SAI for the Affiliated Fund states as follows:

13

To the extent the Complaint alleges that a Fund's investment adviser may at times have paid more than the lowest available commission to execute a portfolio transaction, plaintiffs have also failed to state a claim. An investment adviser's obligation to seek "best execution" of a mutual fund's portfolio transactions is not simply a matter of selecting the brokerage firm that charges the least. Instead, an investment adviser must exercise its business judgment in considering the full range and quality of a broker's services in placing brokerage including, among other things, execution capability, commission rate, price, financial responsibility, and responsiveness to the adviser.[11] The Funds' brokerage allocation policies as reflected in their respective disclosure documents are fully consistent with the

> When, in the opinion of Lord Abbett, two or more broker-dealers (either directly or through their correspondent clearing agents) are in a position to obtain the best price and execution, *preference may be given to brokers who have sold shares of the Fund and/or shares of other Lord Abbett-sponsored funds, or who have provided investment research, statistical, or other related services to the Fund.*

Affiliated Fund SAI Dated March 1, 2003 at 19 (Barbarisi Cert. Ex. 8 at 18) (emphasis added).

[11]  See Interpretive Release Concerning the Scope of Section 28(e), Release No. 34-23170, 51 Fed. Reg. 16004, 35 SEC Docket 703, at 707-09 (Apr. 30, 1986). Plaintiffs obviously cannot sue based on their disagreement with these business judgments. Nor may plaintiffs sue on the basis of allegations that defendants failed to disclose any supposed breaches of fiduciary duty arising out of these business judgments. See, e.g., Santa Fe Indus. v. Green, 430 U.S. 462, 476 (1977); GAF Corp. v. Heyman, 724 F.2d 727, 740 (2d Cir. 1983) (the securities laws "simply do not require management to accuse itself of antisocial or illegal policies"); Ciresi v. Citicorp, 782 F. Supp. 819, 823 (S.D.N.Y. 1991) ("the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing").

14

SEC's guidelines regarding best execution, and the Funds' disclosures comply with Form N-1A. See, e.g., Affiliated Fund SAI Dated March 1, 2003 at 18-19 (Barbarisi Cert. Ex. 8 at 18-19) (emphasis added). Again, plaintiffs do not allege otherwise.

Finally, to the extent that plaintiffs claim that defendants defrauded the Funds by intentionally disregarding the Funds' policies requiring best execution and knowingly paying inflated commission rates in exchange for brokers' promises to "push" Fund shares, their claims are baseless and their pleading efforts are woefully insufficient. The Complaint's allegations of "excessive" commissions do not identify a single allegedly improper brokerage transaction. Such allegations are inadequate even under the liberal pleading standards of Fed. R. Civ. P. 8. See, e.g., Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140, 143 (3d Cir. 2002), cert. denied, 537 U.S. 113, 123 S. Ct. 928 (2003) (general characterization of fees as "excessive" without pleading any supporting facts was insufficient under Rule 8); Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 327 (4th Cir. 2001) (same). A fortiori, merely alleging that defendants caused the Funds to pay "excessive" commissions fails to state a claim under the heightened pleading standards that apply to a claim that unquestionably sounds in fraud.[12] See Grandon

---

[12]     Plaintiffs plainly contend that the practices relating to supposed excessive commissions and other fees are fraudulent. See, e.g., Compl. ¶ 5 ("Defendants purposely omitted disclosing the nature of the improper excessive fees and

v. Merrill Lynch & Co., 147 F.3d 184, 193-94 (2d Cir. 1998) ("A plaintiff's

conclusory allegation that markups are excessive is similar to a barroom generality;

it is insufficient to state a securities fraud claim.... A plaintiff must plead with

particularity the facts that show the markups to be excessive."); Shapiro, 964 F.2d

at 287-88 (Rule 9(b) applies to claims that sound in fraud); Rombach v. Chang,

355 F.3d 164, 172 (2d Cir. 2004) (same).

### C. Plaintiffs' Allegations Regarding Soft Dollars Fail to State a Claim.

Plaintiffs also assert that defendants made improper use of the Funds' so-

called "soft" dollars, and that defendants failed to disclose that they were doing so.

See, e.g., Compl. ¶¶ 111-12, 134-35. The only allegation pled in support of this

contention is simply a minor variation of plaintiffs' "excessive commission

allegation." Plaintiffs allege that "the Investment Adviser Defendant used Soft

Dollars to pay for excessive commissions that served as kickbacks to brokers thus

---

commissions charged to Plaintiffs"); ¶¶ 21-65, 67-75 (alleging that various
defendants engaged in "knowing and reckless" misconduct); ¶ 93 ("Lord Abbett
concealed the truth regarding these revenue sharing arrangements" and "went to
great lengths to avoid creating a paper trail"); ¶ 173 ("the Investment Adviser
Defendant breached its fiduciary duties to the Lord Abbett Funds by engaging in a
deceptive contrivance, scheme, practice and course of conduct pursuant to which it
knowingly and/or recklessly engaged in acts, transactions, practices, and courses of
business which operated as a fraud upon the Lord Abbett Funds."); ¶ 178 (asserting
that "defendants engaged in the unconscionable commercial practice, deception
and fraud of, the excessive and improper fees charged in connection with the Lord
Abbett Funds and the 'shelf-space programs' whereby Defendants paid kickbacks
to brokers to push Lord Abbett Funds").

charging Lord Abbett Funds investors for costs not covered by the Section 28(e) safe harbor." Compl. ¶ 112.

The term "soft dollars" refers to an industry-wide practice whereby investment advisers, when completing brokerage transactions for the mutual fund portfolios they manage, purchase both research and transaction execution at a combined rate. In most cases, brokers package research and execution services together and do not sell them separately. The difference between the theoretical lowest possible trading cost and the amount actually paid in commissions is referred to as "soft dollars." As plaintiffs acknowledge, see Compl. ¶¶ 111-12, the use of soft dollars is protected by a statutory safe harbor in Section 28(e) of the Exchange Act. This statutory safe harbor protects "good faith" determinations that the amount of the commission was reasonable in relation to the value of the "brokerage and research services provided," whether viewed in terms of either that particular transaction or an investment adviser's overall responsibilities with respect to the accounts as to which it exercises investment discretion. 15 U.S.C. § 78bb(e)(1).[13]

Plaintiffs conclusory contention that soft dollars were used to pay "excessive commissions" fails for the same reasons as plaintiffs' other "excessive

_____

[13]    The definition of "research" in Section 28(e) is very broad. See Securities; Brokerage and Research Services, Release No. 34-23170, 51 Fed. Reg. 16004, 16006-07 (Apr. 30, 1986).

commission" allegations: they are either attacks on the business judgment of the investment adviser that are foreclosed by the safe harbor of Section 28(e), or they are utterly conclusory allegations of fraud.

### D.   Plaintiffs Fail to Allege any Impropriety in Connection with the Funds' 12b-1 Plans.

The Complaint also alleges that the Funds' Rule 12b-1 plans were "improper."   See, e.g., Compl. ¶¶ 104-110, 132-33.   Plaintiffs assert that the Funds' Rule 12b-1 marketing fees were "paid to the Lord Abbett distributor as well as the brokers for pushing Lord Abbett funds."   Id. at ¶ 107.   Plaintiffs further allege that "there was no 'reasonable likelihood' that the plan would benefit the company and its shareholders," Id. at ¶ 108, because the economies of scale created by the 12b-1 plans "if any, were not passed on to Lord Abbett Fund investors."   Id.   Therefore, according to the Complaint, defendants should be held liable for "failing" to disclose that the Funds' respective 12b-1 plans "were not in compliance with Rule 12b-1."   Id. at ¶ 133(d).   This claim also is without merit.

Subject to the approval of their independent trustees, mutual funds are permitted to use fund assets for marketing and distribution under a plan, pursuant to the SEC's Rule 12b-1.   See 17 C.F.R. § 270.12b-1.

Plaintiffs' allegations that 12b-1 fees were used to make payments to brokers or otherwise to "push" the Funds, see, e.g., Compl. ¶ 133, merely restate in

pejorative fashion the very purpose of 12b-1 fees: providing mutual fund sales people an incentive to sell shares of a particular fund.

Notwithstanding the Complaint's conclusory allegations to the contrary, moreover, the Funds' prospectuses conclusively demonstrate that the Funds enjoy economies of scale as they grow in size, and hence benefit from their 12b-1 plans. The Funds typically have "breakpoints," i.e., decreases in the rate at which management fees are paid as fund assets increase.[14]

Plaintiffs do not allege any facts contradicting the prospectuses or SAIs or suggest that the 12b-1 plans failed to increase fund size. They instead allege that, between fiscal years ending 1999 and 2003, the net asset value per share of the Lord Abbett Affiliated Fund fell by more than 21% from $16.22 per share to $12.68 per share. Compl. ¶ 108. At the same time, the expenses of the Affiliated Fund are said to have "jump[ed]" one-tenth of a percentage point, from .74% in 1999 to .84% in 2003. Id. Plaintiffs' allegations comparing a particular Fund's net asset value and operating expenses as of two arbitrary points in time have no bearing on whether, at the time they were approved, the directors of the Affiliated Fund had a reasonable basis to believe that the Fund's 12b-1 plan would likely provide economies of scale with respect to management fees. Even if such

---

[14]    See, e.g., Affiliated Fund Prospectus Dated March 1, 2003 at 6 (Barbarisi Cert. Ex. 7 at 6); Affiliated Fund SAI Dated March 1, 2003 at 17 (Barbarisi Decl. Ex. 8 at 17).

allegations were relevant, plaintiffs fail to make them with respect to any of the dozens of other funds the shareholders of which they seek to represent.

More fundamentally, plaintiffs' claim mistakenly assumes that the only purpose of Rule 12b-1 plans is to achieve increased economies of scale. In fact, Rule 12b-1 plans have other purposes and give rise to other benefits, including enhancing shareholder service, increasing portfolio diversification and performance, and enhancing a fund's ability to meet redemptions.[15] Most importantly, 12b-1 plans are often designed to give purchasers of fund shares a choice. A purchaser may elect to buy Class A shares and have an up-front sales charge or "load" deducted from his purchase. This money is paid to the selling broker-dealer. As an alternative, a purchaser may buy Class B shares, and not pay an up-front load and 100% of the purchase price is used to buy fund shares. The mutual fund distributor (such as Lord Abbett Distributor) pays the sales commissions to the broker-dealer that would have been paid by the purchasers if they had bought Class A shares. The Funds (which have received 100% of the purchase price) then reimburse the distributor for those advanced commissions over time from 12b-1 fees. Thus, Rule 12b-1 fees permit Funds to offer an

---

[15]   See, e.g., Krinsk v. Fund Asset Mgmt., Inc., 715 F. Supp. 472, 500-01 (S.D.N.Y. 1988), aff'd, 875 F.2d 404 (2d Cir. 1989).

alternative method for shareholders to gain access to advice from financial advisers

without paying up-front sales loads, a practice that the SEC has approved.[16]

In short, plaintiffs have failed to allege any reason that any Fund's 12b-1

plan was improper (or even to offer any factual allegations whatsoever concerning

the 12b-1 plans of all but one of the dozens of Funds on whose behalf they purport

to sue). [17]

*     *     *

As the foregoing discussion demonstrates, the principal allegations of the

Complaint simply describe in pejorative terms permissible and legal investment

---

[16]    The SEC has stated that Rule 12b-1 plans are "integral" to the multiple share class systems employed by many mutual funds.    Division of Investment Management, SEC, Report on Mutual Fund Fees and Expenses, Dec. 2000, available at http://www.sec.gov/news/studies/feestudy.htm#P1137_160078.    In 1988, the SEC considered, but ultimately declined to adopt, a proposal that would have effectively eliminated the ability of funds to employ Rule 12b-1 to enable them to offer share classes that are not subject to a sales load. See Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Inv. Co. Act Release No. 16431, 53 Fed. Reg. 23258, 23259, 1988 WL 1000015, at *44 (June 13, 1988).    The proposal was rejected because it would have "doom[ed] spread loads without a satisfactory replacement, forcing most spread load funds to revert to front-end loads," a result that investors "would not appreciate."   Report of the Division of Investment Management of the Securities and Exchange Commission: Protecting Investors: A Half Century of Investment Company Regulation (1992) at 324, 327 (an excerpt from this report is included as Ex. 28 to the Barbarisi Cert).

[17]    Consequently, plaintiffs' allegations that defendants failed to disclose that their 12b-1 plans were not in compliance with the Rule, see Compl. ¶¶ 129(f), 133(d), 135(f), 144(c), also fail.  These allegations obviously depend on plaintiffs' meritless substantive allegations about the Funds' 12b-1 plans and in any event would require plaintiffs to accuse themselves (falsely) of wrongdoing.

company practices that the SEC has explicitly or implicitly authorized. Such practices cannot serve as the basis for seeking to impose federal securities law liability on any of the defendants in this case. See Upton v. SEC, 75 F.3d 92, 98 (2d Cir. 1996). The Complaint's remaining conclusory "excessive" commission allegations fail to satisfy even liberal notice pleading standards and are patently insufficient to state claims sounding in fraud.

## II.   PLAINTIFFS' CLAIMS ARE DERIVATIVE RATHER THAN DIRECT.

All of the plaintiffs' claims, other than their purported Section 36(b) claim (Count III), are derivative claims that belong to the various Funds and not to the plaintiffs individually. However, with the exception of Count V, plaintiffs have made no attempt to amend their Complaint to assert these claims derivatively and have continued to insist that the claims may be brought directly by shareholders as class claims. The failure to follow established procedures for suing derivatively requires dismissal of Counts I, II, IV, and VI-X.

In determining whether a claim is direct or derivative, courts look behind the characterization the plaintiff attributes to the claim and examine the substance of the complaint.[18]  See, e.g., Kramer v. Western Pacific Industries, Inc., 546 A.2d 348, 352 (Del. 1988). Shareholders have the right to bring an individual action, as

---

[18]     The characterization of both plaintiffs' state and federal law claims as direct or derivative is determined as a matter of Maryland and Delaware law, as applicable. See, e.g., Strougo v. Bassini, 282 F.3d 162, 168-69 (2d Cir. 2002).

opposed to a derivative one, if, and only if, they are suing to enforce individual shareholder rights. See, e.g., In re Ionosphere Clubs, Inc., 17 F.3d 600, 605-06 (2d Cir. 1994) (Delaware law). Corporate rights must be enforced by the corporation or by means of a shareholder derivative suit. See Kauffman v. Dreyfus Fund, Inc., 434 F.2d 727, 733 (3d Cir. 1970) (discussing this principle in a mutual fund case).

The Complaint fails to identify any shareholder rights that have been violated. It instead repeatedly asserts that defendants have misappropriated an asset of the Fund (fund brokerage) for their own benefit, have charged the Funds "excessive" fees, or have otherwise "skimmed" the assets of the various Funds.[19] Such claims are unquestionably derivative because, as a matter of law, a claim for injury to or waste of corporate funds, brokerage, or any other corporate property belongs to the corporation, which is the legal owner of such property, and not to the individual shareholders, who have no direct ownership in corporate property.[20]

---

[19]   See, e.g., Compl. ¶¶ 1, 3, 103 (alleging "excessive fees" and/or "excessive fees and commissions"); ¶ 4 (alleging that the investment adviser was "siphoning fees from the funds"); ¶¶ 129(h), 131(h), 133(h), 135(h) (all asserting that defendants "skim[med] millions of dollars from the Lord Abbett Funds")); ¶¶ 104-110 (alleging improper payment of 12b-1 fees); ¶¶ 103, 111-112 (alleging "excessive commissions" on Fund portfolio transactions including "improper" soft dollars); ¶¶ 123-141 (restating these various allegations, and adding that defendants failed to disclose these supposed breaches of trust).

[20]   This rule is advantageous "not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each." Waller v. Waller, 49 A.2d 449, 452 (Md. 1946).

See, e.g., In re Ionosphere, 17 F.3d at 605-06; Herman v. Steadman, 50 F.R.D. 488, 489-90 (S.D.N.Y. 1970) (case under the ICA alleging that excessive and illegal brokerage commissions were paid by mutual funds could only be brought derivatively).[21]

Plaintiffs' conclusory allegations that they held stock during the Class Period and were damaged by defendants' supposed misconduct in some unspecified manner[22] do not save the Complaint from dismissal.  As further discussed below, such so-called "holders" claims pose an unusual danger of non-meritorious "strike suits" and are therefore not available in a lawsuit based on federal law.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975).  Additionally, the state law "holders" claims are preempted by SLUSA.  Even were plaintiffs entitled to assert a "holders" claim under state law, moreover, such claims require specific allegations that (1) the plaintiff actually relied on the misrepresentation or omission and consequently refrained from selling shares, and (2) the plaintiff suffered damages *to his or her individual property or economic interests* as a result of the decision to refrain from selling shares other than the (indirect) harm caused by a reduction in the funds' assets and the consequent

---

[21]   See also Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1036-39 (Del. 2004); Waller v. Waller, 49 A.2d 449, 452 (Md. 1946).

[22]   See, e.g., Compl. ¶¶ 14-19 (identifying plaintiffs and baldly asserting that they have "been damaged by the conduct alleged herein"); ¶ 146 (alleging in conclusory fashion that "Lord Abbett Funds investors have incurred damages"); ¶¶ 153, 161, 182, 183, 187, 195 (similar allegations).

24

(indirect) loss to the shareholder. The Complaint contains no allegations of reliance and its allegations of damages are entirely conclusory. Accordingly, the Complaint must be dismissed.[23] See, e.g., In re Worldcom, Inc. Sec. Litig., 336 F. Supp. 2d 310, 322 (S.D.N.Y. 2004) (assuming that 'holder" claims would be recognized at all, complaint that included only "meager allegations of reliance and damages" failed to state a claim); Rogers v. Cisco Sys. Inc., 268 F. Supp. 2d 1305, 1311-12 (N.D. Fla. 2003) (similar holding).[24]

## III.   PLAINTIFFS' STATE LAW CLAIMS ARE PREEMPTED BY SLUSA.

Counts VI-X of the Complaint purport to assert various state law claims on behalf of persons alleged to be "holders" of fund shares. Assuming *arguendo* that, contrary to the analysis set forth above, plaintiffs' state law claims were held to be direct, they are preempted by SLUSA.

---

[23]   Indeed, were the Complaint to include such claims of individualized reliance and damages, the case could not proceed as a class action. See, e.g. Basic, Inc. v. Levinson, 485 U.S. 224, 242 (1988); Manzo v. Rite Aid Corp., No. Civ. A. 18451-NC, 2002 WL 31926606 (Del. Ch. Dec. 19, 2002), aff'd, 825 A.2d 239 (Del. 2003).

[24]   Cf. Metro Communication v. Advanced Mobilecomm Techs., Inc., 854 A.2d 121, 157-58 (Del. Ch. 2004) (to bring breach of fiduciary "holder" claims shareholders must satisfy both a reasonable reliance requirement and a "stringent" scienter element); Tafflin v. Levitt, 608 A.2d 817 (Md. App. 1992) (no individual cause of action existed where plaintiffs made conclusory allegations of "damages," id. at 819, based on acts that injured a savings and loan in which plaintiffs were depositors).

SLUSA provides that a state law claim be dismissed as completely preempted if it features four characteristics: 1) the lawsuit is a "covered class action"; 2) the claim is based upon state law; 3) the claim concerns a "covered security"; and 4) the plaintiff alleges either a "misrepresentation or omission of material fact" or "a manipulative or deceptive device or contrivance" that is "in connection with the purchase or sale of a covered security." 15 U.S.C. § 77(p)(b); id. § 78bb(f)(1).

All four SLUSA preemption requirements are satisfied for the claims set forth in Counts VI-X. First, the Complaint is purportedly brought on behalf of a putative class of mutual fund shareholders. Compl. ¶¶ 1, 136-41. Second, plaintiffs' claims in those Counts are grounded in state law. Third, shares of mutual funds as well as most mutual fund portfolio securities are covered securities. See 15 U.S.C. § 77r(b)(2) (covered securities include securities issued by companies registered under the ICA). Fourth, plaintiffs are alleging: a) a misrepresentation or omission of material fact or a manipulative or deceptive device or contrivance that b) is in connection with the purchase or sale of a covered security.

There are two grounds compelling the conclusion that the fourth SLUSA preemption requirement is met in this case. First, a complaint that hinges on allegations of improper misstatements and omissions in an investment company

26

registration statement or similar SEC filing that may be relied upon by purchasers or sellers of investment company securities necessarily alleges a misrepresentation in connection with the purchase or sale of a security. See, e.g., Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968) (en banc) ("in connection with" requirement in Section 10(b) is satisfied when a misrepresentation is made "in a manner reasonably calculated to influence the investing public"). This is precisely what the Complaint attempts to allege. Plaintiffs, for example, assert that:

> The defendants concealed [the supposedly improper] fees used to induce brokers to push Lord Abbett Funds as they realized that the inducements created insurmountable conflicts of interest significant to any reasonable person deciding how to invest his or her money.

Compl. ¶ 5. In other words, the supposed improper omissions in the Funds' disclosure documents were the sort that would be expected to influence "any reasonable person" including purchasers and sellers of Lord Abbett Fund shares.

Second, the Complaint attempts to allege that defendants, for the purpose of enriching themselves, engaged in a manipulative or deceptive device or contrivance by causing "excessive" brokerage commissions to be paid on fund portfolio transactions.[25] Such alleged conduct is "in connection with" the purchase or sale of securities. See, e.g., In re Alger, Columbia, Janus, MFS, One Group, and

---

[25]     See, e.g., Complaint ¶ 4; ¶ 173 ("[T]he Investment Adviser Defendant breached its fiduciary duties to the Lord Abbett Funds by engaging in a deceptive contrivance, scheme, practice and course of conduct pursuant to which it knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon the Lord Abbett Funds.").

27

Putnam Mut. Fund Litig., 320 F. Supp. 2d 352, 355 (D. Md. 2004) (irrespective of whether plaintiffs themselves were "holders" rather than purchasers or sellers, purportedly illegal "late trading" and "market timing" transactions alleged in the complaint involved the purchase or sale of a covered security); SEC v. Zanford, 535 U.S. 813 (2002) (Rule 10b-5 claim is stated where the alleged fraud "coincides" with the purchase or sale of securities).

Although it is clear that the Complaint alleges "omissions of ... material fact[s]" and "manipulative or deceptive device[s] or contrivances ... in connection with the purchase or sale of a covered security," plaintiffs have attempted to circumvent SLUSA by asserting so-called holders claims[26] under state law, i.e., a claim that alleges only that a plaintiff was improperly induced *to refrain from* selling or purchasing stock and is outside the ambit of the purchaser-seller standing requirement as set forth in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975) (holding that holders claims are precluded under federal law due to the potential for abuse they pose).

SLUSA, however, applies irrespective of whether an individual plaintiff is able to state a claim consistent with Blue Chip. The Complaint alleges the requisite conduct in connection with a purchase or sale of a covered security and

---

[26]  See, e.g., Compl. ¶ 136 (putative class consists of persons who "**held** shares ... in any of the Lord Abbett Funds ... between February 6, 1999 and December 8, 2003, inclusive, and who were damaged thereby") (emphasis added).

the Blue Chip purchaser-seller rule is more appropriately viewed as a standing requirement in private actions rather than a limitation on the scope of the "in connection with" language found in SLUSA and in Section 10(b) of the Exchange Act. The holding in Blue Chip was predicated largely on "policy considerations" that the Supreme Court believed it appropriate to consider in delimiting the scope of an implied private right of action that the courts had created. Blue Chip, 421 U.S. at 737; see also Musick, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 291 (1993) (federal courts have discretion to weigh policy considerations in developing well-recognized implied causes of action that Congress never created). Blue Chip itself recognized that the purchaser/seller rule did not apply to the SEC in a civil enforcement action under Section 10(b). See Blue Chip, 421 U.S. at 751 n.14 ("the purchaser-seller rule imposes no limitation on the standing of the SEC to bring actions for injunctive relief under Section 10(b) and Rule 10b-5"). This statement would not be correct if the purchaser/seller rule were a limitation on the "in connection with" language of Section 10(b), because the SEC also must meet that statutory element.

Indeed, in light of SLUSA's purpose of preventing strike suits based on state law, it "would make little sense ... to preempt claims that exactly track federal law, but permit state class actions where state law permits even broader liability than federal securities law." Winne v. The Equitable Life Assurance Society of the

United States, 315 F. Supp. 2d 404, 415 n.5 (S.D.N.Y. 2003).   Defendants

recognize that there is contrary authority that holds or suggests that the Blue Chip

purchaser/seller rule limits the preemptive scope of SLUSA.  Defendants believe,

however, that any confusion in this respect has been dispelled.  The SEC has

recently filed with the Second Circuit an *amicus curiae* brief consistent with

defendants' position.  This brief (a copy of which is attached to the Barbarisi Cert.

as Ex. 29) is entitled to deference.[27]  Finally, even if so-called "holders" claims

were outside the ambit of SLUSA preemption, plaintiffs have failed to properly

plead such a claim.  An examination of the Complaint here demonstrates that the

"purchase or sale" element is met because:

      1.    The Complaint is brought on behalf of a class that is defined broadly

enough to include both "purchasers" and "holders."  The proposed "holder" class

appears to consist of persons who "held" shares of the Funds at any time between

February 6, 1999 and December 8, 2003, Compl. ¶ 136, a definition that obviously

would include many persons who bought shares during such time.  See Nekritz v.

Canary Capital Partners, LLC, No. 03-5081, 2004 WL 1462035 at *4 (D.N.J. Jan.

---

[27]    See, e.g., In re New Times Sec. Servs., Inc., 371 F.3d 68, 80-83 (2d Cir.
2004); see also Stolz Family Partnership v. Smart World Techs., 355 F.3d 92, 105-
06 (2d Cir. 2004) (discussing at length and adopting legal interpretation set forth in
SEC amicus brief); cf. Horn v. Thoratec Corp., 376 F.3d 163, 179 (3d Cir. 2004)
(according deference to Food and Drug Administration brief).  The SEC's amicus
brief was filed with the Second Circuit in Dabit v. Merrill Lynch, Pierce, Fenner &
Smith, Inc., 03-47996 and IJG Invs., L.P. v. Merrill Lynch, Pierce, Fenner &
Smith, Inc., 03-7458.

12, 2004) (SLUSA preemption applied where plaintiff failed to "limit the proposed investor class to investors who already held shares in Janus mutual funds" prior to the beginning of the class period).

2.    The proposed "holders" subclass includes (and the named plaintiffs themselves presumably were) individuals who were reinvesting dividends during the proposed Class Period.   These investors are purchasers under the federal securities laws,[28] and plaintiffs' claims are therefore preempted by SLUSA.  Prof'l Mgmt. Assocs. v. KPMG LLP, 335 F.3d 800, 802-03 (8th Cir. 2003), cert. denied, 124 S. Ct. 1176 (2004) (action brought on behalf of a class including persons who "bought and held" shares during the period of alleged fraud fell "squarely within SLUSA's parameters"); Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1345 (11th Cir. 2002).

3.    Additionally, in their original complaints in this matter, some of the plaintiffs who are named as putative class representatives in the Second Amended Complaint affirmatively alleged that they were *purchasers* of Fund shares.  See, e.g., Class Action Complaint filed by Joseph C. White, February 9, 2004 ¶ 11. Significantly, *no* named plaintiff disclaims that he or she purchased or sold during the Class Period, as the law requires.  See, e.g., Hardy v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 189 F. Supp. 2d 14, 19 (S.D.N.Y. 2001) (SLUSA

---

[28]    See, e.g., Deutschman v. Beneficial Corp., 761 F. Supp. 1080, 1087 (D. Del. 1991); In re Alger, 320 F. Supp. 2d at 355 (D. Md. 2004).

preemption applies where "the Complaint does not contain sufficient detail to determine whether . . . the named plaintiff and prospective class representative[] has raised a claim that can avoid removal under SLUSA").

*     *     *

Accordingly, because SLUSA's requirements are met, plaintiffs' state law claims must be dismissed as preempted.

## IV.   PLAINTIFFS LACK STANDING TO PURSUE CLAIMS RELATING TO FUNDS IN WHICH THEY NEVER OWNED SHARES.

The Complaint suffers from another pervasive defect: although it purports to assert direct claims on behalf of shareholders in more than 50 mutual funds, the named plaintiffs allege that they owned shares in only seven of these funds. Compl. ¶¶ 14-19.

The issue of Article III standing is a threshold issue in every case; federal courts are without subject matter jurisdiction to proceed with a claim with respect to which the named plaintiffs do not have Article III standing to sue.[29] The named plaintiffs as individuals lack standing to sue for supposed injuries to shareholders of mutual funds in which they admittedly never invested.[30]

---

[29]   See, e.g., Warth v. Seldin, 422 U.S. 490, 498 (1975); City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983); Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976); O'Shea v. Littleton, 414 U.S. 488, 494 (1974).

[30]   See, e.g., Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 493 (N.D. Ill. 1999) ("Pursuant to 15 U.S.C. § 80a-35(b), plaintiffs do not have standing to bring a § 36(b) claim on behalf of investment companies other than the funds in which

32

That plaintiffs seek to serve as class representatives does not change the analysis. The law requires that one or more named representatives possess *individual* standing to assert each claim brought on behalf of a class. See, e.g., Blum v. Yaretsky, 457 U.S. 991 (1982); Kauffman, 434 F.2d at 734 (named plaintiff could not sue concerning mutual funds in which he did not own shares because "a predicate to appellee's right to represent a class is his eligibility to sue in his own right. What he may not achieve himself, he may not accomplish as a representative of a class."); In re Eaton Vance Corp. Sec. Litig., 220 F.R.D. 162 (D. Mass. 2004).[31]

For these reasons, claims as to all Funds in which the named plaintiffs lack an ownership interest must be dismissed.

---

they are security holders."); Acosta v. Pacific Enters., 950 F.2d 611, 617 (9th Cir. 1991) (plaintiff lacked standing to challenge decisions affecting retirement plans or participants of plans in which he did not participate); Kauffman v. Dreyfus Fund, Inc., 434 F.2d at 735-36 ("[s]tanding is justified only by this proprietary interest created by the stockholder relationship").

[31]    See also Rosen v. Tenn. Comm'r of Fin. and Admin., 288 F.3d 918, 928-29 (6th Cir. 2002); James v. City of Dallas, 254 F.3d 551, 563 (5th Cir. 2001); Prado-Steiman v. Bush, 221 F.3d 1266, 1279-80, 1283 (11th Cir. 2000); Vuyanich v. Republic Nat'l Bank, 723 F.2d 1195, 1200-01 (5th Cir. 1984); Clark v. McDonalds Corp., 213 F.R.D. 198, 223-24 (D.N.J. 2003); Matte v. Sunshine Mobile Homes, Inc., 270 F. Supp. 2d 805, 822-23 (W.D. La. 2003); Miller v. Pacific Shore Funding, 224 F. Supp. 2d 977, 995 (D. Md. 2002), aff'd 2004 WL 144138 (4th Cir. 2004); Williams v. FirstPlus Home Loan Trust 1996-2, 209 F.R.D. 404, 414-15 (W.D. Tenn. 2002); Dash v. FirstPlus Home Loan Trust, 248 F. Supp. 2d 489, 503 (M.D.N.C. 2003); Angel Music, Inc. v. ABC Sports, Inc., 112 F.R.D. 70, 74 (S.D.N.Y. 1986); Weiner v. Bank of King of Prussia, 358 F. Supp. 684, 694 (E.D. Pa. 1973).

## PART II: COUNT BY COUNT ANALYSIS

In addition to the pervasive and overarching pleading defects already discussed, each Count of the Complaint must be dismissed because of the specific and additional deficiencies set forth below:

## I.    COUNT I OF THE COMPLAINT ASSERTING A VIOLATION OF SECTION 34(b) OF THE ICA FAILS TO STATE A CLAIM.

Count I of the Complaint, captioned "against the investment adviser defendant and director defendants for violations of section 34(b) of the Investment Company Act on behalf of the class," asserts that, as a result of alleged omissions in various fund registration statements, "Lord Abbett Funds investors have incurred damages." Compl. ¶ 146. As already discussed in detail above, all of plaintiffs' claims based on alleged omissions in the various fund prospectuses and SAIs are without merit because these documents fully complied with relevant SEC disclosure requirements pertaining to revenue sharing, brokerage commissions, soft dollars, and 12b-1 fees.

Count I also must be dismissed because there is no express or implied private right of action under Section 34(b) of the ICA. See, e.g., In re Merrill Lynch & Co., Inc. Research Reports, 272 F. Supp. 2d 243, 255-259 (S.D.N.Y. 2003); Dorchester Investors v. Peak Intern. Ltd., 134 F. Supp. 2d 569, 581 (S.D.N.Y. 2001); White v. Heartland High-Yield Mun. Bond Fund, 237 F. Supp. 2d 982, 986-88 (E.D. Wis. 2002); Pegasus Fund, Inc. v. Laraneta, 617 F.2d

1335, 1341-42 (9th Cir. 1980). As the more recent of these decisions recognize, allowing an implied private right of action under Section 34(b) would be inconsistent with the Supreme Court's recent decision Alexander v. Sandoval, 532 U.S. 275 (2001). Sandoval is further discussed in detail below.[32]

Additionally, the purported Section 34(b) claim would fail even assuming contrary to law that an implied private right of action existed under that provision. Although plaintiffs purport to bring Count I directly in their capacity as shareholders, the only damages plaintiffs allege arise out of the supposed "skimming" *of the assets of the various funds*, a claim for which shareholders manifestly lack standing to sue. See, e.g., In re Merrill Lynch & Co., Inc. Research Reports, 272 F. Supp. 2d 243, 259-61 (S.D.N.Y. 2003); Olesh v. Dreyfus Corp., 1995 WL 500491 at *7 (E.D.N.Y. Aug. 8, 1995); Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 490 (N.D. Ill. 1999).

Even if an individual (direct) implied right of action were available under Section 34(b), moreover, it would necessarily be subject to the same requirements as a claim under Section 10(b) and Rule 10b-5. Cf. Finkel v. Stratton Corp., 962

---

[32]     A number of decisions also recognize that there are no implied private rights under any provision of the ICA where plaintiffs' grievances fall within the action provided in Section 36(b). See, e.g., Green v. Fund Asset Management, L.P., 19 F. Supp. 2d 227, 233 (D.N.J. 1998). Some pre-Sandoval authority holds or assumes that a private right of action exists for § 34(b) claims. See In re Nuveen Fund Litig., No. 94 C360, 1996 WL 328006 at *6 (N.D. Ill. June 11, 1996). Such cases are no longer valid in light of Sandoval.

F.2d 169, 174-75 (2d Cir. 1992) (implied private right of action under Securities

Act Section 17(a) must either be limited in the same manner as Rule 10b-5 claims

or not recognized at all; court holds that it would be more appropriate not to

recognize an implied private right of action at all). Any Section 34(b) claim

therefore must be dismissed because it fails to meet several requirements that apply

to a claim under Rule 10b-5. Most significantly, plaintiffs have made a strategic

decision to eschew any allegations that they purchased or sold fund securities in

reliance on any supposed misstatements or omissions; they instead purport to

represent a class of persons who held shares of Lord Abbett funds during the Class

Period. Compl. ¶¶ 14-19, ¶ 136. Plaintiffs' strategy precludes them from asserting

any federal nondisclosure claim because a private "holders" claim is not

cognizable under the federal securities laws. See, e.g., Blue Chip Stamps v. Manor

Drug Stores, 421 U.S. 723, 741, 747 (1975).

## II.   COUNT II OF THE COMPLAINT ASSERTING A VIOLATION OF SECTION 36(a) OF THE ICA FAILS TO STATE A CLAIM.

In Count II, plaintiffs purport to assert a claim against Lord Abbett

Distributor, Lord Abbett, and the directors "pursuant to Section 36(a) of the

Investment Company Act on behalf of the class." Count II fails for substantially

the same reasons as Count I. There is no private right of action under Section

36(a) and, assuming one existed, any such right would necessarily be derivative

rather than direct.[33]  Even if a direct action were available in some circumstances, Blue Chip forecloses the so-called "holders" claims plaintiffs purport to assert in this case.

Although defendants incorporate their earlier arguments herein, we discuss at some length the issue of whether an implied right of action exists under Section 36(a) because (in contrast to Section 34(b)), we know of no recent authority specifically addressing the availability of the implied private right of action under this section and some older district court decisions in this Circuit and elsewhere have found that Section 36(a) supports an implied private right.[34]

These decisions are clearly invalid today.  As the Second Circuit recently recognized in rejecting an implied private right of action under another section of the ICA, such cases reflect "an *ancien regime*" governing implied rights of action. See Olmstead v. Pruco Life Ins. Co. of New Jersey, 283 F.3d 429, 434 (2d Cir. 2002).  This is because they predate the landmark decisions in Alexander v. Sandoval, 532 U.S. 275 (2001) and Three Rivers Center for Independent Living, Inv. v. Housing Authority of the City of Pittsburgh, 382 F.3d 412 (3d Cir. 2004) in which the Supreme Court and the Third Circuit sharply limited the extent to which

---

[33]    See, e.g., Marquit v. Williams, 2000 WL 1529918 (2d Cir. Oct. 13, 2000).
[34]    See, e.g., In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527, 542 (D. Del. 1994).  The older decisions concerning the availability of a private right of action under Section 36(a) were by no means unanimous, however.  In addition to the cases discussed below, see, e.g., Monheit v. Carter, 376 F. Supp. 334, 342 (S.D.N.Y. 1974) (no implied private right of action under Section 36(a)).

37

courts could imply private rights of action under federal statutes. In particular, although federal courts at one time engaged in a freewheeling policy or legislative history analysis to determine whether a private right of action should be implied under a particular statute, <u>Sandoval</u> and <u>Three Rivers</u> have made clear that courts may not create private rights of action that are unsupported by the statutory text. <u>See, e.g.</u>, <u>Sandoval</u>, 532 U.S. at 288 (It is inappropriate to "accord[] dispositive weight to context shorn of text. In determining whether statutes create private rights of action, as in interpreting statutes generally, legal context matters only to the extent it clarifies text.") (citation omitted).[35]

Of particular significance for present purposes, <u>Sandoval</u> expressly rejects the reasoning of <u>Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran</u>, 456 U.S. 353 (1982), which the Third Circuit relied on as the basis for recognizing an implied private right of action under a provision of the ICA in <u>Bancroft Convertible Fund, Inc. v. Zico Investment Holdings, Inc.</u>, 825 F.2d 731 (3d Cir.

---

[35]     <u>See also</u> <u>Three Rivers</u>, 382 F.3d at 421-22 ("<u>Sandoval</u> ... explain[s] in no uncertain terms that Congress's statutory creation of a personal right is a predicate to finding an implied right of action in a statute"); <u>Correctional Servs. Corp. v. Malesko</u>, 534 U.S. 61, 67 n.3 (2001); <u>Bonano v. East Caribbean Airline Corp.</u>, 365 F.3d 81, 86 (1st Cir. 2004) ("because the Supreme Court's decision in <u>Sandoval</u> changed the legal landscape, we regard that pre-<u>Sandoval</u> decision as lacking continued vitality"). The Third Circuit employs the analysis currently required by the Supreme Court for making the determination of Congressional intent, even if the statute at issue was enacted during a time period where a different method of implied private rights analysis prevailed. <u>American Tel. & Tel. Co. v. M/V Cape Fear</u>, 967 F.2d 864, 872 (3d Cir. 1992).

1987).[36]   As <u>Sandoval</u> explains, <u>Curran</u> "inferred congressional intent to ratify lower court decisions regarding a particular statutory provision when Congress comprehensively revised the statutory scheme but did not amend that provision." <u>Sandoval</u>, 532 U.S. at 292.  <u>Sandoval</u> makes clear that, because the statutory text rather than Congressional inaction is now dispositive, <u>Curran's</u> ratification analysis "deserves little weight in the interpretive process."  <u>Id.</u> citing <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver</u>, 511 U.S. 164, 187 (1994).

Application of the analysis set by the Supreme Court in <u>Sandoval</u> establishes that there is no implied private right of action under Section 36(a).

### A.   The Text of Section 36(a) Forecloses an Implied Private Right of Action.

No provision of the ICA explicitly provides for a private right of action, under Section 36(a), "and so we must presume that Congress did not intend one." <u>Olmstead</u>, 283 F.3d at 432.   Several additional points render this presumption conclusive.

---

[36]   <u>Bancroft</u> did not involve any of the provisions of the ICA under which plaintiffs seek to sue. <u>Bancroft</u> instead held that there was an implied private right of action under Section 12(d)(1)(A) of the ICA. <u>Bancroft</u> reached this result based on what it found to be the "controlling" rationale of <u>Curran</u>, which rationale the Supreme Court has since overturned. See <u>Bancroft</u>, 825 F.2d at 735 ("[w]e find … <u>Curran</u> controlling"); <u>id.</u> ("we apply the <u>Curran</u> Court's reasoning").

First, in order to support an implied private right of action a statute ***must*** use "rights-creating language."[37]    See Three Rivers, 382 F.3d at 419-20, 422 ("Congress's creation of a personal right is necessary to the existence of … an implied right of action" and personal rights are limited to those "intentionally and unambiguously conferred through rights-creating language").  Like Section 34(b), Section 36(a) lacks any rights-creating language.  Indeed, it actually creates no duties or liabilities, it prohibits nothing, and it merely authorizes the SEC to bring suit for breach of fiduciary duty.  As the SEC has explained:

> Neither before the amendment nor afterwards, does § 36 in terms make anything unlawful.  It simply authorizes the Commission to file an action in the Federal court and empowers the court to grant appropriate relief.

In re Carl L. Shipley, 45 SEC Docket 589, 590-93, 1974 WL 161761 at *2-4 (1974) (concluding that Section 36 is not a substantive provision of the ICA and that it therefore cannot be violated).  It makes no sense to suggest that an enforcement provision that cannot itself be violated can serve as the basis for an implied private right of action.[38]  Indeed (1) the lack of rights-creating language in

---

[37]    "Rights-creating language" is language that clearly imparts an "individual entitlement" and has an "unmistakable focus on the benefited class."  Gonzaga Univ. v. Doe, 536 U.S. 273, 287 (2002) (citation and internal quotation marks omitted).

[38]    Cf. Gonzaga Univ., 536 U.S. at 285 ("One cannot go into court and claim a 'violation' of Section 1983 – for Section 1983 by itself does not protect anyone against anything.").

Section 36(a) and (2) the fact that the statute proscribes no conduct are each independently sufficient reasons compelling rejection of the argument that Section 36(a) implies a private right of action. See Central Bank, 511 U.S. at 177 (1994) (federal courts lack authority to "extend liability beyond the scope of conduct prohibited by the statutory text"); Three Rivers, 382 F.3d at 421 ("Put simply, for an implied private right of action to exist, a statute must manifest Congress's intent to create (1) a personal right, and (2) a private remedy."). Accordingly, the Court can end its analysis here.

Second, the text of Section 36(a) is not merely silent with respect to who may enforce it -- it explicitly provides that it is to be enforced *by the SEC* through actions in United States District Courts for injunctive and other relief. Such specification of the appropriate (administrative) enforcement mechanism in Section 36(a) is independently sufficient to preclude any inference of a private cause of action.[39]

---

[39]    See, e.g., Sandoval, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); Olmstead, 283 F.3d at 432-33 (because Section 42 of the ICA provides for enforcement of all ICA provisions by the SEC, but not by private litigants, the ICA's text "creates a strong presumption" that private rights of action have been foreclosed under other sections unless explicitly granted); Three Rivers, 382 F.3d at 420-421 (citing Olmstead); Transamerica Mort. Advisors, Inc. v. Lewis, 444 U.S. 11, 20-21 (1979).

41

Third, Congress in 1970 split original Section 36 into two subsections. Now, Section 36(a) is enforceable only by the SEC, while new Section 36(b) authorizes both a Commission and a private right of action in favor of shareholders. There could hardly be clearer evidence of Congressional intent not to allow private rights of action for violations of Section 36(a).[40]

**B.    The Legislative History Need Not Be Considered and, in any Event, Offers No Support for an Implied Private Right of Action under Section 36(a).**

In light of this overwhelming evidence in the statutory text of legislative intent not to afford a private right under Section 36(a), it is inappropriate to rely on legislative history. See, e.g., Three Rivers, 382 F.3d at 422; Olmstead, 283 F.3d at 435. Nonetheless, for the sake of completeness, we demonstrate why that history does not support an implied private right of action.

Congress changed the words of the statute in 1970. It broadened the scope of conduct subject to SEC enforcement under the original Section 36.[41]

---

[40]    Russello v. United States, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each."); Touche Ross & Co. v. Redington, 442 U.S. 560, 574 (1979) ("[W]here the principal express civil remedy…created by Congress contemporaneously with the passage of Section 17(a) [of the Securities Investor Protection Act of 1970] . . . is . . . limited . . . we are extremely reluctant to imply a cause of action in Section 17(a) that is significantly broader than the remedy Congress chose to provide."); United States v. McClure, 305 U.S. 472 (1939).

[41]    Whereas the original Section 36 authorized the Commission to bring enforcement actions for "gross misconduct or gross abuse of trust," after the 1970 amendments, Section 36(a) empowered the SEC to bring actions for "breach[es] of

42

Accordingly, no valid argument can be made with respect to Section 36(a) that the

1970 amendments give rise to a presumption that Congress intended to preserve a

private cause of action by reenacting a statutory provision from which courts had

consistently inferred private rights of action.  See, e.g., Central Bank, 511 U.S. at

185.  It cannot be said that Congress merely "re-enacted" old Section 36 into new

Section 36(a) when it changed both the legal standard and the relief in addition to

splitting the original statute into two subsections.  The correct description is that

Congress "amended" the statute.  Moreover, courts had not, prior to the 1970

amendments, consistently inferred private rights of action under old Section 36.

On the contrary, prior to 1970, there was a split of authority.[42]  Cf. Sandoval, 532

U.S. at 291 (rejecting ratification argument where Supreme Court had not

definitively spoken on the statutory interpretation assertedly ratified).

---

fiduciary duty involving personal misconduct."  Congress also broadened the range
of injunctive relief available to the SEC.  Instead of being limited to enjoining a
person from acting in his former capacity, the court was now empowered to
"award such injunctive or other relief against such person as may be reasonable
and appropriate in the circumstances, having due regard to the protection of
investors and to the effectuation of the policies declared in § 1(b) of this title."
[42]    See, e.g., Brouk v. Managed Funds, Inc., 286 F.2d 901, 910 (8th Cir.), cert.
granted, 366 U.S. 958 (1961), judgment vacated for mootness, 369 U.S. 424 (1962)
(Section 36 does not imply a private right of action); Cogan v. Johnston, 162 F.
Supp. 907, 908-09 (S.D.N.Y. 1958) (same).    Indeed, one factor apparently
precipitating the addition in 1970 of an express right of action under Section 36(b)
was that "Section 36 of the 1940 Act had proved to be an ineffective vehicle for
dealing with [excessive advisory fees], since it expressly authorized action only by
the SEC," Fogel v. Chestnutt, 668 F.2d 100, 111 (2d Cir. 1981) (citations and
quotation marks omitted).

Additionally, the Senate Committee Report on the Investment Company Amendments Act of 1970, referring to the new Section 36(a), repeatedly speaks of it only in terms of the SEC's enforcement of the statute.[43]   The only reference in the legislative history of the 1970 amendments to a possible private action under Section 36(a) is the following:

> Although § 36(b) provides for an equitable action for breach of fiduciary duty as does § 36(a), the fact that subsection (b) specifically provides for a private right of action should not be read by implication to affect subsection (a).

S. Rep. No. 91-184, at 16, reprinted in 1970 U.S.C.C.A.N. at 4911.[44]   Although this sentence is a model of (presumably deliberate) ambiguity,[45] its implications are nonetheless clear: there was insufficient support in committee to adopt report language clearly endorsing a private right of action and no desire in Congress to provide for a private right of action in controlling statutory text.

---

[43]   For example: "the amended section will enable the Commission to move . . . ."   S. Rep. No. 91-184, at 36 (1970), reprinted in 1970 U.S.C.C.A.N. at 4931; "your committee does not intend to limit the Commission under this section to . . . ." Id.

[44]   The same sentence appears in the House Report.   House Comm. On Interstate & Foreign Commerce, Investment Company Amendments Act of 1970, H.R. Rep. No. 91-1382, at 38 (1970).

[45]   See In re ML-Lee Acquisition Fund II, 848 F. Supp. 527, 546 (D. Del. 1994) ("At best, [for the plaintiffs] the Court finds the above-quoted sentence to be ambiguous. It might be interpreted as expressing the intent of Congress to preclude private equitable actions for breaches of fiduciary duty under section 36(a).").

44

Finally, relying on the outmoded <u>Curran</u> analysis, the Third Circuit's <u>Bancroft</u> opinion leaned heavily on legislative history, ten years later, accompanying the 1980 amendments to the ICA. <u>See</u> <u>Bancroft</u>, 825 F.2d at 735-36 (reasoning that the 1980 amendment had "left intact those provisions from which the court had implied private causes of action" and that the House Report "disclose[d] congressional enthusiasm for private enforcement").

This analysis is inconsistent with current, controlling law. The 1980 amendments to the ICA had nothing to do with § 36(a) – they dealt instead with problems facing so-called business development companies. The reenactment doctrine therefore is inapplicable. <u>See</u> <u>Central Bank</u>, 511 U.S. at 185-86.

Moreover, although <u>Curran</u> may have indicated otherwise, under current, controlling law, neither Congressional inaction (<u>i.e.</u>, Congress' "failure" to amend § 36(a) in 1980) nor the legislative history of the 1980 amendments provides any basis for inferring a private right of action under § 36(a). Recent decisions from the Supreme Court and from the Third Circuit have consistently rejected the use of post-enactment legislative history and Congressional silence because they are unreliable interpretive aids. <u>See, e.g.</u>, <u>Sandoval</u>, 532 U.S. at 292; <u>In re Advanta Corp. Sec. Litig.</u>, 180 F.3d 525 (3d Cir. 1999). As the Supreme Court explained in <u>Central Bank</u>:

> [w]e have observed on more than one occasion that the interpretation given by one Congress (or a committee or

> Member thereof) to an earlier statute is of little assistance
> in discerning the meaning of that statute.... Congress
> may legislate ... only through passage of a bill which is
> approved by both Houses and signed by the President.

Central Bank, 511 U.S. at 185-86  (disapproving Curran).[46]  Applying the current,

controlling analysis, the Second Circuit *has specifically rejected the legislative*

*history of the 1980 amendments as a basis for inferring a private right of action*

*under § 48 of the ICA.*  See Olmstead, 283 F.3d at 435; Reeves v. Continental

Equities Corp. of America, 912 F.2d 37, 42 (2d Cir. 1990).  The Third Circuit has

recently cited Olmstead with approval.  See Three Rivers, 382 F.3d at 420-421.

\*     \*     \*

Because Section 36(a) does not support an implied private right of action,

and for the additional reasons discussed above, Count II of the Complaint must be

dismissed.

---

[46]     See also, South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 355-56
(1998); O'Gilvie v. United States, 519 U.S. 79, 90 (1997).  Moreover, a Committee
report from a later Congress is no more relevant in interpreting the intent of a prior
Congress by virtue of its "enthusiasm."  See Pierce v. Underwood, 487 U.S. 552,
566 (1988) (The Court rejected reliance on a 1985 House Committee report
unambiguously approving of a judicial interpretation, stating: "If this [report]
language is to be controlling upon us, it must be . . . an authoritative interpretation
of what the 1980 statute meant.  [But] [i]t cannot be, of course . . . since it is the
function of the courts and not the Legislature . . . to say what an enacted statute
means.").

### III.   COUNT III OF THE COMPLAINT ASSERTING A VIOLATION OF SECTION 36(b) OF THE ICA FAILS TO STATE A CLAIM.

In Count III, plaintiffs purport to assert a violation of Section 36(b) of the ICA based on their allegations concerning the supposed use of fund assets to finance fund distribution in a manner that is said to have benefited defendants rather than fund shareholders.[47]   Apart from the defects in these claims already discussed above, plaintiffs' efforts to allege a Section 36(b) claim fail for several reasons.

### A.   The Complaint Attacks Payments Outside the Scope of Section 36(b).

The Complaint focuses exclusively on supposed payments that are outside the scope of the statute.

Section 36(b) of the ICA creates only a limited cause of action aimed at excessive *advisory fees*.  See Green v. Fund Asset Management, L.P., 286 F.3d 682, 685 (3d Cir. 2002) ("[Section] 36(b) was intended to provide a very specific, narrow federal remedy.").  Indeed, the case law to have squarely considered the question appears to be "unanimous that ... a section 36(b) claim must either

---

[47]   Plaintiffs properly avoid any suggestion that so-called revenue sharing payments out of adviser or distributor defendants' own assets are within the scope of their Section 36(b) claim.  As the statutory text itself makes clear, the fiduciary duty created by Section 36(b) applies only to certain payments by a fund or its shareholders, and does not apply to payments made by the adviser or distributor (or anyone else) out of their own assets.  See 15 U.S.C. § 80a-35.

involve a challenge to excessive advisory fees per se or to conduct that results in excessive advisory fees." <u>Rohrbaugh v. Inv. Co. Inst.</u>, Fed. Sec. L. Rep. ¶ 91,961, 2002 WL 31100821, at \*9 (D.D.C. July 2, 2002).[48]

Federal courts have repeatedly recognized that a complaint that does not allege *excessive advisory fees* fails to state a claim under Section 36(b) and therefore must be dismissed. <u>See, e.g.</u>, <u>In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.</u>, 941 F. Supp. 326, 343 (S.D.N.Y. 1996) (a complaint alleging that the distributor was paid "at an annual rate of 0.75% of the average daily net assets of the Fund for specific expenses incurred in promoting the sale and distribution of the Fund's shares" but not alleging receipt of compensation for advisory services failed to state Section 36(b) claim.); <u>Rohrbaugh</u>, 2002 WL 31100821, at \*9; <u>Green</u>, 186 F.R.D. at 491-92 (service payments received by corporate parent of fund's investment adviser could not be the basis for a Section 36(b) violation); <u>In re Nuveen Fund Litig.</u>, 1996 WL 328006, at \*15 (N.D. Ill. June 11, 1996).[49] <u>See also</u>

---

[48]    Recently, one court denied a motion to dismiss an action alleging a Section 36(b) violation on the basis that Rule 12b-1 fees continued to be charged after a fund closed. <u>See</u> <u>Pfeiffer v. Bjurman, Barry & Assocs.</u>, 2004 WL 1903075 (S.D.N.Y. August 26, 2004). The defendants in that case never raised the argument that a case solely attacking Rule 12b-1 fees is outside the scope of Section 36(b) and, accordingly, the court had no occasion to consider it.

[49]    Two Second Circuit decisions indicate that Rule 12b-1 fees may be taken into account in determining whether advisory fees are excessive under Section 36(b). <u>See</u> <u>Meyer v. Oppenheimer Mgmt. Corp.</u>, 764 F.2d 76, 83 (2d Cir. 1985); <u>Meyer v. Oppenheimer Mgmt. Corp.</u>, 895 F.2d 861, 866 (2d Cir. 1990). In this case, there is no allegation (conclusory, on information and belief, or otherwise)

Migdal, 248 F.3d at 329 ("[g]eneral breach of fiduciary duty claims which involve merely an incidental or speculative effect on advisory fees are not properly within the scope of Section 36(b)").

These authorities are consistent with the text of Section 36(b), which specifically excludes from its reach the supposed payments that plaintiffs challenge in this case. Section 36(b)(4) expressly provides that Section 36(b) "shall not apply to compensation or payments made in connection with transactions subject to Section 17 of this title [the ICA], or the rules, regulations, or orders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company." 15 U.S.C. § 80a – 35(b)(4).

Plaintiffs simply ignore the limit on the reach of Section 36(b) set by the cases and the statute itself. The Complaint does not so much as mention the amount of the advisory fees paid by any of the Funds, let alone allege that the fees paid by the Funds are excessive. Instead, the Complaint consists of allegations that defendants improperly used fund assets to finance fund distribution. As a recent case in this district has held, the Complaint's narrow focus on certain supposed illegal payments compels dismissal:

> [U]nder Section 36(b), it is the *overall* nature and quality of the services provided by the investment adviser that is at issue – not merely some small percentage of those services.... In this instance,

---

that advisory fees are excessive either standing alone or combined with any supposed illegal soft dollars, commissions, or 12b-1 fees.

however, Plaintiff's complaint fails to address the overall services provided by Defendant to the Fund.

Benak v. Alliance Capital Mgmt. L.P., 2004 WL 1459249, at *8-9 (D.N.J. Feb. 9, 2004) (granting motion to dismiss Section 36(b) claim). Additionally, any such payments are unquestionably "payments made in connection with transactions subject to Section 17 [of the ICA], or the rules ... thereunder." 15 U.S.C. § 80a – 35(b)(4). As the SEC explained in connection with the adoption of Rule 17d-3, which provided an exemption from Section 17 for 12b-1 plans, an arrangement in which fund assets are used to finance fund distribution is "subject to" Section 17 because such an arrangement constitutes a "joint transaction" forbidden by Section 17(d) and Rule 17d-1 thereunder:

> If a fund finances distribution, it becomes so actively and intimately involved in the distribution process that, even if it contracts with an underwriter, it cannot fairly be said to be distributing through that underwriter. Such a fund should more properly be viewed as acting as a distributor along with the underwriter.

See Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414, 45 Fed. Reg. 73898, 73902 (November 7, 1980).[50]

---

[50] Similarly, the use of fund assets to benefit an investment adviser is prohibited by (and thus "subject to") Section 17(e). See Fogel v. Chestnutt, 533 F.2d 731, 739 (2d Cir. 1975) ("[D]iversion of such commissions to benefit an investment company manager may be viewed as additional compensation to the manager for handling the portfolio transactions of the fund within the meaning of, and in violation of, Section 17(e)(1) of the Investment Company Act.").

In short, Section 36(b) does not reach any of the supposed payments alleged in this case and, accordingly, Count III must be dismissed as a matter of law.

**B.      Any Excessive Brokerage Commissions and Soft Dollars Were Received by Brokers and Therefore Cannot Be the Basis for a Section 36(b) Claim.**

With respect to plaintiffs' allegations that the Funds' investment advisers paid excessive brokerage commissions and/or soft dollars, there is an additional, entirely independent reason that plaintiffs have no cause of action under Section 36(b).  Section 36(b) imposes a limited fiduciary duty "with respect to *the receipt* of [certain] compensation for, or of payments of a material nature" (emphasis added).  Section 36(b)(3), in turn, provides that no action may be brought under the statute "against any person other than the recipient of compensation or payments" within the scope of the statute, and "no damages or other relief shall be granted against any person other than the recipient of such compensation or payments."

Brokerage commissions (including soft dollars) paid on behalf of the Funds were received by brokers, not by defendants.  Because the brokers who received such compensation are not named as defendants in this case, there is no basis to recover any supposed excessive brokerage commissions under Section 36(b).  See Green v. Nuveen Advisory Corp., 295 F.3d 738, 743 (7th Cir. 2002) (under Section

36(b) "a shareholder may only sue the recipient of the fees in question").[51]

### C.    Plaintiffs Have Failed to Allege Excessive Fees.

Even assuming *arguendo* that Section 36(b) were otherwise applicable, plaintiffs have failed to allege any facts supporting the central element of a claim under the statute:    that "the adviser-manager [has] charge[d] a fee that is ***so disproportionately large that it bears no reasonable relationship to the services rendered.*"    Krinsk v. Fund Asset Mgmt., Inc., 875 F.2d 404, 409 (2d Cir. 1989) (emphasis added) (quoting Gartenberg, 694 F.2d at 928); Benak, 2004 WL 1459249, at *6 (same).    As the Third Circuit has held, the pleading standards applicable to an ordinary Section 36(b) claim[52] may be liberal, but they are not meaningless:

> Although the pleading requirements are very liberal, more detail is often required than the bald statement by plaintiff that he has a valid claim of some type against defendant.... In order to determine whether a fee is excessive for purposes of Section 36(b), a court must examine the relationship between the fees charged and the services rendered by the investment adviser.... [D]ismissal for failure to state a claim with respect to excessive compensation was appropriate since

---

[51]    See also Pfeiffer, 2004 WL 1903075 at *4 n.11; Halligan v. Standard & Poor's Intercapital, Inc., 434 F. Supp. 1082 (E.D.N.Y. 1977); Cohen v. Fund Asset Mgmt., 1981-1982 CCH Dec. ¶ 98,433, 1980 WL 1488, at *2 (S.D.N.Y. March 31, 1980).

[52]    As noted above, defendants maintain that plaintiffs' Section 36(b) claim sounds in fraud and therefore is subject to heightened pleading standards.    See Shapiro, 964 F.2d at 287-88 (Rule 9(b) applies to claims that sound in fraud); Rombach, 355 F.3d at 172 (same).    The Complaint obviously fails to meet these strict pleading standards.

Plaintiff failed to allege any facts indicating that the fees received were disproportionate to the services rendered.

Krantz, 305 F.3d at 142-43 (citations and internal quotation marks omitted).

Accord Migdal, 248 F.3d at 327 (citations omitted) (emphasis added).[53]

Even as to their claims based on brokerage commissions and 12b-1 fees (which, as discussed earlier, are not cognizable under Section 36(b)),[54] plaintiffs fail to meet this pleading standard.

**1.    The Complaint Lacks Adequate Allegations of Excessive Brokerage Commissions.**

The Complaint repeatedly alleges in conclusory fashion that defendants caused the Funds to pay "excessive" brokerage commissions. See, e.g., Compl. ¶¶ 1, 3, 4, 5, 12, 98, 103, 104, 107, 110, 112, 117. These allegations fail to set forth any facts regarding even one allegedly improper brokerage transaction. Particularly because the concept of "best execution" is an inherently subjective one that requires consideration of numerous factors other than simply the amount of the commission, such boilerplate allegations fail to state a claim. See, e.g., Krantz,

---

[53]    See also Yamplosky v. Morgan Stanley Inv. Advisers, Inc., 2004 WL 1065533, *2 (S.D.N.Y. May 12, 2004).

[54]    As already discussed previously, the Complaint does not even specify the amount of the advisory fees paid by the various funds or allege (even in conclusory fashion, on information and belief or otherwise) that the advisory fees are excessive.  Not surprisingly, therefore, the Complaint contains no allegations remotely bearing on the relationship between the fees charged and the services rendered by the investment adviser.

Migdal, supra (both holding that general characterizations that fees are "excessive" do not state a claim in a Section 36(b) case subject only to Rule 8).

## 2.    The Complaint Lacks Allegations of Excessive 12b-1 Fees.

The Complaint contains no factual allegations whatsoever concerning the 12b-1 fees paid by any of the dozens of mutual funds plaintiffs have purported to sue other than the Lord Abbett Affiliated Fund. This compels dismissal of any claims based on 12b-1 fees paid by such funds. Even as to the Lord Abbett Affiliated Fund, the Complaint lacks any allegations that the 12b-1 fees received by any defendant were excessive or unearned in any respect.

In any event, the permissible amount of Rule 12b-1 fees that the principal underwriter of a fund (such as Lord Abbett Distributor) is entitled to receive is governed by a comprehensive regulatory scheme and, as a matter of law, cannot be deemed excessive under Section 36(b).[55] In Section 22(b) of the ICA, Congress granted the NASD the power to regulate all sales charges, including 12b-1 fees. See Proposed Rule Change by NASD Relating to the Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, SEC Release No. 29070, 56 Fed. Reg. 16137, 16139 (April 19, 1991). NASD Rule 2830 (previously known as Section 26 of the NASD Rules of Fair Practice), entitled "Investment Company

---

[55]    One recent case appears to hold otherwise. See Pfeiffer, 2004 WL 1903075. However, defendants in that case did not bring to the court's attention the significance of Section 22(b) and the decision does not discuss the effect of that section.

Securities," sets the permissible sales charges for distribution of investment company shares.[56]

Current Section 22(b) was enacted as part of the same 1970 Amendments to the ICA that also added Section 36(b). See Investment Company Amendments Act of 1970, Pub. L. No. 91-547, 84 Stat. 1413, 1413-36 (1970). Whereas Section 36(b) created a private right of action as a means of addressing excessive advisory fees, Section 22(b) reflects a Congressional intent to prevent excessive sales charges by delegating to the NASD, subject to SEC oversight, responsibility for regulating these charges as they apply to mutual fund shares. See S. Rep. No. 91-184, at 17-18 (1970), reprinted in 1970 U.S.C.C.A.N. 4897, 4904-05, 4912. In particular, the text of Section 22(b), which NASD Rule 2830 implements, gave the NASD *exclusive authority* (subject to SEC oversight) to strike a balance between prohibiting "excessive" sales charges and "allow[ing] for reasonable compensation for sales personnel, broker-dealers, and underwriters." See 15 U.S.C. § 80a-22(b)(1). It is plain that the balance struck by NASD Rule 2830 could not be

---

[56] The SEC approved this Rule. See NASD Rule Release 57 Fed. Reg. at 30989-90. Rule 2830 defines "sales charge" as "all charges or fees that are paid to finance sales or sales promotion expenses . . . ." Rule 2830(b)(8). Rule 2830 defines "asset-based sales charge" as "a sales charge that is deducted from the net assets of an investment company and does not include a service fee." Rule 2830(b)(8)(A). Under Rule 2830, an investment company may pay both an "asset-based sales charge" and a "service fee." The asset-based sales charge may not exceed .75 of 1 percent per annum of the average annual net assets of the investment company plus interest. Rule 2830(d)(2)(E). Service fees may not exceed .25 of 1% of average net assets per annum.

maintained were courts exercising jurisdiction under Section 36(b) to intrude with their own judgments about what constitutes excessive sales charges.[57] Accordingly, Section 22(b) expressly trumps Section 36(b). See 15 U.S.C. § 80a-22(b)(3).

Plaintiffs do not (and cannot) contend that the 12b-1 fees paid by the Lord Abbett Affiliated Fund exceeded the limitations imposed by NASD Rule 2830, and plaintiffs do not (and cannot) contend that the fees were not used to "finance sales or promotion expenses." In fact, the Complaint affirmatively alleges that Lord Abbett Distributor's efforts to distribute the Affiliated Fund were successful. Compl. ¶ 108 (alleging that Affiliated Fund's assets increased despite drop in net asset value per share).

Against this backdrop, it is plain that plaintiffs' quarrel is not with the amount of 12b-1 fees any defendant received or with the nature or quality of the distribution services any defendant performed. Instead, plaintiffs apparently disagree with the independent directors' business judgment to seek to increase the

---

[57]     See SEC Order Approving Proposed NASD Rule Change Relating to Limitation of Asset-Based Sales Charges as Imposed by Investment Companies, SEC Release No. 34-30897, 57 Fed. Reg. 30985, 30988 (July 13, 1992) (SEC notes that NASD possesses the authority to "regulate comprehensively" and "ensure overall reasonableness" of Rule 12b-1 fees and other mutual fund sales charges). Cf. United States v. NASD, 422 U.S. 694, 734 (1975) (antitrust laws are impliedly repealed when necessary "to assure that the federal agency entrusted with regulation in the public interest could carry out that responsibility free from the disruption of conflicting judgments that might be voiced by courts").

size of the Affiliated Fund by authorizing *any* 12b-1 payments by the Fund. See Compl. ¶ 109 (asserting that increased fund size was detrimental to the Affiliated Fund). In addition to its other obvious deficiencies, this frontal assault on the independent trustees' business judgment is not cognizable under Section 36(b). See Migdal, 248 F.3d at 329 ("if the claim for general breach of fiduciary duty is to be brought, it must be done under some other section of the ICA [besides Section 36(b)], or alternatively under state law"); Benak, 2004 WL 1459249 at *8 (same); Green, 295 F.3d at 744 n.9 ("fund mismanagement issues are … not … within the purview of … Section 36(b)"); In re Nuveen Fund Litig., 1996 WL 328006, at *15 (N.D. Ill. 1996) (Section 36(b) "does not … regulate[] the propriety of the transactions for which fees are paid.").

### D.    Plaintiffs May Not Seek Damages Under Section 36(b) for Any Period Prior to One Year Before the Filing of the Lawsuit.

Finally, although the Complaint states that the purported "class period" is February 6, 1999 to December 8, 2003, Compl. ¶ 136, Section 36(b)(3) expressly provides that no award of damages shall be recoverable for any period prior to one year before the action was instituted. See Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1037-38 (2d Cir. 1992). Any claim by plaintiffs for damages prior to one year is frivolous.

## IV.   COUNT IV OF THE COMPLAINT ASSERTING A VIOLATION OF SECTION 48(a) OF THE ICA FAILS TO STATE A CLAIM.

In Count IV of the Complaint, Compl. ¶¶ 163-68, plaintiffs attempt to allege secondary, "control person" claims under ICA Section 48(a) that are predicated on their claims in Counts I-III.   Count IV fails to state a claim because, as with Section 34(b), Section 48(a) does not provide for an express private right of action and none is implied.

It is clear, moreover, that, to the extent Counts I-III fail to state a claim, Count IV also must be dismissed.   <u>See, e.g.</u>, <u>Strougo v. Bassini</u>, 112 F. Supp. 2d 355, 361 n.4 (S.D.N.Y. 2000) (since no primary violation of the securities laws had been properly pled, the court dismissed plaintiffs' Section 48 claims against the alleged control defendants).

## V.   COUNT V OF THE COMPLAINT ASSERTING A VIOLATION OF SECTIONS 206 AND 215 OF THE ADVISERS ACT FAILS TO STATE A CLAIM.

Count V of the Complaint, Compl. ¶¶ 169-76, purports to assert a claim "against the investment adviser defendant under section 215 of the Investment Advisers Act for Violations of Section 206 of the Advisers Act derivatively on behalf of the Lord Abbett Funds."

Section 215 of the Advisers Act provides only a limited right of rescission in

favor of the party to an investment advisory contract.[58]   Plaintiffs therefore limit

their request for relief to rescission, see Compl. ¶ 176, and (as suggested by their

denomination of it as a "derivative" claim on behalf of the Lord Abbett Funds)

they seemingly recognize that they have no right to bring a direct claim under

Section 215.   Plaintiffs' Section 215 claim nonetheless suffers from several other

obvious deficiencies and must be dismissed.

### A.    Section 215 is Inapplicable Because Plaintiffs Have Not Alleged that the Advisory Contract is Unlawful.

Plaintiffs have not alleged (and cannot allege) that the advisory contract by

its terms violates the Advisers Act.   Plaintiffs instead complain about supposed

illegal transactions (e.g., alleged payment of excessive brokerage commissions and

inappropriate use of soft dollars or failure to disclose such alleged payments)

undertaken pursuant to a lawful advisory contract.

Even assuming *arguendo* the validity of plaintiffs' defective allegations of

such illegal transactions, plaintiffs fail to state a claim under Section 215.   The

voidability provisions of the federal securities laws are simply inapplicable absent

an allegation that the relevant contract itself (in this case the investment advisory

contracts entered into between the "adviser defendant" and the Funds) is illegal or

(according to some authorities) that the contract cannot be performed without a

---

[58]    As plaintiffs apparently understand, there is no private right of action for damages under § 206.  See Transamerica Mort. Advisers, Inc. v. Lewis, 444 U.S. at 19-21.

violation of the federal securities laws.  See GFL Advantage Fund, 272 F.3d at

200-202 (under the voidability provisions of the federal securities laws "only

unlawful *contracts* may be rescinded, not unlawful *transactions* made pursuant to

lawful contracts"), cert. denied, 536 U.S. 923 (2002) (citation and internal

quotation marks omitted).[59]

**B.    Plaintiffs Have Failed to Properly Plead Demand Futility.**

As plaintiffs recognize in their caption to Count V, their claim under Section

215 of the Advisers Act is derivative.  As explained in the memorandum submitted

by the Independent Directors (the arguments of which are incorporated herein),

plaintiffs are not entitled to bring a derivative action.

**C.    Plaintiffs May Not Pursue Derivative Actions on Behalf of Funds
in Which They Do Not Own Shares.**

Plaintiffs' Section 215 claims also must be dismissed to the extent that they

purport to assert derivative claims on behalf of funds in which the named plaintiffs

did not own shares.  See Kauffman v. The Dreyfus Funds, Inc., 434 F.2d 727, 735-

36 (3d Cir. 1970) (it is improper to combine provisions of Rule 23 and Rule 23.1 to

---

[59]    Accord Zerman v. Jacobs, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), aff'd,
672 F.2d 901 (2d Cir. 1981).  Although these cases involved Section 29(b) of the
Exchange Act, this provision is essentially identical to Section 215 of the Advisers
Act.  See, e.g., Kahn, 970 F.2d at 1039(noting that § 215 of the Advisers Act
parallels § 29(b) of the Securities Act of 1933); Mills v. Elec. Auto-Lite Co., 396
U.S. 375, 387-88 & n.10 (1970) (noting that Section 29(b) has a "counterpart[]" in
the Investment Advisers Act [i.e., Section 215]); see generally Louis Loss & Joel
Seligman, Fundamentals of Securities Regulation at 1240 (5th ed. 2004).

allow mutual fund shareholder to maintain an action on behalf of other mutual funds in which he does not own shares).

*     *     *

For the foregoing reasons, the Complaint fails to state a valid federal claim, and it is therefore inappropriate to exercise supplemental jurisdiction over any non-SLUSA-preempted state law claims.  See 28 U.S.C. § 1367(c); United Mine Workers of America v. Gibbs, 383 U.S. 715, 726 (1966); Green v. Fund Asset Management, L.P., 147 F. Supp. 2d 318, 332-33 (D.N.J. 2001), aff'd, 286 F.3d 682 (3d Cir. 2002) (dismissing state law claims after dismissal of all ICA claims). Defendants, however, will briefly address the Complaint's state law claims.

## VI.    COUNT VI OF THE COMPLAINT HAS BEEN WITHDRAWN.

Plaintiffs yesterday informed Defendants by letter that they are withdrawing their claim under the New Jersey Consumer Fraud Act.  Compl. ¶¶ 177-78.

## VII.    COUNT VII OF THE COMPLAINT ALLEGING A BREACH OF FIDUCIARY DUTY AGAINST THE INVESTMENT ADVISER DEFENDANTS FAILS TO STATE A CLAIM.

Even though it appears almost indistinguishable from Count V (which plaintiffs concede is a derivative claim), Count VII of the Complaint purports to assert a direct claim for "breach of fiduciary duty" against the "Investment Adviser Defendant."  Compl. ¶¶ 179-83.  Plaintiffs' breach of fiduciary duty claim fails for the reasons discussed above (e.g., as with plaintiffs' other state law claims, any

breach of fiduciary duty claim is preempted by SLUSA, can only be brought derivatively, it depends on conclusory allegations of wrongdoing that sound in fraud, and it is an inadequately alleged "holders" claim).

We emphasize one point: The client to which the investment adviser owes a fiduciary duty is the mutual fund with which it has entered into an investment advisory contract, not individual Fund shareholders. Because plaintiffs have not specified what fiduciary duties plaintiffs believe that the "investment adviser defendant" owed them or how these duties were supposedly breached, they have failed to state a claim.

## VIII. COUNT VIII OF THE COMPLAINT ALLEGING BREACH OF FIDUCIARY DUTY AGAINST THE DIRECTOR DEFENDANTS FAILS TO STATE A CLAIM.

In yet another variation on the same theme, Count VIII purports to allege a direct, class claim against the director defendants for "breach of fiduciary duty." Compl. ¶¶ 184-88. This claim fails for the reasons already given and for the additional reasons set forth in the memorandum submitted by the Independent Directors, which are adopted by defendant Robert Dow.

## IX. COUNT IX OF THE COMPLAINT ALLEGING AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY FAILS TO STATE A CLAIM.

Count IX purports to assert a claim against defendants for aiding and abetting breaches of fiduciary duty by brokers who sold the Funds. Compl. ¶¶

189-96. This claim is without merit, it is manifestly unsuitable for class treatment, and plaintiffs lack standing to bring it.

Civil liability for aiding and abetting is not recognized under federal law or under the law of a number of states.[60] The law of those jurisdictions that do recognize such liability is not uniform,[61] but some such jurisdictions require at least: 1) an underlying breach of fiduciary obligations to another; 2) knowing participation by defendant in the breach; and 3) resulting damages to the plaintiff proximately caused by the breach. See, e.g., Malpiede v. Townson, 780 A.2d 1075, 1096 (Del. 2001).

The Complaint does not allege that any plaintiff was a customer of any brokerage firm that breached its fiduciary duty, it fails to allege what fees these firms received or what representations plaintiffs believe their brokers made (or should have made) to them, and it fails to allege any facts suggesting that any defendant knowingly participated in any broker's breach of fiduciary duty.

---

[60]   See Central Bank, 511 U.S. at 182-86 (no aiding and abetting liability under the federal securities laws); Munford v. Valuation Research Corp., 98 F.3d 604, 613 (11th Cir. 1996) (Georgia law does not recognize aiding and abetting liability).
[61]   It is unclear which state's law applies with respect to plaintiffs' allegations of defendants' aiding and abetting the brokerages' breach of fiduciary duties. Under the "governmental interest" test, Courts focus on the "qualitative" nature of the state's contacts. Veazey v. Doremus, 510 A.2d 1187, 1189 (N.J. 1986).

The nature of any state law fiduciary duties owed by the numerous brokerage firms to the Funds would vary depending on which state's law applies.[62] Whether the brokerage firms actually breached these obligations would depend on the fees received by the broker and the specific representations made to each customer. Such considerations clearly foreclose class treatment. See, e.g., Johnston v. HBO Film Mgm't., Inc., 265 F.3d 178, 194 (3d Cir. 2001).

More fundamentally, because any broker's breach of fiduciary duty is said to consist of accepting fees "in exchange for aggressively pushing Lord Abbett Funds" without providing proper disclosure, Compl. ¶ 192, plaintiffs lack standing to bring the claim. As purported "holders" (as opposed to purchasers) of Fund shares, Compl. ¶ 136, plaintiffs cannot complain that any broker "push[ed]" Lord Abbett funds on them.

Finally, because Count IX alleges omissions in the purchase or sale of investment company securities that defendants supposedly aided and abetted, as discussed above, it is also preempted by SLUSA.

## X.    COUNT X OF THE COMPLAINT ALLEGING UNJUST ENRICHMENT FAILS TO STATE A CLAIM.

Count X, captioned "against all defendants for unjust enrichment on behalf of the class," fails to state a claim for the same reasons as the other Counts already

---

[62] See, e.g., Yadlosky v. Grant Thornton, 197 F.R.D. 292, 300-01 (E.D. Mich. 2000).

discussed (including SLUSA, the requirement to plead reliance and damages in holders claims, and plaintiffs' failure to allege any direct injury or even any illegal conduct). In <u>ABF Capital Mgmt. v. Askin Capital Mgmt.</u>, 957 F. Supp. 1308, 1333-34 (S.D.N.Y. 1997), the court rejected an almost identical claim by investors against a hedge fund's investment adviser and distributing brokers.

## CONCLUSION

For the foregoing reasons and for the additional reasons set forth in the Memorandum submitted by the Independent Directors, the Consolidated Amended Class Action Complaint should be dismissed in its entirety with prejudice.

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP

By: _____

Christopher A. Barbarisi (CB 8716)
KIRKPATRICK & LOCKHART LLP
One Newark Center, Tenth Floor
Newark, NJ 07102
(973) 848-4000

Jeffrey B. Maletta
Nicholas G. Terris
Jon A. Stanley
KIRKPATRICK & LOCKHART LLP
1800 Massachusetts Avenue, N.W.
Washington, DC 20036
(202) 778-9000

*Counsel for Defendants*

65