Patrick L. Rocco (PR 8621)
**SHALOV STONE & BONNER LLP**
163 Madison Avenue
P.O. Box 1277
Morristown, New Jersey 07962-1277
(973) 775-8997

*Liaison Counsel for Plaintiffs*

Steven G. Schulman
Jerome M. Congress
Janine L. Pollack
Kim E. Miller
Michael R. Reese
**MILBERG WEISS BERSHAD
  & SCHULMAN LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300

*Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re LORD ABBETT MUTUAL FUNDS FEE LITIGATION | )  Document Filed Electronically |
| | ) |
| | )  MASTER FILE: 04-cv-559 (WJM) |
| THIS DOCUMENT RELATES TO: | ) |
| ALL ACTIONS | ) |

**<u>SECOND AMENDED DERIVATIVE COMPLAINT</u>**

Plaintiffs, by and through their counsel, allege the following based upon the

investigation of counsel, which included interviews with persons with knowledge

of the conduct complained of herein and a review of United States Securities and

Exchange Commission ("SEC") filings, as well as other regulatory filings, reports, advisories, press releases, and media reports. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after an opportunity for discovery.

## INTRODUCTION

1.      This is an action brought by Plaintiffs on behalf of the Lord Abbett mutual funds in which the Plaintiffs are shareholders as alleged below ("the Funds") arising from the payment of excessive compensation and fees to Defendants. Defendants are liable under Section 36(b) of the Investment Company Act of 1940 because the investment adviser fees, administrative fees, 12b-1 fees, and director compensation received by Defendants from the Funds was grossly disproportionate to the value of services provided, and was not within the bounds of what would have been negotiated at arm's-length. During the relevant timeframe, compensation and fees to the adviser and distributor defendants rose dramatically even though the services provided by these Defendants remained the same, and no additional benefits were provided to the Funds in return for the additional fees.

2.      A major reason for the dramatic increase in compensation to the defendant adviser and distributor companies was the growth in the size of the Funds resulting from Defendants' use of Fund assets to promote the sale of Fund

shares.  Among other things, those programs included (a) cash payments to brokers in return for the brokers' agreement to promote sales of Fund shares; (b) the directing of Fund portfolio brokerage to brokerage firms in return for agreements by the brokers to promote the shares of the Funds; and (c) "Soft Dollar" commission arrangements with brokers.  These payments resulted in the growth of the Funds, which benefited the adviser and distributor Defendants because it allowed their management fees and other asset-based fees to increase.  The aforesaid Defendants engaged in those programs in an effort to generate increased compensation even though many of those programs were in violation of SEC and NASD rules and regulations.  They engaged in such improper activity despite ample evidence that the increase in their compensation was not justified by any increase in the quality or nature of the services which they provided to the Funds, or by additional benefits to the Funds.

3.     Although an increase in mutual fund assets can benefit investors through economies of scale that decrease the expenses of operating such funds on a per share basis, Defendants failed to reduce their fees to pass on the economies of scale to the Funds.  Instead, they utilized the economies of scale for their own benefit.

4.     The fee structure imposed by Defendants on the Funds far exceeded the fees that would be paid as a result of arm's-length bargaining. For example, the

fees charged to retail investors in the Funds were much higher than the fees paid to Defendants by institutional investors for essentially the same services.  Unlike individual retail investors, institutional investors have the ability to negotiate at arm's-length with investment advisers.

5.      The Defendant directors of the Funds also violated Section 36(b) by receiving substantial compensation for serving in that capacity while failing to perform the responsibilities for which they were being paid.  They were appointed as directors in order to serve as "watch dogs" having the responsibility to assure that compensation received by the advisor and distributor defendants was reasonable.  In violation of that duty, they repeatedly approved compensation and fee programs that provided millions of dollars of additional payments to the advisor and distributor defendants despite an extensive array of red flags that should have alerted them to the fact that no additional services or other benefits were being provided to the Funds in return for the increased compensation.

6.      The director defendants had a fiduciary duty to the Funds to provide the services for which they were being retained.  Because they failed to provide those services, the payments made to them were grossly disproportionate to the value of any services rendered.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 36(b) and 48(a) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a-35(b) and 80a-47(a).

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 44 of the Investment Company Act, 15 U.S.C. §§ 80a-43; and 28 U.S.C. § 1391(b).

9.      Many of the wrongful acts alleged herein, including the charging of excessive fees, occurred in substantial part in this District.  Defendants conducted other substantial business within this District and many Fund shareholders reside within this District.  Defendant Lord, Abbett & Co. LLC was at all relevant times, and still is, headquartered in this District.

10.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### Plaintiffs

11.     Plaintiff Joseph C. White held and continues to hold shares or units of the Lord Abbett Mid-Cap Value Fund, Lord Abbett Affiliated Fund, Lord Abbett

All Value Fund and Lord Abbett Growth Opportunities Fund and has been damaged by the conduct alleged herein.

12.     Plaintiff Josephine Logan held and continues to hold shares of the Lord Abbett Affiliated Fund and has been damaged by the conduct alleged herein.

13.     Plaintiff Richard Curtis held and continues to hold shares of the Lord Abbett Affiliated Fund and has been damaged by the conduct alleged herein.

14.     Plaintiff Bo Bortner held and continues to hold shares of the Lord Abbett Mid-Cap Value Fund, Lord Abbett All Value Fund and the Lord Abbett America's Value Fund and has been damaged by the conduct alleged herein.

15.     Plaintiff James A. Pingitore held and continues to hold shares or units of the Lord Abbett Bond Debenture Fund and has been damaged by the conduct alleged herein.

16.     Plaintiff Philip Katz held and continues to hold shares of the Lord Abbett California Tax-Free Fund and has been damaged by the conduct alleged herein.

17.     The aforementioned funds in which the Plaintiffs are invested are hereinafter referred to as the "Funds."

**The Parent Company/Investment Adviser**

18.     Defendant Lord, Abbett & Co. LLC ("Lord Abbett" or the "Investment Adviser Defendant") is a privately-held Delaware limited liability

company engaged in the business of money management.  Lord Abbett manages approximately 45 mutual fund portfolios, including the Funds, and, as of September 30, 2003, managed over $62.1 billion in assets.  Lord Abbett has its principal place of business at 90 Hudson Street, Jersey City, New Jersey 07302. Lord Abbett is registered as an investment adviser under the Investment Advisers Act and had ultimate responsibility for overseeing the day-to-day management of the Funds.  Investment advisory fees payable to Lord Abbett are calculated as a percentage of Fund assets under management.

**The Directors and Trustees**

19.     At all relevant times, Defendant Robert S. Dow ("Dow") was the Managing Partner and Chief Investment Officer of Lord Abbett and is an "interested person" as defined in the Investment Company Act.  He was also at all relevant times a director/trustee of each of the Funds, and received substantial compensation in that capacity.  The business address of Dow is 90 Hudson Street, Jersey City, New Jersey 07302-3973.

20.     At all relevant times, Defendant E. Thayer Bigelow ("Bigelow") was a director/trustee of each of the Funds.  For his service as a director or trustee of Lord Abbett funds, Bigelow received compensation in 2002 of $85,000.  The business address of Bigelow is 909 Third Avenue, 5th Floor, New York, New York.

21.     At all relevant times, Defendant H.T. Bush ("Bush") was a director/trustee of each of the Funds.  For his service as a director or trustee of Lord Abbett funds, Bush received compensation in 2002 of $85,000.  The business address of Bush is 101 South Hanley Road, Suite 1025, St. Louis, Missouri.

22.     At all relevant times, Defendant Robert B. Calhoun, Jr. ("Calhoun") was a director/trustee of each of the Funds.  For his service as a director or trustee of Lord Abbett funds, Calhoun received compensation in 2002 of $86,400.  The business address of Calhoun is Two Canal Park, Cambridge, Massachusetts.

23.     At all relevant times, Defendant Franklin W. Hobbs ("Hobbs") was a director/trustee of each of the Funds.  For his service as a director or trustee of Lord Abbett funds, Hobbs received compensation in 2002 of $85,000.  The business address of Hobbs is 685 Third Avenue, New York, New York.

24.     At all relevant times, Defendant C. Alan MacDonald ("MacDonald") was a director/trustee of each of the Funds.  For his service as a director or trustee of Lord Abbett funds, MacDonald received compensation in 2002 of $85,000.  The business address of McDonald is 415 Round Hill Road, Greenwich, Connecticut.

25.     At all relevant times, Defendant Thomas J. Neff ("Neff") was a director/trustee of each of the Funds.  For his service as a director or trustee of Lord Abbett funds, Neff received compensation in 2002 of $84,000.  The business address of Neff is 277 Park Avenue, New York, New York.

26.    During the relevant period, Defendant James F. Orr III ("Orr") was a director/trustee of the Affiliated Fund, the All Value Fund and the California Tax-Free Income Fund.  For his service as a director or trustee of Lord Abbett funds, Orr received compensation in 2002 of $70,500.  The business address of Orr is 90 Hudson Street, Jersey City, New Jersey 07302-3973.

27.    Defendants Dow, Bigelow, Bush, Calhoun, Hobbs, MacDonald, Neff and Orr are herein referred to as the "Director Defendants."

**The Distributor**

28.    At all relevant times, Defendant Lord Abbett Distributor LLC (the "Distributor Defendant"), Lord Abbett's wholly-owned broker/dealer registered under the Securities Exchange Act of 1934 (the "Exchange Act"), marketed and sold the Lord Abbett Funds as the Funds' principal underwriter and promoted and provided information regarding the portfolio management services of the Lord Abbett investment adviser to unaffiliated third-party broker/dealer firms.  The Distributor Defendant also implemented the Rule 12b-1 distribution plans entered into between the Distributor Defendant and the Funds.  The Distributor Defendant is located at 90 Hudson Street, Jersey City, New Jersey 07302.  The Distributor Defendant receives payment for distribution services calculated as a percentage of the net asset value of the Funds under a Rule 12b-1 Plan.

**The Funds**

29.     Nominal Defendants the Funds are open-ended management companies consisting of the capital invested by mutual fund shareholders.  The Funds are named as nominal Defendants to the extent that they may be deemed necessary and indispensable parties pursuant to Rule 19 of the Federal Rules of Civil Procedure and to the extent necessary to ensure the availability of adequate remedies.

**SUBSTANTIVE ALLEGATIONS**

**DEFENDANTS VIOLATED THEIR DUTIES
IN CHARGING AND OBTAINING EXCESSIVE FEES**

30.     The fees charged to mutual fund investors should be the equivalent of fees that would have resulted from arm's-length bargaining.  Directors are required to negotiate the fees charged to the fund on behalf of the investors (who, individually, are unable to negotiate such fees), and on behalf of the fund, which is otherwise under the control of the fund's adviser.  At the same time, investment advisers and their affiliates have a fiduciary duty with respect to the fees that are charged to funds in that the fees must be reasonably related to the services provided.

31.     Congress enacted Section 36(b) to protect investors and their funds, stating that investment advisers have a fiduciary duty with regard to the

compensation they receive from the fund.  When examining the source of

excessive advisory fees, the legislative history of Section 36(b) states:

> It is noted … that problems arise due to the economies of scale
> attributable to the dramatic growth of the mutual fund industry.  In
> some instances these economies of scale have not been shared with
> investors.  Recently there has been a desirable tendency on some fund
> managers to reduce their effective charges as the fund grows in size.
> Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), reprinted in 1970 U.S. Code Cong. & Ad. News,

at 4901-02.

32.     Distributors, as affiliates of the investment adviser, are also fiduciaries

to investors with respect to the fees the fund and its investors pay.

33.     The fees at issue in this case include, without limitation, the

investment adviser fees (including administrative fees), Rule 12b-1 fees (including

service fees), and directors' fees paid by the Funds.

34.     Investment adviser fees are calculated as a percentage of assets under

management.  As the fund assets increase, the dollar amount of such fees parallel

this growth.

35.     12b-1 fees get their name from the SEC rule that authorizes their

payment.  Rule 12b-1 permits a fund to pay distribution fees out of fund assets

only if the fund has adopted a plan (12b-1 plan) authorizing their payment.

"Distribution fees" include fees paid to compensate the distributor for marketing

and selling fund shares, including compensating brokers and others who sell fund

shares, and paying for other promotional expenses.  The 12b-1 fees paid by an investor will vary based on the class of share purchased by that investor.  Mutual funds typically offer different classes of share per portfolio based on how the investor wishes to pay for the sales load, and whether the investor is a retail purchaser or an institution.  For example, according to the 2004 Annual Report of the Lord Abbett Affiliated Fund, which is similar in structure to other Funds, that Fund has the following classes of shares:

- Class A - front-end load commission (normally pay a front-end load and a contingent deferred sales charge and may have service fees up to 25 basis points and a 12b-1 fee that may not exceed 10 basis points).

- Class B - a contingent deferred sales charge, may have service fees up to 25 basis points and a 12b-1 fee of 75 basis points).

- Class C - a contingent deferred sales charge and may have service fees up to 25 basis points and a 12b-1 fee of 75 basis points.

- Class P - a contingent deferred sales charge and may have service fees up to 20 basis points and 12b-1 fee of 25 basis points.

- Class Y - institutional (pay no sales load or 12b-1 fees).

**<u>The Fees Charged Were Excessive</u>**

36.     Defendants charged the Funds excessive investment adviser fees, 12b-1 fees and directors' fees.

37.     The profitability of a fund to an adviser-manager is a function of revenues minus the costs of providing services.  Defendants' incremental costs of providing advisory services to the Funds were nominal.  The additional fees

received by Defendants were disproportionate given that the nature, quality and level of the services remained the same. On a per share basis, it does not cost more to manage additional assets in a growing fund because economies of scale occur on both the fund complex and portfolio level for various costs incurred. For example, many of the costs, such as the costs of research for a particular investment, remain fixed regardless of the amount of assets in a given fund devoted to that investment.

38. Significant economies of scale also exist in regard to the administration fees charged to investors. The cost of maintaining a shareholder's account is typically the same for all shareholders, regardless of the relative size of their accounts. For example, assume the annual cost of maintaining an account is $40 and that the mutual fund has 100,000 shareholders. If the fund has $100,000,000 in assets (an average of $1,000 per account), then the administrative expenses are 4.0% of fund assets. But, if total assets are $250,000,000 (an average account of $2,500), then the administrative expense ratio is 1.6%. The expense ratio falls as fund assets rise. David A. Latzko, *Economies of Scale in Mutual Fund Administration*, 22 J. Fin. Res. 331 (1999), *available at* http://personal.psu.edu/faculty/d/x/dx131/ research/articles/mutual.pdf.

39. During the relevant time frame, the Fund assets managed by the Investment Adviser Defendant have grown dramatically, resulting in greatly increased advisory, 12b-1 and administrative fees. That immense growth of assets

under management has also generated substantial economies of scale to the great

benefit of the Investment Adviser and Distributor Defendants, which have not been

passed on to the Funds through lower fees.  As has been noted, the mutual fund

industry is a business in which economies of scale are present and are statistically

significant.  William Baunol, *The Economics of Mutual Fund Markets:*

*Competition Versus Regulation*, 186, 190, Boston: Kluwer Academic (1990).

      40.    The economies of scale enjoyed by Defendants have not been shared

with the Funds or their investors.  The Investment Adviser Defendant and

Distributor Defendant, in charging fees to the Funds, failed to pass on the

economies of scale they were realizing as the Funds grew.  The Director

Defendants ignored this failure and allowed the Investment Adviser and

Distributor Defendants to continue to charge the Funds excessive fees.  As the SEC

has made clear, "if the fund or fund family is experiencing economies of scale,

fund directors have an obligation to ensure that fund shareholders share in the

benefits of the reduced costs by, for example, requiring that the adviser's fees be

lowered, breakpoints be included in the adviser's fees, or that the adviser provide

additional services under the advisory contract… If the fund or fund family is not

experiencing economies of scale, then the directors may seek to determine from the

adviser how the adviser might operate more efficiently in order to produce

economies of scale as fund assets grow."  SEC, Division of Investment

Management: Report on Mutual Fund Fees and Expenses, at B1 (Dec. 2000)

("SEC Report on Mutual Fund Fees"), *available at* http://www.sec.gov/

news/studies/feestudy.htm.

### The Breakpoints In The Funds' Advisory Agreements Do Not Meaningfully Pass The Economies of Scale On To The Funds And Are Largely Illusory

41.     A "fee breakpoint" has been explained as follows:

Many funds employ a declining rate structure in which the percentage fee rate decreases in steps or at designated breakpoints as assets increase…. The declining rate schedule reflects the expectation that costs efficiencies or scale economies will be realized in the management and administration of the fund's portfolio and operations as the fund grows.

John P. Freeman and Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, U.S.C.L., http://www.law.sc.edu/freeman/jcl-01.pdf.

42.     While the advisory contracts for the Funds include breakpoints, many of these breakpoints were meaningless because, as a practical matter, they did not pass any of the economies of scale to fund investors.  For example, according to Lord Abbett Affiliated Fund prospectuses, at all relevant times the Fund had the following breakpoints:

- .50 of 1% on the first $200 million in assets

- .40 of 1% on the next $300 million in assets

- .375 of 1% on the next $200 million in assets

- .35 of 1% on the next $200 million in assets

- .30 of 1% on the fund's assets over $900 million

The net assets of the Lord Abbett Affiliated Fund have been significantly over the $900 million mark since before 1986. Therefore the breakpoints for that Fund are illusory because they failed to pass any economies of scale on to investors after the $900 million level was reached over 20 years ago. As of 1986, the Lord Abbett Affiliated Fund had net assets of $3,212,287,000 and by 2004 this number increased to $16,672,092,000. Thus, the Investment Adviser Defendant breached its fiduciary duty to the Funds by failing to implement any new breakpoints over the course of two decades and the Director Defendants breached their fiduciary duty to the Fund by failing to insist on new breakpoints in the advisory agreement. The increase in the Fund's size resulted in a major increase in Defendants' fees, but Fund investors received no benefits from the economies of scale through a reduction in fees or a corresponding increase in services rendered to the Funds.

43.     Another example of the failure of the ostensible breakpoints to benefit Fund investors involved the Lord Abbett Bond Debenture Fund. This Fund includes two breakpoints that have not resulted in any of the economies of scale being passed to investors since 1990. While the Lord Abbett Bond Debenture Fund charges .50 of 1% for the first $500 million in assets and .45 of 1% on assets over $500 million, the Fund has had net assets of over $500 million since 1990. In fact, since 1990, this Fund has experienced significant growth, increasing its net assets from $480,847,000 to $8,600,174,000. Since the investors received no

breakpoints from the Fund's net asset increase over $500 million, the Fund's growth was enjoyed solely by the Defendants.

44.     Similarly, Lord Abbett Mid-Cap Value Fund has two breakpoints that have not resulted in any of the economies of scale being passed to investors since prior to 2000.  Lord Abbett Mid-Cap Value Fund charges .75 of 1% for the first $200 million in assets; .65 of 1% on the next $300 million and .50 of 1% on assets over $500 million.  However, Lord Abbett Mid-Cap Value Fund has had assets over $500 million since 2000.  In fact, since 2000, this Fund has experienced significant growth, going from $716,110,000 to $8,338,716,000.  Since the investors received no breakpoints from the Fund's net asset increase over $500 million, the Fund's growth was enjoyed solely by the Defendants.

45.     Furthermore, some of the breakpoints included in the Fund's advisory agreements were never reached because the Fund assets never reached the asset level required for the breakpoints to take effect.  For example, Lord Abbett Growth Opportunities Fund has the following breakpoints for its advisory fees:

- .80 of 1% of the first $1 billion of average daily net assets

- .75 of 1% of the next $1 billion

- .70 of 1% of the next $1 billion

- .65 of 1% of assets over $3 billion

46.     Between 2000 and 2004, however, the assets of Lord Abbett Growth Opportunities Fund grew from $290,243,000 to $784,472,000.  Yet since the

Fund's net assets have never reached $1 billion, the Fund's investors have never enjoyed any of the benefits of the economies of scale created by the increase in the Fund's net assets.

## Expense Ratios Did Not Adequately Decrease as Fund Assets Proliferated

47.     The Investment Adviser and Distributor Defendants kept the benefits of the economies of scale for themselves. For example:

- During 2000 to 2004, Lord Abbett Bond Debenture Fund's assets under management grew from $3,335,990,000 to $8,600,174,000, increasing by 158%, while expenses increased from $38,950,852 to $102,325,719, increasing by 163%.

- During 2000 to 2004, Lord Abbett Affiliated Fund's assets under management grew from $11,354,916,000 to $16,672,092,000, increasing by 47%, while expenses increased from $96,496,798 to $157,108,000 increasing by 63%.

- During 2000 to 2004, Lord Abbett Growth Opportunities Fund's assets under management grew from $290,243,000 to $784,472,000, increasing by 170%, while expenses increased from $5,038,650 to $14,654,069, increasing by 191%.

48.     Even when the percentage increase in the expense was less than the percentage increase of assets under management, it was slight.  For example:

- During 2000 to 2004, Lord Abbett Mid-Cap Value Fund's assets under management grew from $716,110,000 to $8,338,716,000, increasing by 1064%, while expenses increased from $10,443,945 to $108,532,713, increasing by 939%.

49.     According to Morningstar, the well-respected mutual fund information service, the Funds have high expenses compared with their peers in the industry and high expense ratios given their asset growth.  For example, according

to a recent Morningstar report, the Mid-Cap Value Fund's A shares 12b-1 fee of

0.36% "is one of the highest among the category's front-load option[s]."

According to Morningstar, the same is true of the All Value Fund, which also has a

12b-1 fee of 0.36%.  Similarly, according to another Morningstar report, the

California Tax-Free Income Fund's "0.99% expense ration is high relative to its

typically front-loaded category peer."  Morningstar also noted in another recent

report on the Bond Debenture Fund that "this fund's 0.99% expense ration should

decline at a much quicker pace, given its asset growth…."

**The Investment Adviser and Distributor Defendants Charged**
**Excessive Rule 12b-1 Marketing Fees**

      50.    Section 12(b) of the Investment Company Act prohibits mutual funds

from directly or indirectly distributing or marketing their own shares unless certain

enumerated conditions set forth in Rule 12b-1, promulgated by the SEC pursuant

to the Investment Company Act, are met.  The Rule 12b-1 conditions, among

others, are that payments for marketing must be made pursuant to a written plan

"describing all material aspects of the proposed financing of distribution"; all

agreements with any person relating to implementation of the plan must be in

writing; the plan and any related agreements must be approved by a vote of the

majority of the board of directors; and the board of directors must review, at least

quarterly, "a written report of the amounts so expended and the purposes for which

such expenditures were made."  Distribution of Shares by Registered Open-end Management Investment Company, 17 C.F.R. § 270.12b-1.

51.     Additionally, the directors "have a duty to request and evaluate, and any person who is a party to any agreement with such company relating to such plan shall have a duty to furnish, such information as may reasonably be necessary to an informed determination of whether such plan should be implemented or continued."  *Id.*  The directors may continue the plan "only if the board of directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable business judgment, and in light of their fiduciary duties under state law and section 36(a) and (b) (15 U.S.C. 80a-35(a) and (b)) of the [Investment Company] Act that there is a reasonable likelihood that the plan will benefit the company and its shareholders."  *Id.*

52.     The exceptions to the Section 12(b) prohibition on mutual fund marketing and distribution were enacted in 1980 under the theory that the marketing of mutual funds generally should be encouraged because increased investment in mutual funds would presumably result in economies of scale, the benefits of which would be shifted from fund managers to investors.  During the relevant time period, the Director Defendants authorized, and the Investment Adviser and Distributor Defendants collected, millions of dollars in Rule 12b-1 marketing and distribution fees.

53.     However, the Rule 12b-1 fees charged to the Funds were excessive because those payments did not result in any benefits to the Funds.  As alleged above, as the Funds were marketed and the number of Fund investors increased, the economies of scale thereby created, if any, were not passed on to the Funds through lower fees.  For example, although the Lord Abbett Affiliated Fund Class A grew by $11 billion between 1989 and 2004, the expense ratio also increased during that time.  Timothy Middleton, *3 Sure Steps to Bigger Fund Profits*, MSNMoney, July 19, 2005, http://moneycentral.msn.com /content/P122718.asp.

54.     The increase in assets and fees while the expense ratio also increased was a red flag that the Director Defendants should have recognized as evidence that the 12b-1 payments were disproportionate to any benefit received by the Funds from those payments.   If anything, the Funds' marketing efforts were creating diminished marginal returns under circumstances where increased Fund size correlated with reduced liquidity and Fund performance.

**Excessiveness Is Also Shown By Comparing The Fees
at Issue to Fee Arrangements In Which Both Parties
Have The Ability To Negotiate at Arm's-Length**

55.     Fees that were the result of arm's-length negotiations with institutional investors were significantly lower than fees charged to individual retail investors for the same services.  The SEC recently noted its concern over such fee discrepancies when proposing a rule requiring further disclosure of

directors' bases for approving or renewing an advisory contract. The proposal states:

> Recently, concerns have been raised regarding the adequacy of review of advisory contracts and management fees by fund boards. In particular, the level of fees charged by investment advisers to mutual fund clients, especially in comparison to those charged by the same advisers to pension plans and other institutional clients, has come under scrutiny.

Disclosure Regarding Approval of Investment Advisory Contracts by Directors of Investment Companies, Release Nos. 33-8364, 34-49219, IC-26350, 2004 SEC LEXIS 298, at *8 (proposed Feb. 11, 2004)(to be codified at 17 C.F.R. pt. 239, 240, and 274).

56.     Lord Abbett distribution fees are significantly higher for retail investors than for institutional investors for similar services. As a result, the overall expense ratio is higher for the retail shares than for the institutional shares. For example, retail Class A shares of Lord Abbett Affiliated Fund have an annual expense ratio of .83% whereas the institutional shares have an expense ratio of .48%. Ken Hoover, *Lord Abbett Completes Allocation Suite; Funds For All Seasons; New Offerings are Aimed at Investors with Taste for Income, Foreign Fare*, Investors Business Daily, July, 5, 2005 at A09.

57.     Similarly, in 2005, the Lord Abbett Bond Debenture Fund Class Y (institutional) investors had a .65% expense ratio, compared with an expense ratio of 1.00% for Class A investors and 1.64% expense ratio for Class B investors;

Lord Abbett Mid-Cap Value Fund Class Y investors had an .82% expense ratio while Class A investors had a 1.19% expense ratio; Lord Abbett America's Value Fund Class Y investors had a 1.10% expense ratio while Class A investors had a 1.35% expense ratio; and Lord Abbett Growth Fund Opportunities Fund Class Y investors had a 1.34% expense ratio while Class A investors had a 1.85% expense ratio.

**The Fees At Issue Were Wrongfully Inflated to Facilitate Defendants' Revenue Sharing Arrangements with Brokers**

58.     The Investment Adviser and Distributor Defendants inflated their advisory and distribution fees to reimburse themselves from Fund assets for "revenue sharing" payments they made to brokers.  Revenue sharing arrangements are agreements in which investment advisers and distributors agree to pay brokers extra compensation in return for the brokers' agreement to promote their fund family products over the shares of other fund families. These payments resulted in significant increases in the asset size of the funds being promoted.  As alleged above, the benefits from those increases went solely to the Defendants, not to the Funds.

59.     In particular, Lord Abbett used the assets of its mutual funds to participate in revenue sharing programs (also called "shelf-space programs") at various brokerages, including, but not limited to, Morgan Stanley, Edward Jones, Wachovia Securities, Salomon Smith Barney and Merrill Lynch.

60.     Additionally, the Investment Adviser and Distributor Defendants directed Fund portfolio brokerage to brokers with which they had shelf space agreements to satisfy their revenue sharing obligations.  They thereby used Fund brokerage commissions -- a Fund asset -- to benefit themselves rather than the Funds.

61.     The Investment Adviser and Distributor Defendants were willing to, and did, engage in such activities in order to increase the size of their fees despite the fact that those programs violated applicable SEC and NASD rules and regulations.  For example, both the SEC and the NASD have announced that the revenue sharing and directed brokerage payments that were made to brokerage house Morgan Stanley by various fund families, including Lord Abbett, violated applicable regulations because those programs were not adequately disclosed in the fund prospectuses and because payment of directed brokerage was in violation of those regulations.  The SEC and other regulators have made similar findings with respect to other revenue sharing relationships between funds that included the Lord Abbett family of funds and the brokerage house Edward D. Jones & Co.

**The Investment Adviser Defendant Did Not
Reduce Its Advisory Fees to Reflect the Benefits
It Received From the Funds' Payment of Soft Dollars**

62.     Funds are allowed to pay brokerage commissions amounts that exceed "best execution" costs in order to obtain certain additional services, which the SEC

has defined to include any service that "provides lawful and appropriate assistance to the money manager in the performance of his investment decision-making responsibilities."  15 U.S.C. §78bb interpretive notes and decisions, at 7.  The commission amounts charged by brokerages for selling the underlying securities in a mutual fund that are in excess of the purchase and sale charges are known within the industry as "Soft Dollars."  The Soft Dollar component of such commission payments is typically paid to obtain for the fund services or products that are traditionally provided to the fund by the investment adviser out of its own resources, such as investment research.  By paying for such services out of fund assets through Soft Dollar commissions, the Investment Adviser Defendant shifted substantial expenses that it would otherwise have borne to the Funds.  However, it failed to reduce its advisory fee in an amount that compensated the Funds for the fact that the Funds were now paying expenses that are normally borne by the adviser.  The advisory fees were therefore excessive to the extent that they were not adjusted down to compensate the Funds for bearing such additional costs.

**The Director Defendants' Fees Were Excessive**
**Relative To The Services They Provided**

63.     The Director Defendants' compensation was excessive because they were paid for services they did not perform.

64.     A mutual fund's Board of Directors has a duty to ensure that fees paid to the fund's investment adviser and distributor are not excessive.  As explained by

William Donaldson, the head of the SEC, in a January 7, 2004 speech to the

Mutual Funds Directors Forum:

> The board of directors of a mutual fund has significant responsibility
> to protect investors. By law, directors generally are responsible for the
> oversight of all of the operations of a mutual fund. In addition, under
> the Investment Company Act, directors are assigned key
> responsibilities, such as negotiating and evaluating the reasonableness
> of advisory and other fees, selecting the fund's independent
> accountants, valuing certain securities held by the fund, and managing
> certain operational conflicts.
>
> The role of fund directors is particularly critical in the mutual fund
> context because almost all Funds are organized and operated by
> external money-management firms, thereby creating inherent conflicts
> of interest and potential for abuse.  Money-management firms
> operating mutual funds want to maximize their profits through fees
> provided by the Funds, but the fees, of course, paid to these firms,
> reduce the returns to fund investors.
>
> Independent directors, in particular, should serve as "independent
> watchdogs" guarding investors' interests — and helping to protect
> fund assets from uses that will be of primary benefit to management
> companies. These interests must be paramount, for it is the investors
> who own the Funds and for whose sole benefit they must be operated.

William H. Donaldson, SEC Chairman, America's Need for Vigilant Mutual Fund

Directors Speech at Mutual Fund Directors Forum (Jan. 7, 2004), available at

http://www.sec.gov/news/speech/spch010704whd.htm.  Congress fortified

directors' duties by adopting Section 15(c) of the Investment Company Act,

requiring directors to be adequately informed and giving them the authority to

demand documents from investment advisers to make their decisions.

65.     Accordingly, the Funds' public filings state that the board of directors for each Fund is responsible for the management and supervision of each respective fund.  In this regard, the SAI dated May 1, 2003 for the Lord Abbett Mid-Cap Value Fund, Inc., which is substantially similar to filings by the other Funds on this subject during the relevant time period, states, with respect to the duties of board members, as follows:

> The Board of Directors is responsible for the management of the business and affairs of the Fund.…  The Board appoints officers who are responsible for the day-to-day operations of the Fund and who execute policies authorized by the Board.  As discussed fully below, the Board also approves an investment adviser to the Fund and continues to monitor the cost and quality of the services provided by the investment adviser, and annually considers whether to renew the contract with the adviser.

66.     Another section of the same SAI under the heading APPROVAL OF ADVISORY CONTRACT sets forth the purported process by which the investment manager is selected:

> At a meeting on December 12, 2002, the Board of Directors of the Fund, including all its Directors who are not interested persons of the Fund (the "Board"), considered whether to approve the continuation of the existing management agreement between the Fund and Lord Abbett.  In addition to the materials the Board had reviewed throughout the course of the year, the Board received materials relating to the management agreement before the meeting and had the opportunity to ask questions and request further information in connection with their consideration.

67.     The same SAI also states that the Directors take the following factors into consideration when approving the advisory contracts:

NATURE AND QUALITY OF OTHER SERVICES. The Board considered the nature, quality, costs, and extent of administrative and other services performed by Lord Abbett and Lord Abbett Distributor and the nature and extent of Lord Abbett's supervision of third party service providers, including the Fund's transfer agent, custodian, and subcustodians.

EXPENSES. The Board considered the expense ratios of each class and the expense ratios of a peer group of Funds. They also considered the amount and nature of fees paid by shareholders.

PROFITABILITY. The Board considered the level of Lord Abbett's profits in managing the Funds, including a review of Lord Abbett's methodology for allocating its costs to its management of the Fund. The Board concluded that the allocation methodology had a reasonable basis and was appropriate. They considered the profits realized by Lord Abbett in connection with the operation of the Fund and whether the amount of profit is fair for the management of the Fund. They also considered the profits realized from other businesses of Lord Abbett, which may benefit from or be related to the Fund's business. The Board also considered Lord Abbett's profit margins in comparison with available industry data, both accounting for and ignoring marketing and distribution expenses, and how those profit margins could affect Lord Abbett's ability to recruit and retain investment personnel.

ECONOMIES OF SCALE. The Board considered whether there have been any economies of scale in managing the Fund, whether the Fund has appropriately benefited from any such economies of scale, and whether there is potential for realization of any further economies of scale.

OTHER BENEFITS TO LORD ABBETT. The Board considered the character and amount of fees paid by the Fund and the Fund's shareholders to Lord Abbett and Lord Abbett Distributor for services other than investment management, the allocation of Fund brokerage, and the receipt of research by Lord Abbett in return for fund brokerage. The Board also considered the revenues and profitability of Lord Abbett's investment advisory business apart from its mutual fund business, and the intangible benefits enjoyed by Lord Abbett by virtue of its relationship with the Fund.

68.    However, as alleged earlier in this Complaint, the pertinent

information concerning the nature and quality of the advisory services, the expense

ratios, Lord Abbett's profitability, economies of scale, and other benefits to Lord

Abbett from the programs described contained numerous red flags that should have

alerted the Director Defendants to the fact that the aggregate dollar amount of

advisory and distribution fees was dramatically increasing but no benefit was being

received by the Funds in return for this large amount of additional compensation.

The statistics on their face revealed that although adviser and distributor

compensation had increased, economies of scale were not being passed on to the

Funds.  In light of those red flags, the Director Defendants' responsibility was to

insist during negotiations with the Investment Adviser and Distributor Defendants

that their fees be scaled back, that meaningful break-points in the advisory and

distribution fee structure should be implemented, that the shifting of research and

similar costs from the Investment Adviser Defendant to the Funds through "soft-

dollar" commissions should be accompanied by a corresponding reduction in the

advisory fee, and that the advisory fee should not be structured in a way that

effectively treated the Defendants' "shelf space" payments to brokers as a

legitimate component of the expenses to be covered by the advisory fee.  By failing

to insist on such changes in the advisory and distribution fee structures, the

directors failed to perform the services for which they were being paid.  In

consequence, the Director Defendants' compensation was grossly disproportionate to the value of any services they provided to the Funds.

69.    The Director Defendants received documents that alerted them to Lord Abbetts' revenue sharing arrangements.  For example, according to the Distribution Agreement between Lord Abbett Affiliated Fund, Inc. and the Distributor Defendant:

> Recognizing the need for providing an incentive to sell and providing necessary and continuing informational and investment services to shareholders of the Corporation, the Corporation or the Distributor (by agreement) may pay independent broker-dealers periodic servicing and distribution  fees based on the percentage of average annual  net asset value of shareholders accounts of such broker-dealers.

Distribution Agreement between Lord Abbett Affiliated Fund, and Lord Abbett Distributor LLC dated July 12, 1996.  Given such information, the Director Defendants were alerted to the likelihood that the proposed advisory and distribution fees would be set in an amount designed to cover the revenue sharing obligations of the Investment Adviser and Distributor Defendants.  They also had the information to know that those programs were not providing any benefit to the Funds through the provision of economies of scale or in other respects, and that, therefore, any advisory fee structure which was calculated to provide a large profit for the Investment Adviser Defendant after payment of its revenue sharing obligations would be grossly disproportionate to the services rendered. Nevertheless, the Director Defendants repeatedly approved advisory fees that were

calculated by the adviser so that they would be large enough to encompass the payment of revenue sharing obligations.

70.    The Director Defendants' fees increased during the relevant period, even though the services they provided to the Funds did not change.  From 1996 to 2005, Director Defendants' fees doubled.  For example,  according to Lord Abbett Affiliated Prospectuses, between 1996 and 2002, Director Defendant Alan MacDonald's fees increased from $33,600 to $85,000; and Thomas J. Neff's fees increased from $33,600 to $84,000.  Although their fees more than doubled, no additional services were provided to investors or the Fund.

## COUNT I

### AGAINST THE DISTRIBUTOR DEFENDANT, THE INVESTMENT ADVISER DEFENDANT AND THE DIRECTOR DEFENDANTS PURSUANT TO SECTION 36(b) OF THE INVESTMENT COMPANY ACT

71.    Plaintiffs repeat and reallege each and every allegation contained above and otherwise incorporate the allegations contained above.

72.    This Count is brought by Plaintiffs against all of the Defendants for breach of their fiduciary duties with respect to compensation or payments as defined by Section 36(b) of the Investment Company Act.

73.    Each of the Defendants had a fiduciary duty to the Funds and their investors with respect to the receipt of compensation for services and of payments of a material nature.

74.     The fees received by the Defendants in this Count charged to the Funds and their investors were excessive under Section 36(b) because they are not what would have been negotiated at arm's-length and were so disproportionately large that they bore no reasonable relationship to the services rendered.  For example, the Investment Adviser Defendant and/or Distributor Defendant charged investors in the Funds excessive advisory and 12b-1 marketing fees as a result of their failure to pass on economies of scale as the size of the Funds grew, as described hereinabove.  In fact, no additional services were provided to the Funds or their investors for the increased advisory and distributor fees enjoyed by the Investment Adviser Defendant and the Distributor Defendant.  A major reason for the dramatic increase in compensation to the Investment Adviser Defendant and Distributor Defendant was the growth in the size of the Funds resulting from Defendants' use of Fund assets to promote the sale of Fund shares through revenue sharing and other agreements, as described hereinabove.  These payments resulted in the growth of Defendants' asset-based fees as the Funds grew.  Accordingly, the sole purpose of the fees charged to the Funds and investors by Defendants was to expand the size of the Funds to profit Defendants but no benefit accrued to the Funds or their investors from those fees.  Thus, the fees were excessive and Defendants breached their fiduciary duties by charging such fees and receiving the benefits therefrom.

75.     The Director Defendants received material compensation or payment for their duties as the appointed watchdogs over the other Defendants, which they breached.  The duties of the Director Defendants, which include the approval of the advisory contract, the supervision of advisers' management, review of distribution arrangements and information regarding the advisory services, are what the Funds pay for in compensating their directors.  As such, the Director Defendants received from the Funds compensation or payments of a material nature.  However, despite their compensation, the Director Defendants ignored the fact that the economies of scale were not being passed on to the Funds or their shareholders and allowed the Investment Adviser and Distributor Defendants to continue charging the Funds and their investors excessive fees.

76.     The Distributor Defendant similarly received from the Funds compensation or payments of a material nature.  For example, the Distributor Defendant caused 12b-1 fees to be paid to itself.  The sole purpose of such payments was to increase the size of the Funds, in order to increase the size of the fees received by the Distributor and the Investment Adviser Defendant.  As such, the Distributor Defendant breached its fiduciary duties in respect of compensation or payments of a material nature from the Funds and their investors.

77.     By reason of the conduct described above, the Investment Adviser Defendant, Distributor Defendant and Director Defendants violated Section 36(b)

of the Investment Company Act.  As a direct, proximate and foreseeable result of these Defendants' breaches of fiduciary duties, the Funds and their investors, including Plaintiffs herein, have incurred damages.

**COUNT II**

**AGAINST THE INVESTMENT ADVISER DEFENDANT (AS CONTROL PERSON OF THE DISTRIBUTOR DEFENDANT AND THE DIRECTOR DEFENDANTS) FOR VIOLATION OF SECTION 48(a) OF THE INVESTMENT COMPANY ACT**

78.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

79.     This Count is brought pursuant to Section 48(a) of the Investment Company Act against the Investment Adviser Defendant as a control person of the Distributor Defendant and Director Defendants that caused the Distributor Defendant and Director Defendants to commit the violations of the Investment Company Act alleged herein.

80.     The Distributor Defendant and the Director Defendants are liable under Section 36(b) of the Investment Company Act as set forth above.

81.     The Investment Adviser Defendant was a "control person" of the Distributor Defendant and Director Defendants that caused the violations complained of herein.  By virtue of its position of operational control and/or authority over the Distributor Defendant and Director Defendants, the Investment Adviser Defendant directly and indirectly had the power and authority, and

exercised the same, to cause the Distributor Defendant and Director Defendants to engage in the wrongful conduct complained of herein.

82.   Pursuant to Section 48(a) of the Investment Company Act, by reason of the foregoing, the Investment Adviser Defendant is liable to the Funds and their investors, including Plaintiffs, for primary violations of Section 36(b) of the Investment Company Act.

83.   By virtue of the foregoing, the Funds and their investors, including Plaintiffs, are entitled to damages against the Investment Adviser Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.   Awarding compensatory damages on behalf of the Funds against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

B.   Awarding the Funds injunctive relief ordering Defendants to cease the charging of excessive fees;

C.   Ordering an accounting of all Fund related fees, commissions, and Soft Dollar payments;

D.   Ordering restitution of all excessive fees and charges;

E.   Awarding such other and further relief as this Court may deem just and proper;

F.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

G.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:          September 29, 2005

SHALOV STONE & BONNER LLP

By:   /s/ Patrick L. Rocco
          Patrick L. Rocco
163 Madison Avenue, P.O. Box 1277
Morristown, New Jersey  07962-1277
(973) 775-8997

*Liaison Counsel for Plaintiffs*

MILBERG WEISS BERSHAD
  & SCHULMAN LLP
Steven G. Schulman
Jerome M. Congress
Janine L. Pollack
Kim E. Miller
Michael R. Reese
One Pennsylvania Plaza
New York, New York 10119-0165
(212) 594-5300

*Lead Counsel for Plaintiffs*