## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE LORD ABBETT MUTUAL FUNDS FEE LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | MASTER FILE: 04-CV-0559 (WJM)<br><br><br>AMENDED OPINION<br><br>HON. WILLIAM J. MARTINI |

Jerome M. Congress, Esq.
Janine L. Pollack, Esq.
Kim B. Levy, Esq.
Milberg Weiss Bershad & Schulman, LLP
One Pennsylvania Plaza
New York, NY 10119
 (*Plaintiffs' Lead Counsel and Chair of Plaintiffs' Executive Committee*)

Samuel H. Rudman, Esq.
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
200 Broadhollow, Suite 406
Melville, NY 11747
 (*Member of Plaintiffs' Executive Committee*)

Marvin L. Frank, Esq.
Eric J. Belfi, Esq.
Murray, Frank & Sailer LLP
275 Madison Ave.
New York, NY 10016
 (*Member of Plaintiffs' Executive Committee*)

Joseph H. Weiss, Esq.
Richard A. Acocelli, Esq.
Weiss & Lurie
551 Fifth Ave.
New York, NY 10176
 (*Member of Plaintiffs' Executive Committee*)

Patrick L. Rocco, Esq.
Jennier A. Sullivan, Esq.
Shalov Stone & Bonner LLP
163 Madison Avenue, P.O. Box 1277
Morristown, NJ 07962

(*Liaison Counsel for Plaintiffs*)

Joseph J. DePalma, Esq.
Lite, DePalma, Greenberg & Rivas LLC
Two Gateway Center, Twelfth Floor
Newark, NJ 07102-5003
     (*Counsel for Plaintiff*)

Gary S. Graifman, Esq.
Kantrowitz, Goldhamer & Graifman
210 Summit Ave.
Montvale, NJ 07645
     (*Counsel for Plaintiff*)

(*Counsel for Defendants*):

Anthony P. LaRocco, Esq.
Christopher A. Barbarasi, Esq.
Kirkpatrick & Lockhart LLP
One Newark Center, Tenth Floor
Newark, NJ 07102

Jeffrey B. Maletta, Esq.
Nicholas G. Terris, Esq.
Jon A. Stanley, Esq.
Kirkpatrick & Lockhart LLP
1800 Massachusetts Ave., N.W.
Washington, DC 20036-1221

Andrew Weissman, Esq.
Sam Broderick, Esq.
Wilmer Cutler Pickering Hale and Dorr LLP
2445 M Street, N.W.
Washington, DC 20037

Mary Sue Henifin, Esq.
Tod S. Chasin, Esq.
Buchanan Ingersoll, PC
700 Alexander Park, Suite 300
Princeton, NJ 08540-6347

**WILLIAM J. MARTINI, U.S.D.J.**:

This matter comes before the Court on a pair of motions to dismiss the Consolidated Amended Class Action Complaint (referred to herein as "Complaint" or "Compl.") pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(6), and 23.1—one filed by Lord, Abbett & Co. LLC, Lord Abbett Distributor LLC, Robert S. Dow, and the persons identified in the Complaint as "the Partners" and the other filed by the remaining persons identified in the Complaint as "the Directors and Trustees." There was no oral argument. Fed. R. Civ. P. 78. For the reasons set forth below, the motions are **GRANTED IN PART** and **DENIED IN PART**. Accordingly, Counts One, Two, Five, and Seven through Ten are **DISMISSED**. Counts Three and Four are **DISMISSED WITHOUT PREJUDICE**.[1]

## BACKGROUND

This consolidated action, before this Court on allegations of subject matter jurisdiction under 15 U.S.C. §§ 80a-43, 80b-14, is brought by six shareholders in seven mutual funds managed by Lord, Abbett & Co. LLC ("Lord Abbett") against Lord Abbett, certain of its "Partners," certain "Directors and Trustees" of Lord Abbett-sponsored Funds, Lord Abbett Distributor LLC (Lord Abbett's wholly-owned broker dealer and principal underwriter), and certain other unnamed "John Doe" Defendants. (*See* Compl. ¶¶ 14–82.) Also named as nominal defendants are more than fifty separate mutual funds managed by Lord Abbett (referred to herein as "Lord Abbett Funds" or the "Fund(s)"). (*See* Compl. ¶¶ 78–81 & Ex. A.) The action, which purports to assert both class and derivative claims, arises out of broker compensation practices employed by Lord Abbett between February 1999 and December 2003 pursuant to which brokers

---

[1]     Plaintiffs have withdrawn Count Six of the Complaint. (*See* Pls.' Opp'n at 5 n.4.)

were allegedly compensated excessively as an incentive for them to steer new investors into Lord

Abbett mutual funds.  The following are the relevant allegations.  To provide some necessary

context, the following also briefly describes the Funds' and their disclosed fee and broker

compensation practices.

### *The Funds, Their Fees, and Lord Abbett's Broker Compensation Practices*

Lord Abbett is investment advisor to a mutual fund complex that, as of September 30,

2003, maintained over $62.1 billion in assets.  (*Id.* ¶ 20.)  The 52 nominal-defendant Funds it

manages are open-ended management companies consisting of the capital invested by fund

shareholders.  (*Id.* ¶ 78.)  They share a common board of directors, are all generally managed and

administered by officers and employees of Lord Abbett, all share Lord Abbett as their investment

adviser and Lord Abbett Distributor LLC as their principal underwriter and distributor, and pool

together fees and expenses.  (*Id.* ¶¶ 80–81.)

The Funds prospectuses indicate that Lord Abbett deducts a number of fixed-percentage

fees from Fund assets each year.  (*See* March 1, 2003 Prospectus and Statement of Information

for the Lord Abbett Affiliated Fund at 6, Ex. G to Decl. of Kim E. Miller [hereinafter "2003

Prospectus & SAI"].)[2]  These annual fees, which are distinct from those assessed at the time of

---

[2]     The parties do not dispute the Court's authority to consider on this motion the
Prospectus and Statement of Information for the Lord Abbett Affiliated Funds (referred to in this
Opinion as the "Fund prospectuses" or "prospectuses") referenced in the Complaint and
separately attached to Defendants' and Plaintiffs' papers.  *See Pension Ben. Guar. Corp. v. White
Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).  Nor do the parties dispute that the
2003 Fund prospectus attached to Defendants' papers and discussed in this Opinion is
representative of the prospectuses issued through the proposed class period with respect to the
Funds.  Because the prospectus attached by Defendants contains multiple pagination, the Court
notes that it cites herein the pagination provided by Thomson Financial at the bottom of each
printed page.

purchase, are called "Annual Fund Operating Expenses" and include "Management Fees,"

"Distribution and Services (12b-1) Fees," and "Other Expenses."  (*Id*.)  "Distribution and

Services (12b-1) Fees" (referred to herein as "12b-1 Fees") are drawn from fund assets pursuant

to a written plan "describing all material aspect of . . . financing of distribution" (Compl. ¶ 105)

and are expended on activities intended to result in the sale of Fund (*see* 2003 Prospectus & SAI

at 7).

The Fund prospectuses' discussion of "Sales Compensation" acknowledges that brokers

are compensated for selling Fund shares in part out of 12b-1 Fees: "[T]he Fund and Lord Abbett

Distributor pay sales and service compensation to AUTHORIZED INSTITUTIONS that sell the

Fund's shares . . . , [which] compensation originates from sales charges . . . and 12b-1

distribution fees . . . ."  (2003 Prospectus & SAI at 15.)  12b-1 Fees may also be used to provide

brokers with *additional* concessions for selling Fund shares: "Additional payments may be paid

from Lord Abbett Distributor's own resources *or* from distribution fees received from the Fund

and may be made in the form of cash or . . . non-cash payments.  The non-cash payments may

include business seminars . . . , including meals and entertainment . . . ."  (*Id*. at 16 (emphasis

added).)  Although it is not clear from the allegations in the Complaint, the Fund prospectuses

suggest that Lord Abbett Distributor is ultimately compensated out of 12b-1 Fees for any sales

compensation or additional concessions it pays to brokers out of its own assets.  (*See id.* at 61

("Each [12b-1] Plan compensates Lord Abbett Distributor for financing activities primarily

intended to sell shares of the Fund.").)

With regard to compensation of brokers for executing portfolio transactions, Fund

prospectuses state that "the Fund pays all expenses attributable to its operations . . . , including,

without limitation, . . . expenses connected with executing portfolio transactions." (*See id.* at 57 (emphasis added).) The Funds generally pay commissions on portfolio transactions above and beyond the lowest possible commission they could otherwise obtain, a fact acknowledged in Fund prospectuses: "Consistent with obtaining best execution, the Fund generally pays . . . a higher commission than some brokers might charge on the same transaction. . . . We pay a commission rate that we believe is appropriate to give maximum assurance that our brokers will provide us, on a continuing basis, the highest level of brokerage services available." (*Id.* at 58–59.) Elaborating on the circumstances in which Lord Abbett allows the Funds to pay higher brokerage commissions than they could otherwise obtain, the prospectuses state:

> Our traders are authorized to pay brokerage commissions in excess of those that other brokers might accept on the same transactions in recognition of the value of the services performed by the executing broker, viewed in terms of either the particular transaction or the overall responsibilities of Lord Abbett, with respect to us and the other accounts they manage. Such services include showing us trading opportunities . . . , a willingness and ability to take positions in securities, knowledge of a particular security or market-proven ability to handle a particular type of trade, confidential treatment, promptness and reliability.

(*Id.* at 59.) For the fiscal years ended October 2002, 2001, and 2000, the Funds paid commissions totaling $27,249,265, $26,213,126, and $13,129,004, respectively. (*Id.* at 60.)

### *The Purported Scheme: Undisclosed Revenue-Sharing Payments and Excessive "Soft Dollars"*

Against this background, the Complaint alleges that between February 1999 and December 2003 Lord Abbett, unbeknownst to Fund shareholders, compensated brokers excessively as an incentive for brokers to steer unwitting investors into the Lord Abbett Funds. (*See generally* Compl. ¶¶ 1, 83–93, 103–112.) The Complaint indicates that the broker compensation was "excessive" because it included, above the standard compensation for

executing portfolio transaction and for selling Lord Abbett shares, either revenue-sharing payments or "Soft-Dollar" payments.  (*See id.* ¶ 112.)  That is, under so-called "Shelf-Space Programs," Lord Abbett entered into undisclosed oral revenue-sharing agreements with brokers pursuant to which Lord Abbett paid brokers "an additional 10 to 15 basis points of compensation from Lord Abbett [for selling Fund shares] as incentive to steer unwitting investors into the Lord Abbett Funds."  (*See id.* ¶¶ 84–91, 93.)[3]  Lord Abbett also paid excessive "Soft Dollar" commissions—that is, that portion of broker commission that exceeds the broker's execution costs and which, therefore, is permissible only if it compensates "assistance to the money manager in the performance of his investment decision-making responsibilities"— on portfolio transactions not for permissible purposes but simply to compensate brokers for "push[ing] unwitting clients into Lord Abbett Funds."  (*See id.* ¶¶ 111–12.)

In addition to making these broker payments, Lord Abbett allegedly treated brokers who steered investors into its Funds to lavish vacations and engaged in "Directed Brokerage," whereby it directed brokerage business to brokers who steered clients into Lord Abbett Funds. (*See id.* ¶¶ 92, 103.)   Fund prospectuses disclaim the existence of brokerage allocation agreements: "No commitments are made regarding the allocation of brokerage business to or among brokers. . . ." (2003 Prospectus & SAI at 59.)  However, the prospectuses acknowledge that Lord Abbett favors, when it can, brokers who have previously sold Fund shares: "When, in the opinion of Lord Abbett, two or more broker-dealers . . . are in a position to obtain the best price and execution, preference may be given to brokers who have sold shares of the Fund and/or

---

[3]      The Complaint refers to revenue sharing payments made pursuant to the "Shelf-Space Programs" and "directed brokerage payments" interchangeably.  (*See, e.g*, Compl. ¶ 129.)

shares of other Lord Abbett-sponsored funds." (*Id.*)

Lord Abbett allegedly benefitted handsomely from these broker compensation practices: because Lord Abbett collects as its advisory fee a percentage of assets under management and because these broker compensation practices resulted in the enlargement of the fund assets under management, Lord Abbett's advisory fees increased significancy between 1999 and 2002. (*See* Compl. ¶ 100.) Specifically, the Complaint alleges that Lord Abbett's advisory fees increased between February 1999 and December 2003 from $29 million to $36 million even though the net asset value of the Funds decreased from $16.22 per share to $12.68 per share. (*See id.* ¶¶ 108–09.)

These undisclosed broker compensation practices, Plaintiffs allege, rendered Fund prospectuses issued between February 1999 and December 2003 false and/or misleading. (*See id.* ¶¶ 123–135.) Specifically, Plaintiffs allege:

• *Material Omission Regarding Strategies for Growth*. Although Fund prospectuses stated that "[t]he Fund's investment objective is long-term growth of capital and income without excessive fluctuations in market value," they purportedly failed to disclose that one of the Funds' growth strategies was payment of excessive broker compensation (*see id.* ¶ 127);

• *Material Omission Regarding Revenue Sharing*. Although Fund prospectuses stated under the heading "Sales Compensation" that "Lord Abbett Distributor pays sales and service compensation to AUTHORIZED INSTITUTIONS that sell the funds' shares and service its shareholder accounts" and that "[a]dditional payments may be paid from Lord Abbett Distributor's own resources or from distribution fees received from the Fund," these disclosures were purportedly false and misleading because they failed to disclose: (1) that Lord Abbett used Fund assets to pay brokerages moneys pursuant to revenue-sharing agreements; (2) that the revenue-sharing payments were in excess of what is allowed by Rule 12b-1; (3) that the revenue-sharing payments were not authorized by the Funds' Rule 12b-1 Plans; (4) that Lord Abbett and Lord Abbett Distributor compensated themselves out of investor assets for any payments they made pursuant to the revenue-sharing agreements; (5) that the revenue-sharing agreements created undisclosed conflicts of interest; (6) that the Lord Abbett Funds' 12b-1 Plans were not in compliance with Rule

12b-1 and that any payments made under them were in violation of Section 12 of the Investment Company Act because they were not properly evaluated by the Director Defendants and because there was no reasonable likelihood that the Plans would benefit Fund shareholders; (7) that any economies of scale achieved by bringing in new investors were not passed on to investors; and, finally, (8) that the Director Defendants were not fulfilling their statutory and common law duties and were not monitoring and supervising Lord Abbett (*see id.* ¶¶ 128–29);

- *Material Omission Regarding Directed Brokerage Business*.  Although Fund prospectuses stated under the heading "Brokerage Allocations and Other Practices" that "[t]he Fund's policy is to . . . have purchases and sales of portfolio securities executed at the most favorable prices, considering all costs of the transaction, including brokerage commissions" and that "[n]o commitments are made regarding the allocation of brokerage business to or among brokers," these disclosures were purportedly false and misleading because they failed to make the preceding disclosures (*see id.* ¶¶ 130–31);

- *Material Omission Regarding 12b-1 Fees*.  Although Fund prospectuses stated under the heading "Sales Activities and Rule 12b-1 Plans" that "[w]e may use 12b-1 distribution fees to pay Authorized Institutions to finance any activity that is primarily intended to result in the sale of shares" and that "[e]ach Plan compensates Lord Abbett Distributor for financing activities primarily intended to sell shares of the Fund," these disclosures were purportedly false and misleading because they failed to make the preceding disclosures (*see id.* ¶¶ 132–33); and

- *Material Omission Regarding Soft Dollars*.  Although Fund prospectuses stated under the heading "Brokerage Allocations and Other Practices" that "[o]ur traders are authorized to pay brokerage commissions in excess of those that other brokers might accept on the same transactions in recognition of the value of the services performed by the executing brokers," they failed to make the preceding disclosures (*see id.* ¶¶ 134–35).

Based on these allegations, Plaintiffs purport to assert *directly* eight claims (Counts One, through Four and Seven through Ten) under either the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq.*, or pursuant to state law on behalf of the proposed class. Plaintiffs also purport to assert *derivatively* one claim (Count Five) under the Investment Adviser Act of 1940 ("IAA"), 15 U.S.C. § 80b-1 *et seq.*  Plaintiffs seek, *inter alia*, compensatory damages, punitive damages, rescission of Lord Abbett's advisory contracts, recovery of all fees paid to Lord Abbett, and an accounting of all fees and broker compensation. (*See id.* at

pp.55–56.)  Defendants now seek to dismiss the Complaint in its entirety.  (*See generally* Memorandum of Law in Support of Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint [hereinafter "Defs.' Br."]; Independent Director Defendants' Memorandum of Law in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint [hereinafter "Directors' Br."].)

<u>**ANALYSIS**</u>

**I.      Standard of Review**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must set forth sufficient information to outline the elements of its claims or to permit inferences to be drawn that these elements exist.  *See* Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957).  A court may dismiss a complaint for failure to state a claim only if, after viewing the allegations in the complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted under any set of facts which could prove consistent with the allegations.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Zynn v. O'Donnell*, 688 F.2d 940, 941 (3d Cir. 1982).  In deciding such a motion, a court must take as true and view in the light most favorable to a plaintiff all allegations in the complaint.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  A court need not, however, accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

Because Defendants have raised two overarching bases for dismissal—standing and the propriety of Plaintiffs having pled most of their claims as direct (as opposed to derivative) claims—this Opinion addresses these bases first before addressing the count-by-count bases for

dismissal asserted by Defendants.

## II.    Plaintiffs Have Standing to Assert Class Claims on Behalf of Shareholders of Funds in Which Plaintiffs Lack an Ownership Interest

Defendants argue preliminarily that all claims in the Complaint asserted on behalf of shareholders of specific Lord Abbett Funds in which the named Plaintiffs lack an ownership interest must be dismissed because the named Plaintiffs lack standing to assert these claims.  (*See* Defs.' Br. at 32–33; Reply Memorandum in Support of Lord Abbett Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint at 10 [hereinafter "Defs.' Reply"].) Plaintiffs respond that standing is not a ground for dismissal at this stage of the litigation but is an issue properly left for adjudication at the class certification stage of this putative class action. (*See* Plaintiffs' Opposition to Defendants' Motions to Dismiss the Consolidated Amended Complaint at 26–32 [hereinafter "Pls.' Opp'n"].)  In the alternative, Plaintiffs argue that under *Haas v. Pittsburgh National Bank*, 526 F.2d 1083 (3d Cir. 1975), the named Plaintiffs have standing to pursue these putative class claims.  (*See* Pls.' Opp'n at 29.)  The Court agrees that the issue of standing is appropriately addressed now, but concludes that Plaintiffs lack of any ownership interest in certain Funds on whose shareholders' behalf they purport to assert class claims provides no basis for dismissal of any claims at this time.

### A.    The Court Must Address Standing Before Addressing the Merits of The Case

This Court may not defer the issue of standing to the class certification stage of this action.  Demonstration of Article III standing is a threshold requirement in any action in federal court, and ordinarily a court must address the issue of Article III standing before addressing the merits of a case.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 830–31 (1999); *O'Shea v.*

*Littleton*, 414 U.S. 488, 493–94 (1974).   Indeed, in *O'Shea v. Littleton*, the Supreme Court

affirmed the dismissal of a class action lawsuit before any class determination had been made

because of lack of standing.  414 U.S. at 494 & n.3.  *Cf.* 1 Newberg on Class Actions § 2:9 (4th

ed.) ("Because individual standing requirements constitute a threshold inquiry, the proper

procedure when the class plaintiff lacks individual standing is to dismiss the complaint, not to

deny the class for inadequate representation.  The class issues are not reached in this instance.").

The issue of Rule 23 certification may be treated before standing only where class

certification issues are "logically antecedent" to Article III concerns and themselves pertain to

statutory standing.  *See Ortiz*, 527 U.S. at 831.  This exception does not apply, however, "if the

standing issue would exist regardless of whether the named plaintiff filed his claim alone or as

part of a class."  *Clark v. McDonald's Corp.*, 213 F.R.D. 198, 204 (D.N.J. 2003); *see also Ford

v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 333 n. 2 (5th Cir. 2002) (same).

And in this case, the Article III standing issue identified by Defendants (Plaintiff's lack of any

ownership interest in certain Lord Abbett mutual funds operated by Defendants) would exist

regardless of whether the named Plaintiffs filed their claims alone or as part of a putative class.

Thus, the Court addresses in this Opinion the issue of standing.

**B.     Plaintiffs' Lack of Any Ownership Interest In Certain Funds On Whose
        Shareholders' Behalf They Purport to Assert Class Claims Does Not
        Warrant Dismissal of Any Claims at This Time**

To satisfy the threshold standing requirement, a plaintiff must allege: (1) personal injury

suffered by him/her that is (2) fairly traceable to a defendant's allegedly unlawful conduct (3) that

is likely to be redressed by the requested relief.  *See Allen v. Wright*, 468 U.S. 737, 751 (1984).

As the Supreme Court has stated, "if none of the named plaintiffs purporting to represent a class

establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea*, 414 U.S. at 494; *see also* 1 Newberg on Class Actions § 2:5 ("[I]ndividual standing must be independently demonstrated, and, with the exception of membership organizational plaintiffs, one cannot acquire individual standing by virtue of bringing a class action.")

In the class action context, however, a named plaintiff's lack of standing to assert each and every putative class claim is not grounds for dismissal of those claims if plaintiff otherwise has standing to sue the defendant against whom these claims are asserted. In *Haas v. Pittsburgh National Bank*, 526 F.2d 1083 (3d Cir. 1975), a defendant contended that summary judgment in its favor on standing grounds was appropriate against a pair of nominal plaintiffs simply because plaintiffs lacked standing to assert some but not all of their putative class claims against the defendant. *See* 526 F.2d at 1088–89. The Third Circuit rejected the defendant's contention because plaintiffs had standing to bring some (even if not on all) of their claims against the defendant and because the claims over which they lacked individual standing were closely related. *See id.* In doing so, it distinguished a Ninth Circuit case holding that a nominal plaintiff with a claim against only one defendant could not represent a class of plaintiffs with claims against another defendant:

> We believe the situation in *La Mar* is distinguishable from that in the present case. Whereas in *La Mar* the representative plaintiffs asserted no cause of action against the dismissed defendants, here Haas had claims against Mellon Bank for other violations of the National Bank Act. . . . Haas' two claims against Mellon Bank, moreover, are closely related to the commercial transactions claim on which she lacks standing.

*Id.* (emphasis added) (citing *La Mar v. H&B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973)).

Page 11 of  30

Thus, the Third Circuit concluded, "[e]ven though Haas herself does not have standing to

challenge the service charge rate imposed on commercial transactions by Mellon Bank, summary

judgment is inappropriate if Haas may represent a class of plaintiffs who do have standing." *Id.*

at 1088.

In this case, the named Plaintiffs have standing to bring some claims against all

Defendants (that is, Lord Abbett, Lord Abbett Distributors LLC, the Directors and Trustees, and

the Partners) based on their ownership interest in seven of the more than fifty mutual funds on

whose shareholders' behalf they purport to bring Counts one through Four and Seven through

Ten (*see* Compl. ¶¶ 14–19).  Defendants do not contest the named Plaintiffs' standing in this

respect.  Given the named Plaintiffs' undisputed standing to bring some claim against each

Defendant, it is clear that under *Haas* their lack of standing to assert the other (obviously closely

related) claims on behalf of shareholders of specific Lord Abbett Funds in which the named

Plaintiffs lack an ownership interest does not warrant dismissal of any claims at this time.[4]

### III.    Counts One, Two, Four, and Seven Through Ten Allege Entirely Derivative Injury and Thus Are Inappropriately Pled as Direct Claims

Before addressing the merits of each of these Counts, Defendants argue preliminarily that

Counts One, Two, Four, and Seven through Ten are improperly pleaded as direct (as opposed to

derivative) claims and should, therefore, be dismissed on this basis alone.  (*See* Defs.' Br. at

22–25; Directors' Br. at 9–12).  Plaintiffs respond that these claims are not derivative because

they have alleged injury distinct from any harm suffered by the Funds themselves.  (*See* Pl.'s Br.

---

[4]        The Court notes that it expresses no opinion here as to whether the named
Plaintiffs satisfy Rule 23's requirements for serving as class representatives.  That determination
will be made at a later stage of this action, should the need arise.

at 20–26.)  Because the Court finds that Plaintiffs' alleged injuries are not direct, it will dismiss these Counts as being inappropriately pleaded as direct claims.

The parties agree that this issue is governed by Delaware and Maryland law, as the Funds are incorporated either in Maryland or Delaware.  Under Delaware law, this issue "turn[s] solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).  In making this determination, "a court should look to the nature of the wrong . . . .  The stockholder's claimed direct injury must be independent of any alleged injury to the corporation."  *Id*. at 1039.  In other words, "the stockholder must demonstrate that . . . he or she can prevail without showing an injury to the corporation."  *Id*.  Maryland law is substantially the same:  "To sue directly under Maryland law, a shareholder must allege an injury distinct from an injury to the corporation, not from that of other shareholders."  *Struogo v. Bassini*, 282 F.3d 162, 171 (2d Cir. 2002) (applying Maryland law); *see also Tafflin v. Levitt*, 608 A.2d 817, 819 (Md. App. Ct. 1992) ("[T]he cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation.").

With these general rules in mind, the Court must make its determination about the nature of Plaintiffs' alleged injury by looking behind the parties' characterizations and examining the substance of the Complaint.  The allegations in the Complaint indicate that Lord Abbett's broker

compensation practices allegedly caused several forms of injury to Fund shareholders, specifically: (1) loss of "excessive" fees deducted from Fund assets by Defendants and used to pay excessive broker compensation (*see, e.g.*, Compl. ¶¶ 3, 129(d), 131(e), 133(e), 135(d) 144(f)); (2) payment of advisory fees to Lord Abbett out of Fund assets for services that were of no benefit to shareholders  (*id*. ¶ 100); and (3) "diminished marginal returns" on shareholder investment due to poorer Fund performance (*id*. ¶ 109).

The first two forms of alleged injury—payment of excessive distribution and advisory fees out of Fund assets—are, in the Court's opinion, derivative in nature.  That is, the injury they allegedly caused Fund shareholders (depletion of Fund assets) is indistinguishable from injury they caused the Funds themselves: the mere fact that Fund assets ultimately belong to the Fund shareholders does not render depletion of those assets injury suffered by shareholders that is distinct from injury suffered by the Funds.  *See, e.g.*, *Herman v. Steadman*, 50 F.R.D. 488, 489–90 (S.D.N.Y. 1970) (holding that mutual fund shareholder alleging, among other things, "excessive and illegal brokerage commissions and advisory fees . . . . has no individual right of action for alleged wrongs done to the corporation" because "[t]he right of action is that of the corporation and is derivative only").  The same may be said with regard to the third form of injury—diminished marginal returns on shareholder investment—allegedly caused by Lord Abbett's broker compensation practices: this injury is indistinguishable from injury to the Funds themselves, as each investor's diminished marginal return on investment is merely a reflection of the Funds' overall diminished performance.

For these reasons, the Court dismisses Counts One, Two, Four, and Seven through Ten as being improperly pleaded as direct claims.

**IV.     Plaintiffs' Surviving State Law Claims (Counts Seven Through Ten) Are Preempted by SLUSA and, Therefore, Must Be DISMISSED**

Plaintiffs assert Counts Seven through Ten directly against Lord Abbett, the Lord Abbett Partners, the Fund Directors and Trustees, and/or Lord Abbett Distributor LLC for alleged unjust enrichment and for alleged breaches of fiduciary duties and duties of good faith, loyalty, fair dealing, due care, and/or candor.  (*See* Compl. ¶¶ 184–198.)  Defendants argue that these counts should be dismissed because they are preempted by the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb(f)(1).  (*See* Defs.' Br. at 25–32; Defs.' Reply at 7–9; Directors' Br. at 6–8.)   Plaintiffs respond that SLUSA is inapplicable to their state law claims because they do not concern misstatements/omissions or deception *in connection with the purchase or sale* of a covered security.  (*See* Pltfs.' Br. at 66–71.)  Because the Court concludes that Plaintiffs' state law claims are preempted by SLUSA, Counts Seven through Ten must be **DISMISSED**.[5]

SLUSA mandates dismissal of any: (1) covered class action; (2) based on state law; (3) alleging a misrepresentation or omission of a material fact or act of deception; (4) in connection with the purchase or sale of a covered security.  15 U.S.C. § 78bb(f)(1); *Prager v. Knight/Trimark Group, Inc.*, 124 F. Supp. 2d 229, 231–33 (D.N.J. 2000).  Several factors bear on whether claims may be deemed "in connection with the purchase or sale" of a covered security:

---

[5]     The Court notes that it has never rendered any decision on this issue.  Contrary to Plaintiffs' suggestion, the Court's February 8, 2005 Letter Opinion and Order upholding Judge Ronald Hedges' December 13, 2004 discovery Order did not adjudicate this issue.  The Court merely held at that time that Judge Hedges did not abuse his discretion or commit legal error in "allowing class certification discovery to proceed in this case pending resolution of [Defendants'] motion to dismiss" after concluding that Defendants had not, in connection with their appeal, "identified . . . authority to support Defendants' assertion that Plaintiffs' state law claims are preempted by SLUSA."  (February 8, 2005 Letter Opinion at 3.)

> [F]irst, whether the covered class action alleges a "fraudulent scheme" that
> "coincides" with the purchase or sale of securities; second, whether the complaint
> alleges a material misrepresentation or omission "disseminated to the public in a
> medium upon which a reasonable investor would rely"; third, whether the nature
> of the parties' relationship is such that it necessarily involves the purchase or sale
> of securities; and fourth, whether the prayer for relief "connects" the state law
> claims to the purchase or sale of securities . . . .

*Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 302 (3d Cir. 2005) (citations omitted).

These considerations "are not requirements, but [simply] guideposts in a flexible preemption

inquiry." *Id*. at 302 n.7.

The Third Circuit's application of these four factors in its recent *Rowinski* opinion

informs the Court's application of the factors to the case at bar. Before the court in *Rowinski* was

an action brought on behalf of persons who during the class period relevant to that action

maintained Salomon Smith Barney ("SSB") retail brokerage accounts and who paid charges,

commissions, or fees to SSB. Plaintiffs alleged that SSB provided the class with biased

investment research and analysis. *See id.* at 296–97. Plaintiffs' first cause of action—for breach

of contract—alleged that SSB breached its contracts with class members by providing biased and

misleading analysis that was intended to curry favor with SSB's existing and potential

investment banking clients. *Id*. at 297. Plaintiffs' second cause of action—for unjust

enrichment—sought recovery of the fees and charges paid to SSB in exchange for objective and

unbiased investment research and analysis. *Id*. Plaintiffs' final count—brought under a state

consumer protection statute—sought to recover unnecessary and unwarranted brokerage fees and

charges attributable to SSB's failure to disclose material facts to its retail brokerage customers

regarding the relationship between its analysts and its investment bankers. *Id*. As discussed

below, the Third Circuit affirmed the district court's conclusion that these claims were preempted

by SLUSA.  *See id.* at 305.

**A.   The Complaint Alleges a "Fraudulent Scheme" that "Coincides" with the Purchase or Sale of Securities**

*Rowinski* concluded that the first factor weighed in favor of preemption because the gist of plaintiffs' complaint was that SSB "systematically misrepresented the value of securities to the investing public in order to 'curry favor with investment banking clients and reap hundreds of millions of dollars in investment banking fees.'  For this purported scheme to work," the Court reasoned, "investors must purchase the misrepresented securities.  Absent purchases by 'duped' investors and a corresponding inflation in the share price, [SSB's] biased analysis would fail to benefit its banking clients and, in turn, would fail to yield hundreds of millions of dollars in investment banking fees."  *Id.* at 302.  For this reason, the Third Circuit concluded, "[t]he scheme . . . necessarily 'coincides' with the purchase or sale of securities."  *Id.*  The same conclusion may be reached in this case.

The gravamen of Plaintiffs' Complaint in this case is that Lord Abbett made improper, undisclosed, and excessive payments to brokers to induce them to aggressively market the Funds. For this scheme to work and cause harm to Plaintiffs, however, new investors must purchase shares of the Funds.  This scheme, therefore, like the scheme in *Rowinski*, necessarily "coincides" with the purchase or sale of securities.  *See Rowinski*, 398 F.3d at 302.  Thus, this factor weighs in favor of SLUSA preemption.

**B.   The Complaint Alleges a Material Misrepresentation or Omission "Disseminated to the Public in a Medium Upon Which a Reasonable Investor Would Rely"**

Also weighing in favor of SLUSA preemption in this case is the fact that Plaintiffs'

Complaint alleges material misrepresentations or omission "disseminated to the public in a medium upon which a reasonable investor would rely." *Rowinski*, 398 F.3d at 302. In *Rowinski*, the Third Circuit favored SLUSA preemption in part on this basis because SSB's alleged biased and misleading analyses were disseminated in research reports. *See id.* Similarly, in this case the Complaint alleges that "Defendants purposely omitted disclosing the nature of improper excessive fees and commissions charged to Plaintiffs and other members of the class" and identifies numerous omissions in Fund prospectuses (discussed in the background section of this Opinion) that rendered them "materially false and misleading." (*See* Compl. ¶¶ 5, 123–35.) Therefore, this factor also weighs in favor of SLUSA preemption.

### C. The Nature of the Parties' Relationship Necessarily Involves the Purchase or Sale of Securities

Further weighing in favor of SLUSA preemption is the fact that Plaintiffs' relationship with Defendants "necessarily involves the purchase or sale of securities." *Rowinski*, 398 F.3d at 302. In *Rowinski*, the plaintiffs argued that this factor did not support SLUSA preemption because the putative class was comprised of "holders" of recommended securities. *Id.* at 303. The Third Circuit rejected this argument, noting that the putative class definition in that case—"All persons who maintained a [SSB] retail brokerage account and who paid any charges[,] commissions or fees to Salomon Smith Barney"—was not "limited to non-purchasers and non-sellers" and, therefore, necessarily encompassed claims by SSB customers who purchased or sold securities. *Id.* The Court can reach the same conclusion in this case. Plaintiffs purport to bring this action on behalf of "all persons or entities who held one or more shares or like interests in any of the Lord Abbett Funds listed [in Exhibit A of the Complaint] between

February 6, 1999 and December 8, 2003, inclusive." (Compl. ¶ 136.) The only entities excluded from the proposed class are "defendants, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest." (*Id.*) Like the class in *Rowinski*, this proposed class is not "limited to non-purchasers and non-sellers" and, therefore, necessarily encompasses claims by investors who purchased or sold Lord Abbett shares during the class period and thereby became members of the putative class. *See Rowinski*, 398 F.3d at 302.

******

Based on these consideration, it is clear that Plaintiffs' state law class claims concern misrepresentations, omissions, or deceptive acts "in connection with the purchase or sale of any security." Therefore, Counts Seven through Ten, to the extent that they are properly asserted as direct claims, are preempted by SLUSA. They are, therefore, **DISMISSED**.

## V.   Counts One and Two Must Also Be DISMISSED Because There Is No Private Right of Action for Violations of Sections 34(b) and 36(a) of the Investment Company Act

Plaintiffs assert Count One directly against Lord Abbett and the Director Defendants pursuant to Section 34(b) of the ICA, 15 U.S.C. § 80a-33(b), which generally prohibits the making of untrue statements or omissions of material fact in registration statements or reports filed or transmitted pursuant to the ICA. Plaintiffs assert Count Two directly against Lord Abbett, Lord Abbett Distributor LLC, and the Director Defendants for breach of their fiduciary duties under Section 36(a) of the ICA, 15 U.S.C. § 80a-35(a), which generally authorizes the Securities and Exchange Commission to prosecute persons acting as officers, directors, members of any advisory board, investment advisers, depositors, or principal underwriters of a mutual fund

Page 19 of 30

for acts or practices constituting a breach of fiduciary duties.  Defendants argue that these Counts should be dismissed because, under the reasoning set forth in the Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), as well as the Second and Third Circuits' recent decisions in *Olmsted v. Pruco Life Insurance, Co. of New Jersey*, 283 F.3d 429 (2d Cir. 2002), and *Three Rivers Center for Independent Living, Inc. v. Housing Authority of the City of Pittsburgh*, 382 F.3d 412 (3d Cir. 2004), no express or implied private right of action exists under Sections 34(b) and/or 36(a).  (*See* Defs.' Br. at 34–46; Defs.' Reply Br. at 10–11; Directors' Br. at 6–7.)  The Court agrees that these Counts must be dismissed because there is no private right of action for violations of Sections 34(b) or 36(a) of the ICA.

Plaintiffs acknowledge that federal law does not expressly provide a private right of action for violations of Sections 34(b) and 36(a) of the ICA.  The question, therefore, is whether a private right of action may be implied.  Such an inquiry turns on the intent of Congress.  *Three Rivers*, 382 F.3d at 421.  Without some indication of congressional intent to create a private right, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute."  *Sandoval*, 532 U.S. at 286–87.  The Court's inquiry into legislative intent is guided by the following considerations:

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [Fourth,] is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Three Rivers*, 382 F.3d at 421 (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)).  The first two

criteria are critical.  If they do not point toward a private right, the remaining two criteria cannot by themselves support a finding of an implied private right of action.  *Id.*

Because Plaintiffs rely on numerous pre-*Sandoval* cases finding implied rights of action under various ICA provisions, the Court notes initially, as the Second Circuit recently has, that although "an overwhelming majority" of earlier decisions interpreting provisions of the ICA had found implied private rights of action, "[w]hen those cases were decided . . . courts had more latitude to weigh statutory policy and other considerations than they do now."  *Olmsted*, 283 F.3d. at 434.  Indeed, the Supreme Court has recently stated that it has, in general, unambiguously "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one."  *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 67 n. 3 (2001); *see also Olmsted*, 283 F.3d. at 434 ("Past decisions reflecting judicial willingness to 'make effective [statutory] purpose' in the context of implied rights of action belong to an '*ancien regime*.'") (quoting *Sandoval*, 532 U.S. at 287).

In addition, because Plaintiffs argue that subsequent legislative history demonstrates that Congress intended for there to be implied rights of action under both sections, the Court points out that subsequent legislative history deserves little weight in the Court's attempt to ascertain the existence of an implied right of action.  *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 185 (1994) ("But '[w]e have observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute.'") (quoting *Pub. Employees Ret. Sys. of Ohio v. Betts*, 492 U.S. 159, 168 (1989)); *see also White v. Heartland High-Yield Mun. Bond Fund*, 237 F. Supp. 2d 982, 987 (E.D. Wis. 2002) (rejecting attempted use

of 1980 legislative history to inject an implied right of action into Section 34(b)).  Those cases that have given undue weight to subsequent legislative history were decided under the old regime.

### A.    There Is No Implied Private Right of Action for Violations of Section 34(b)

In light of the relevant considerations, the Court must conclude that there is no implied private right of action for violations of Section 34(b).  *Accord In re Merrill Lynch & Co., Inc., Research Reports*, 272 F. Supp. 2d 243, 255–59 (S.D.N.Y. 2003) (no private right of action under Section 34(b)).  Section 34(b) states in its entirety:

> It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this Act or the keeping of which is required pursuant to section 80a-30(a) of this title.  It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading.  For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document.

15 U.S.C. § 80a-33(b).  With regard to the first consideration, the Court notes that this text does not contain "rights-creating language" but instead merely describes prohibited actions.  The text of the statute thus weighs against finding an implied right of action. *See Sandoval*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'") (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).

Nor, addressing the second consideration, does the Court see any indication of legislative intent, explicit or implicit, to create such a remedy. On the contrary, Section 42 of the ICA explicitly provides for enforcement of all ICA provisions by the Securities and Exchange Commission. That Section 42 does so is significant, because "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Olmsted*, 283 F.3d. at 433 (quoting *Sandoval*, 532 U.S. at 290); *accord In re Merrill Lynch*, 272 F. Supp. 2d at 257–58. Moreover, Congress explicitly provided a private right of action for another section of the ICA—Section 36(b). This, too, is significant, because "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional." *Olmsted*, 283 F.3d. at 433; *accord In re Merrill Lynch*, 272 F. Supp. 2d at 258.

For these reasons, the Court finds no basis for implying a private right of action for violations of Section 34(b) of the ICA.

### B.   There Is No Implied Private Right of Action for Violations of Section 36(a)

Again weighing these considerations, the Court must conclude that there is no implied private right of action for violations of Section 36(a) either. *Accord Chamberlain v. Aberdeen Asset Mgmt., Ltd.*, No. 02-5870, 2005 WL 195520, at *2–*4 (E.D.N.Y. Jan. 21, 2005) (no private right of action under Section 36(a)), *vacated pursuant to settlement by* 2005 WL 1378757 (E.D.N.Y. Apr. 12, 2005). Section 36(a) states, in relevant part, that "[t]he [Securities and Exchange] Commission is authorized to bring an action"

against persons subject to the provision who have "engage[d] in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company."  15 U.S.C. § 80a-35(a).  With regard to the first consideration, the Court notes that, like the text of Section 34(b), the text of Section 36(a) does not contain "rights-creating language" but instead merely describes prohibited conduct.  To the extent that it mentions investors at all, it is only to say that a court, in awarding relief after the Securities and Exchange Commission has established its allegations of breach of fiduciary duty, should give "due regard to the protection of investors and to the effectuation of the policies declared in section 80a-1(b) of this title." 15 U.S.C. § 80a-35(a).  In addition, addressing the second consideration, the Court does not—for the reasons articulated above with regard to Section 34(b)—see any indication of legislative intent, explicit or implicit, to create such a remedy.

For these reasons, the Court finds no basis for implying a private right of action for violations of Section 36(a) of the ICA.

*******

The Court must, therefore, **DISMISS** Counts One and Two.

## VI.  Count Three Is Pled as a Direct, Not Derivative, Claim and, Therefore, Must Be DISMISSED WITHOUT PREJUDICE

Plaintiffs assert Count Three directly against Lord Abbett, Lord Abbett Distributor, and the Director Defendants for breach of their fiduciary duties under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), which provides that "the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for

services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."  Although the issue was not addressed by the parties, the Court concludes that a Section 36(b) claim can be maintained only as a derivative (as opposed to a direct) claim. Therefore, this Count must be **DISMISSED WITHOUT PREJUDICE**.

Shareholders do not have a primary or direct right of action under Section 36(b) of the ICA, which states, in relevant part: "An action may be brought under this subsection . . . by a security holder of such registered investment company *on behalf of such company* . . . ."  15 U.S.C. § 80a-35(b) (emphasis added).  In *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523 (1984), the Supreme Court addressed the meaning of the "on behalf of" phrase, stating unequivocally that Section 36(b) confers only a derivative right:

> The "on behalf" language in § 36(b) indicates only that the right asserted by a shareholder suing under the statute is a "right of the corporation"—a proposition confirmed by other aspects of the action: The fiduciary duty imposed on advisors by § 36(b) is owed to the company itself as well as its shareholders and *any recovery obtained in a § 36(b) action will go to the company* rather than the plaintiff.  *See* S. Rep. No. 91-184, p. 6 (1970); § 36(b)(3).  In this respect, a § 36(b) action is undeniably "derivative" in the broad sense of the word.

464 U.S. 523, 535 n.11 (emphasis added).  To the extent that *Fox* distinguished a derivative claim under Section 36(b) from a typical derivative claim, the Court did so merely to explain why Rule 23.1 is inapplicable to Section 36(b) actions.  *Id.*[6]

---

[6]     The Supreme Court's decision in *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90 (1991), does not change this conclusion.  In dicta, the Court, relying on *Fox*, imprecisely stated that "a shareholder action 'on behalf of' the company under § 36(b) is direct rather than derivative and can therefore be maintained without *any* precomplaint demand on the directors." 500 U.S. at 108 (emphasis in original).  However, neither *Kamen* nor *Fox*, the authority relied on

Given the plain language of Section 36(b) and the Supreme Court's subsequent comment on the meaning of the statutory provision, the Court concludes that Plaintiffs' Section 36(b) claim must be pleaded as a derivative (not a direct) claim. *Cf. Olmsted*, 283 F.3d at 433 ("Congress explicitly provided in § 36(b) of the ICA for a private right of *derivative action* for investors in regulated investment companies alleging that investment advisors breached certain fiduciary duties.") (emphasis added). The Court raises this issue not to suggest that a shareholder asserting a Section 36(b) claim must satisfy Rule 23.1's pleading requirement or make a pre-complaint demand in order to survive dismissal. Rather, the Court raises this issue merely to point out that Plaintiffs may not maintain Count Three as a class action claim, given the derivative nature of the claim. *See Kauffman*, 434 F.2d at 734–37 (dismissing notion that fund shareholder can institute a "class derivative action"). Moreover, should Plaintiffs replead Count Three consistent with this Opinion, the Court points out that standing concerns not addressed in this Opinion likely will bear on adjudication of any motion to dismiss the repleaded Count. *Cf. Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 493 (N.D. Ill. 1999) ("Pursuant to 15 U.S.C. § 80a-35(b), plaintiffs do not have standing to bring a § 36(b) claim on behalf of investment companies other than the Funds in which they are security holders."). In other words, *Haas*, discussed *supra*, would not allow Plaintiffs to bring Section 36(b) claims derivatively on behalf

---

in *Kamen* for that statement, stands for the broad proposition that an action under Section 36(b) is direct in every sense of the word. Indeed, the very next sentence of the opinion clarified that "[u]nder these circumstances, it can hardly be maintained that a shareholder's exercise of his state-created prerogative to initiate a *derivative suit* without the consent of the directors frustrates the broader policy objectives of the ICA." *Kamen*, 500 U.S. at 108 (emphasis added). Thus, examined in context, this passage in *Kamen* states nothing more than the incontestable proposition that a shareholder may bring a derivative claim under Section 36(b) without making a pre-complaint demand. However, that suit remains a "derivative" action brought on behalf of the company.

of Funds in which they have no ownership interest.

**VII.   Count Four Is DISMISSED WITHOUT PREJUDICE Because Counts One and Two Have Been DISMISSED and Count Three Has Been DISMISSED WITHOUT PREJUDICE**

Plaintiffs assert Count Four directly against Lord Abbett (as control person of Lord Abbett Distributor and the Director Defendants) for violation of Section 48(a) of the ICA, 15 U.S.C. § 80a-47(a), which makes it "unlawful for any person, directly or indirectly, to cause to be done any act or thing through or by means of any other person which it would be unlawful for such person to do under the provisions of this subchapter or any rule, regulation, or order thereunder." The Complaint indicates that Counts One through Three represent the unlawful acts caused by Lord Abbett as the control persons. (*See* Compl. ¶¶ 165–67.) Defendants argue that this Count should be dismissed because there is no private cause of action for violation of ICA Section 48(a) or, alternatively, because Plaintiffs have no claim under this provision because Counts One through Three have been dismissed. (*See* Defs.' Br. at 58.)

Counts One through Three have indeed been dismissed. However, Count Three has been dismissed without prejudice. Thus, the Court will dismiss Count Four, which is predicated on Counts One through Three, without prejudice as well.

**VIII.   Count Five Is DISMISSED Because Section 215 of the Investment Advisers Act Invalidates Unlawful Contracts, Not Unlawful Transactions Made Pursuant to Lawful Contracts**

Count Five, asserted derivatively, seeks to rescind Lord Abbett's advisory contracts pursuant to IAA Section 215, which provides for the rescission of contracts that on their face or by their performance violate other provisions of the IAA:

Every contract *made in violation of any provision of this subchapter . . . , [or] the*

> *performance of which involves the violation of*, or the continuance of any
> relationship or practice in violation of any provision of *this subchapter*, or any
> rule, regulation, or order thereunder, shall be void.

15 U.S.C. § 80b-15(b) (emphases added).  The other IAA provision that Lord Abbet's advisory

contracts allegedly violated (as a result of its broker compensation practices) is Section 206, 15

U.S.C. § 80b-6, which makes it unlawful for covered entities "to engage in any act, practice, or

course of business which is fraudulent, deceptive, or manipulative."  Defendants present several

arguments for dismissal.  They argue primarily, however, that this Count should be dismissed

because the Complaint does not allege that Lord Abbett's advisory contracts are unlawful on

their faces or through their performance necessarily result in a violation of some other provision

of the IAA.  IAA Section 215, they contend, provides a remedy only for allegedly unlawful

contracts, not allegedly unlawful transactions made pursuant to lawful contracts.  (*See* Defs.' Br.

at 58–61.)  The Court agrees that this Count must be dismissed for this reason.

The Third Circuit, in *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189 (3d Cir. 2001),

recently construed a provision identical to IAA Section 215—Section 29(b) of the Securities

Exchange Act.  Section 29(b), which tracks nearly word-for-word the language of IAA Section

215, voids contracts that on their face or by their performance violate other provisions of the

Exchange Act:

> Every contract *made in violation of any provision of this chapter* or of any rule or
> regulation thereunder, . . . *[or] the performance of which involves the violation of*,
> or the continuance of any relationship or practice in violation of, any provision of
> *this chapter* or any rule or regulation thereunder, shall be void.

15 U.S.C. § 78cc(b) (emphases added).  The plaintiff in *GFL* sought to invalidate under Section

29(b) certain promissory notes that were neither on their face nor necessarily through their

Page 28 of  30

performance in violation of any other provision of the Exchange Act.  Plaintiff claimed that the notes were nonetheless voidable under Section 29(b) because they were "part of" defendant's scheme to manipulate the market price of certain stock securing the notes and/or because the notes contained omissions of material facts about defendant's business plans with regard to the stock securing the notes.  *See GFL*, 272 F.3d at 199–200.   The Third Circuit rejected plaintiff's theory, pointing out that defendant's allegedly unlawful conduct was too "collateral or tangential" to the parties' respective obligations under the notes.  *See id*. at 202.   In reaching this conclusion, the Third Circuit relied on numerous cases declining to void under Section 29(b) contracts that were neither on their face nor necessarily through their performance in violation of any other provision of the Exchange Act.  *See id*. 200–02.  Following *GFL*, therefore, Section 29(b) invalidates only those contracts: (1) that by their terms violate some other provision of the Exchange Act, or (2) the performance of which necessarily results in a violation of some other provision of the Exchange Act.

The courts have repeatedly acknowledged that Section 29(b) of the Exchange Act and Section 215 of the IAA are "comparable"/"parallel" provisions and that the purposes behind the IAA and Exchange Act are "almost identical."  *See, e.g.*, *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S. 11, 18–21 (1979) (observing that Sections 29(b) and 215 are "comparable" provisions and thus construing Section 215 as implying a private right of rescission because of Court's prior holding that Section 29(b) provides such a right); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 387–88 & n.10 (1970) (observing that Sections 29(b) and 215 are "counterparts"); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963) (citations omitted) ("Congress intended the [IAA] to be construed like other securities legislation 'enacted for the purpose of

Page 29 of  30

avoiding frauds.'"); *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1039 (2d Cir. 1992) (agreeing that IAA claims are "similar to . . . 1933 and 1934 Act claims [because t]he purposes behind the statutes are almost identical").  Plaintiffs acknowledge as much.  (*See* Pls.' Opp'n at 57.)  Given the identical language of Sections 29(b) and 215 and the identical purposes of the statutory schemes under which they were enacted, the Court will apply the Third Circuit's construction of Section 29(b) to IAA Section 215 as well.

Because Lord Abbett's advisory contracts are voidable under Section 215 only if by their terms they violate some other provision of the IAA or if their performance necessarily results in the violation of some other provision of the IAA, Plaintiffs' contention that Lord Abbett's advisory contracts are voidable because they were "part of Lord Abbett's overall scheme to defraud the investors and potential investors" (Pls.' Opp'n at 58–59) holds no water.

For these reasons, Count Five is **DISMISSED**.

**CONCLUSION**

For the foregoing reasons, Defendants' motions to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), 12(b)(6), and 23.1 are **GRANTED IN PART** and **DENIED IN PART** as set forth herein.  Accordingly, Counts One, Two, Five, and Seven through Ten of the Consolidated Amended Class Action Complaint are **DISMISSED**.  Counts Three and Four are **DISMISSED WITHOUT PREJUDICE**.

An appropriate Order accompanies this Opinion.

**Dated:** December 28, 2005                    s/ William J. Martini
                                            **William J. Martini, U.S.D.J.**

cc:    The Honorable Ronald J. Hedges, U.S.M.J.

Page 30 of  30
