## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

IN RE LORD ABBETT MUTUAL FUNDS FEE )
LITIGATION                         )
                                   )      MASTER FILE:  04-cv-559 (WJM)
                                   )
                                   )
_____)


## MEMORANDUM IN SUPPORT OF MOTION OF LORD ABBETT DEFENDANTS TO DISMISS PLAINTIFFS' SECOND AMENDED DERIVATIVE COMPLAINT

Jeffrey B. Maletta
Nicholas G. Terris
Petra A. Walsh
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
1601 K Street, N.W.
Washington, DC  20006-1600
(202) 778-9000

Christopher A. Barbarisi
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
One Newark Center, Tenth Floor
Newark, NJ  07102
(973) 848-4000

*Counsel for Defendants Lord, Abbett &
Co. LLC, Lord Abbett Distributor LLC,
Robert S. Dow, and the Persons
Identified in the prior complaint as the
"Partner Defendants"*

Dated:  February 21, 2006

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

I.    PLAINTIFFS' CLAIMS ARE TIME BARRED AND CONTAIN NO
      ALLEGATIONS ADDRESSING THE RELEVANT TIME FRAME ......................... 3

      A.    The SAC Does Not Relate Back .......................................................... 5

      B.    Fed. R. Civ. P. 15(c) Does Not Extend the § 36(b)(3) 1-Year Look
            Back Period in the Circumstances Here ............................................. 7

      C.    Plaintiffs Fail to Allege Facts Addressing the Relevant Time Frame .......... 8

II.   ICA § 17 BARS PLAINTIFFS' NOVEL ATTEMPT TO BRING A COMMON
      ACTION ON BEHALF OF SEVEN LORD ABBETT FUNDS .............................. 9

III.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER § 36(b) ................. 12

      A.    Pleading Standard for § 36(b) Cases ................................................ 12

      B.    Plaintiffs' General Allegations Provide Little or No Logical
            Support for an Excessive Fee Claim ................................................. 14

            1. Directors' Fees .................................................................... 15

            2. Rule 12b-1 Fees................................................................... 16

                a. Plaintiffs' Allegations of Impermissible Rule 12b-1 Fees
                   Are Irrelevant in a § 36(b) Action ................................. 17

                b. Plaintiffs' Suggestion that Retail Share Classes and
                   Institutional Share Classes Should be Charged Similar
                   Rule 12b-1 Fees is Frivolous......................................... 20

            3. Investment Advisory Fees...................................................... 21

                a. Plaintiffs' Allegations Regarding Failure to Provide Breakpoints are
                   Insufficient to State a 36(b) Claim ................................. 21

                b. Plaintiffs' Allegations Regarding Institutional Investors Compel Dismissal ... 23

      C.    Plaintiffs' Fund-Specific Allegations Fail to State a Claim........................ 24

            1. Lord Abbett Mid-Cap Value Fund .......................................... 24

2. Lord Abbett Bond Debenture Fund.................................................................. 25

3. Lord Abbett Affiliated Fund .................................................................. 26

4. Lord Abbett Growth Opportunities Fund.................................................. 26

5. Lord Abbett California Tax-Free Income Fund ......................................... 27

6. Lord Abbett All Value Fund .................................................................... 27

7. Lord Abbett America's Value Fund ......................................................... 27

III.    SECTION 36(b)(4) REMOVES 12b-1 FEES FROM THE STATUTE ....................... 28

CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

## CASES

_ALA, Inc. v. CCAIR, Inc._, 29 F.3d 855 (3d Cir. 1994) ................................................ 13

_Alexander v. Sandoval_, 532 U.S. 275 (2001) .................................................................. 3

_Baldwin County Welcome Center v. Brown_, 466 U.S. 147 (1984) ................................ 7

_Batra v. Investors Research Corp._, 144 F.R.D. 97, 98-99 (W.D. Mo. 1992) .............. 20

_Benak v. Alliance Capital Mgmt. L.P._, No. Civ.A. 01-5734, 2004 WL 1459249
    (D.N.J. Feb. 9, 2004) ................................................................................................ 28

_Bender v. Suburban Hosp., Inc._, 159 F.3d 186 (4th Cir. 1998) ................................... 24

_Brennan v. Kulick_, 407 F.3d 603 (3d Cir. 2005) .......................................................... 4

_Brever v. Federated Equity Mgmt. Co._, No. 04-cv-855 (W.D. Pa. Nov. 7, 2005) ........ 7

_Brown v. Norton_, No. Civ.A. 02-5556, 2005 WL 2671360 (D.N.J. Oct. 17, 2005) ...... 7

_Dumond v. Mass. Fin. Serv. Co._, No. Civ.A. 04-11458, 2006 WL 149038 (D. Mass. Jan.
    19, 2006) ................................................................................................................. 18

_First United Methodist Church of Hyattsville v. United States Gypsum Co._, 882 F.2d 862
    (4th Cir. 1989) .......................................................................................................... 8

_Fogel v. Chestnutt_, 668 F.2d 100 (2d Cir. 1981) ......................................................... 14

_Forsythe v. Sun Life Financial Inc._, No. Civ.A. 04-10584, 2005 WL 81576 (D. Mass.
    Jan. 13, 2005) .................................................................................................... 2, 6, 7

_Forsythe v. Sun Life Financial, Inc._, --- F. Supp. 2d ---, 2006 WL 148935 (D. Mass. Jan.
    19, 2006) ............................................................................................................. 3, 18

_Gartenberg v. Merrill Lynch Asset Management, Inc._, 694 F.2d 923 (2d Cir. 1982) .......... _passim_

_Gilliam v. Fidelity Management & Research Co._, No. Civ.A. 04-11600, 2005 WL
    1288105 (D. Mass. May 3, 2005) ........................................................................ 1, 6

_Green v. Nuveen Advisory Corp._, 186 F.R.D. 486 (N.D. Ill. 1999) ............................. 28

_Imperial Financial Services, Inc._, 42 S.E.C. 717, 1965 SEC LEXIS 239 (1965) ........ 11

_ING Principal Protection Funds Derivative Litigation_, 369 F. Supp. 2d 163 (D. Mass.
    2005) ........................................................................................................... 8, 17, 18

_In re AllianceBernstein Mutual Fund Excessive Fee Litig._, 2006 WL 74439 (S.D.N.Y.
    Jan. 1, 2006) .......................................................................................................... 8, 9

_In re Columbia Entities Litig._, Civ. No. 04-11704, 2005 U.S. Dist. LEXIS 33439 (D.
    Mass. Nov. 30, 2005) ............................................................................................. 15

_In re Davis Selected Mutual Funds Litigation_, No. 04 Civ. 4186, 2005 WL 2509732
    (S.D.N.Y. Oct. 11, 2005) .................................................................................. 15, 18

_In re Eaton Vance Mut. Funds Fee Litig._, 380 F. Supp. 2d 222 (S.D.N.Y. 2005) ........... 3, 14

In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310 (S.D.N.Y. 2005) ...................... 17

In re Franklin Mut. Funds Fee Litig. 388 F. Supp. 2d 451 (D.N.J. 2005) ................................ 8, 13

In re Goldman Sachs Mutual Funds, No. 04 Civ. 2567, 2006 WL 126772 (S.D.N.Y. Jan. 17, 2006) ..................................................................................................... 3, 17

In re Lord Abbett Mutual Funds Fee Litig., --- F. Supp. 2d ---, 2005 WL 3544312 (D.N.J. Dec. 28, 2005) ................................................................................. 1, 3, 5, 13

In re Marino, 37 F.3d 1354 (9th Cir. 1994) ............................................................... 7

In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 184 F.3d 280 (3d Cir. 1999) ................................ 13

In re TCW/DW N. Am. Gov't Income Trust Sec. Litig., 941 F. Supp. 326 (S.D.N.Y. 1996) ......................................................................................... 28

Jackson v. Marion County, 66 F.3d 151 (7th Cir. 1995) ............................................. 13

Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030 (2d Cir. 1992) ...................................... 8

Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222 (S.D.N.Y. 1990) ................................ 20, 22

Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140 (3d Cir. 2002)........................... passim

Krinsk v. Fund Asset Mgmt. Inc., No. 85 Civ. 8428, 1986 WL 205 (S.D.N.Y. May 9, 1986) ............................................................................................. 8

Lessler v. Little, 857 F.2d 866 (1st Cir. 1988) ............................................................ 29

Mayle v. Felix, 125 S. Ct. 2562 (2005)...................................................................... 7

Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321 (4th Cir. 2001)........................... passim

Olesh v. Dreyfus Corp., No. CV-94-1664, 1995 WL 500491 (E.D.N.Y. Aug. 8, 1995).............. 13

Pension Benefit Guarantee Corp. v. White Consol. Indus., Inc., 998 F.2d 1192 (3d Cir. 1993) ............................................................................................... 13

Pfeiffer v. Bjurman Barry & Assocs., No. 03 Civ.9741, 2004 WL 1903075 (S.D.N.Y. Aug. 26, 2004) ........................................................................... 18

SEC v. Talley Industries, Inc., 399 F.2d 396 (2d Cir. 1968) ...................................... 10

Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962 (S.D.N.Y. 1987) ........... 20, 22

Strougo v. Bassini, 112 F. Supp. 2d 355 (S.D.N.Y. 2000) ............................................... 3

Strougo v. BEA Associates, 188 F. Supp. 2d 373 (S.D.N.Y. 2002) ................................... 20

Texaco, Inc. v. Duhe, 274 F.3d 911 (5th Cir. 2001) ................................................... 30

United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542 (D.C. Cir. 2002) ................... 29

Waldock v. M.J. Select Global, Ltd., No. 03 C 5293, 2005 WL 3542527 (N.D. Ill. Dec. 27, 2005) ................................................................................................. 3

Wellman v. Dickinson, 475 F. Supp. 783 (S.D.N.Y. 1979)............................................ 12

Yameen v. Eaton Vance Distributors, Inc., 394 F. Supp. 2d 350 (D. Mass. 2005) ......... 17, 18, 19

Young-Henderson v. Spartanburg Area Mental Health Center, 945 F.2d 770 (4th Cir. 1991) ................................................................................................................ 4

## OTHER MATERIALS

AB & Co., SEC No-Action Letter, [1974-1975 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,071 (Aug. 19, 1974) ................................................................................... 11

Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414, 45 Fed. Reg. 73898 (November 7, 1980) ................................................ 15, 29

Contran Corp., [1974-1975 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,105 (Dec. 24, 1974) ........................................................................................................... 11

Investment Company Act Release No. 25557, 77 SEC Docket 1456, 2002 WL 818297 (Apr. 30, 2002) ................................................................................................... 10

Investment Company Act Release No. 10886, 18 SEC Docket 587, 1979 WL 170394 (Oct. 2, 1979) ..................................................................................................... 10

National Student Marketing Corp, SEC No-Action Letter, [1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,524, 1973 WL 11356 (Aug. 19, 1973) .............................. 10, 12

Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 53 Fed. Reg. 23258, 1988 WL 1000015 (June 13, 1988) ....................................................................... 20

Scudder Cash Investment Trust and Scudder, Stevens & Clark, Investment Company Act Release No. 13480, 1983 SEC LEXIS 891 (Sept. 1, 1983) ............................................ 11

The Prudential Insurance Co. of America et al., 46 SEC Docket 881, 55 Fed. Reg. 28499-02, 1990 WL 333916 (Jul. 11, 1990) ................................................................... 10

The South Bay Corp., [1974-1975 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,105 (Dec. 24, 1974) .................................................................................................... 11

The Lord Abbett defendants submit this Memorandum in support of their Motion to Dismiss Plaintiffs' Second Amended Derivative Complaint ("SAC").

## PRELIMINARY STATEMENT

It is plain from the history of this case and the allegations of the SAC that plaintiffs are desperately casting about for a theory – any theory – that will revive their moribund lawsuits. Plaintiffs already have twice failed to plead sustainable claims in this case, and their attorneys also have had a number of essentially identical complaints dismissed in other actions. Last year, this Court issued a published opinion and order dismissing plaintiffs' most recent prior pleading effort – the Consolidated Amended Class Action Complaint – in its entirety. In re Lord Abbett Mutual Funds Fee Litig., --- F. Supp. 2d ---, 2005 WL 3544312 (D.N.J. Dec. 28, 2005). The Court generously afforded plaintiffs an additional opportunity to file an amended complaint limited to derivative claims under §§ 36(b) and 48(a) of the Investment Company Act of 1940 ("ICA" or "Investment Company Act"). Plaintiffs filed the SAC on September 29, 2005, and by letter dated January 11, 2006, they declined a final opportunity to amend yet again in light of the Court's intervening decisions, electing instead to stand on the SAC. Like its predecessors, the SAC also fails to state a claim and should be dismissed with prejudice for multiple reasons.

To begin with, plaintiffs effectively have attempted to allege an entirely new case. Prior to the SAC, the "gravamen of [the case was] that Lord Abbett made improper, undisclosed, and excessive payments to brokers to induce them to aggressively market the Funds." Id. at *10. In the SAC, however, plaintiffs essentially seek to pursue a traditional Gartenberg style excessive advisory fee case under § 36(b), albeit for multiple funds. As two courts recently have recognized in cases involving these plaintiffs' attorneys, the type of claim raised in the SAC is "striking[ly]" different from plaintiffs' earlier claims. Gilliam v. Fidelity Management &

Research Co., No. Civ.A. 04-11600, 2005 WL 1288105, at *2 (D. Mass. May 3, 2005); see Forsythe v. Sun Life Financial Inc., No. Civ.A. 04-10584, 2005 WL 81576, at *1 (D. Mass. Jan. 13, 2005). Accordingly, given that the SAC necessarily must cover the same 2003 period as its predecessor, plaintiffs' claims do not relate back under Fed. R. Civ. P. 15(c)(2) and are barred by the 1-year look back period of § 36(b)(3).

When the allegations of the SAC are examined, it is clear why plaintiffs' new theory of the case was not their first choice. Their new claim – that every one of the seven Lord Abbett funds that the named plaintiffs happen to own (the "Funds") were charged legally excessive fees – is inherently implausible and transparently meritless. Plaintiffs offer a few generalized or legally irrelevant allegations that do not begin to satisfy their burden to allege "facts indicating that the fees received were disproportionate to services rendered." Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140, 143 (3d Cir. 2002). And where plaintiffs do offer more specific allegations, they affirmatively obliterate their case. Most notably, the SAC affirmatively alleges facts demonstrating that the Funds' advisory fees are equivalent to those that would have resulted from arm's-length bargaining, and it relies heavily on a series of Morningstar reports about the Funds *that actually conclude that the fees charged to the Funds were "fair."*

The SAC also should be dismissed because (a) plaintiffs' novel attempt to bring a § 36(b) case on behalf of seven Lord Abbett mutual funds is a joint transaction among affiliated funds that, absent prior Securities and Exchange Commission ("SEC") permission, is forbidden by ICA § 17 and Rule 17d-1 thereunder, (b) particularly where, as here, the prior pleading failed to state a claim, the "relation back" rule of Fed. R. Civ. P. 15(c)(2) cannot extend the 1-year look back period of § 36(b)(3), which is not a statute of limitations but a substantive limitation on liability, and (c) plaintiffs fail to allege facts relating to the time period at issue in this lawsuit. Finally, to

the extent they seek to attack Rule 12b-1 fees, plaintiffs' claims must be dismissed because § 36(b)(4) expressly excludes 12b-1 fees from § 36(b).[1]

## I.   PLAINTIFFS' CLAIMS ARE TIME BARRED AND CONTAIN NO ALLEGATIONS ADDRESSING THE RELEVANT TIME FRAME

Plaintiffs' search for a cause of action has created a long pleading history.  This case began with a series of actions filed by plaintiffs beginning in February 2004.  Those actions were consolidated by order of the Court entered on May 26, 2004.  Plaintiffs then filed a Consolidated Amended Class Action Complaint on August 16, 2004 (the "First Amended Complaint").  The First Amended Complaint attempted to state a claim based on an alleged scheme relating to improper broker compensation practices that allegedly began in 1999 and terminated in December 2003.  As the Court has aptly summarized:

> The action, which purports to assert both class and derivative claims, arises out of broker compensation practices employed by Lord Abbett between February 1999 and December 2003 pursuant to which brokers were allegedly compensated excessively as an incentive for them to steer new investors into Lord Abbett mutual funds…. The gravamen of Plaintiffs' Complaint in this case is that Lord Abbett made improper, undisclosed, and excessive payments to brokers to induce them to aggressively market the Funds.

In re Lord Abbett, 2005 WL 3544312, at *1, *10.  In fact, the First Amended Complaint expressly alleged that plaintiffs' claims were limited to a discrete "class period" ending on

---

[1]      Plaintiffs' § 48(a) claim, SAC ¶¶ 78-83, warrants no extended discussion.  For substantially the same reasons previously given by this Court in rejecting the notion of an implied private right of action under §§ 34(b) and 36(a), and as every on-point post Alexander v. Sandoval, 532 U.S. 275 (2001), case has held, there is no implied private right of action under § 48(a).  See, e.g., In re Goldman Sachs Mutual Funds, No. 04 Civ. 2567, 2006 WL 126772, at *5 n.8 (S.D.N.Y. Jan. 17, 2006); Forsythe v. Sun Life Financial, Inc., --- F. Supp. 2d ---, 2006 WL 148935, at *2 (D. Mass. Jan. 19, 2006); Waldock v. M.J. Select Global, Ltd., No. 03 C 5293, 2005 WL 3542527, at *9 (N.D. Ill. Dec. 27, 2005); In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp. 2d 222, 233 (S.D.N.Y. 2005).  In addition, because plaintiffs' § 36(b) claim fails, their § 48(a) claim necessarily also fails.  See, e.g., Strougo v. Bassini, 112 F. Supp. 2d 355, 361 n.4 (S.D.N.Y. 2000).

December 8, 2003, at which point "the truth…emerged" and defendants' alleged misconduct was "exposed" and "revealed."  First Amended Complaint ¶¶ 1, 8-9.

By Opinion and Order entered August 30, 2005, the Court dismissed the First Amended Complaint in its entirety but gave plaintiffs one more opportunity to "file an ***amended Complaint*** within thirty (30) days of the date of this Order consistent with the [Court's two accompanying opinions]" (emphasis added).  Among other things, the Court's opinions limited plaintiffs to claims under Investment Company Act §§ 36(b) and 48(a).  By letter dated January 11, 2006, plaintiffs announced that they would stand on their SAC filed on September 29, 2005.

Three points are clear in light of this history, and they collectively preclude any relief being granted under the SAC.  First, given the 1-year look back period in § 36(b)(3) and the original February 2004 filing date, plaintiffs may not assert claims for any conduct occurring prior to February 2003.  Second, plaintiffs may not assert claims for any conduct after February 2004 given that the Court authorized only an amended pleading, and plaintiffs have not requested (and the Court certainly has not authorized) the filing of a supplemental pleading pursuant to Fed. R. Civ. P. 15(d).[2]  Thus, the only time frame relevant to the SAC is the 1-year period prior to February 2004.  But, third, given the 1-year look back period of § 36(b)(3) and

---

[2]      See Young-Henderson v. Spartanburg Area Mental Health Center, 945 F.2d 770, 775 (4th Cir. 1991) ("facts accruing after the suit is brought may not be inserted by way of amendment but must be added by supplemental pleading… [p]articularly fatal to appellees' argument is the rule that supplemental pleadings require leave of court").  Because plaintiffs previously had attempted to allege a discrete fraudulent scheme beginning in 1999 and terminating in December 2003 (nearly nine months before the filing of the Amended Complaint) neither the Court nor defendants had reason to anticipate that plaintiffs would seek to assert supplemental claims.  In the procedural posture here, and given the Court's clear instructions, any effort by plaintiffs to supplement rather than amend their claims warrants dismissal of the action.  See Brennan v. Kulick, 407 F.3d 603, 607-608 (3d Cir. 2005) (where district court dismisses complaint without prejudice in an order containing conditions for reinstatement within a specified time period and plaintiff fails to comply with those conditions, dismissal of complaint becomes final and action is terminated).

the September 2005 filing date of the SAC, plaintiffs' claims for the time period February 2003 to February 2004 are time barred unless saved by Fed. R. Civ. P. 15(c)(2), which allows an amended complaint to "relate back" to an earlier filing only if the claim stated therein arises out of the same "conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."  As discussed in Parts A-C immediately below, in light of the requirements of the "relation back" rule and § 36(b) itself, the SAC must be dismissed for each of the following independently sufficient threshold reasons.

### A.    The SAC Does Not Relate Back

The claim in the SAC does not satisfy the same conduct, transaction, or occurrence requirement of Fed. R. Civ. P. 15(c)(2).  As noted above, the Court has explained that the "gravamen of [the earlier Complaint was] that Lord Abbett made improper, undisclosed, and excessive payments to brokers to induce them to aggressively market the Funds."  In re Lord Abbett, 2005 WL 3544312, at *10.  The SAC carries over certain rhetoric regarding excessive payments to brokers, SAC ¶¶ 58-62, as well as certain conclusory allegations that Rule 12b-1 fees were of no benefit to investors.  See, e.g., SAC ¶¶ 53-54.  But, as explained below in Part III.B., these allegations are legally irrelevant window dressing in the context of the SAC, which is an effort to assert a traditional Gartenberg style excessive fee case that bears virtually no resemblance to the original action.

Indeed, the differences between the type of claim plaintiffs now seek to assert and that which they previously asserted are so vast that plaintiffs' counsel already has lost two motions to consolidate the two types of claims under the comparatively lax standard of Fed. R. Civ. P.

42(a).[3]   See Forsythe v. Sun Life Financial Inc., No. Civ.A. 04-10584, 2005 WL 81576, at *1 (D.

Mass. Jan. 13, 2005); Gilliam v. Fidelity Management & Research Co., No. Civ.A. 04-11600,

2005 WL 1288105, at *2 (D. Mass. May 3, 2005).  As explained in the latter decision:

> [D]efendants properly describe the [derivative §36(b)] actions as excessive management fee cases and the five class action cases as revenue sharing cases.
>
> In the [derivative § 36(b)]  cases, the two sets of plaintiffs seek to recover excessive management or advisory fees for breaches of fiduciary duty on the part of two defendants, FMR and FMRC, and on behalf of five Fidelity funds in which they are shareholders.  The actions concern five specific Fidelity funds wherein advisory fees were excessive in relation to the economies of scale accomplished as the funds grew in size. The [derivative § 36(b)] actions similarly and additionally allege that fees for individual investors in the mutual funds were higher than those charged to institutional investors. The [derivative §36(b)] claims thereby allege Gartenberg type claims for charging fees "so disproportionally large that [they] bear[ ] no reasonable relationship to the services rendered." Gartenberg v. Merrill Lynch Asset Management, Inc., 694 F.2d 923, 928 (2nd Cir.1982)....
>
> In striking contrast, the [Milberg Weiss] plaintiffs premise their section 36(b) claims primarily, albeit not exclusively, upon improper brokerage practices. The excessive fees concern undisclosed, excessive fees paid to brokers from fund assets for pushing certain funds. The gravamen of the section 36(b) claim in the [Milberg Weiss] action, as well as the other four class action cases, is not upon the excessive advisor fees charged to shareholders in comparison to the services rendered but upon the undisclosed fees paid to brokers of soft dollars and excessive commissions for pushing certain funds. Using excessive fees disguised as brokerage commissions, fund assets were used to pay brokers to aggressively push consumers to purchase Fidelity funds rather than other mutual funds. The undisclosed purported Rule 12b-1 marketing fees thereby violated section 36(b) of the ICA.
>
> Hence, the distinction in the section 36(b) claims in the five class action cases and the [derivative] cases parallel[s] the distinction between the two sets of cases in

---

[3]     See generally 8 James Wm. Moore et al., Moore's Federal Practice ¶ 42.10 (3d ed. 2005) ("The articulated standard for consolidating two or more cases [under Fed. R. Civ. P. 42(a)] is simply that they 'involve a common question of law or fact.'  This standard is an expansive one.... Common questions of law and fact do not have to predominate."); 9 Charles Alan Wright et al., Federal Practice and Procedure § 2382 (3d ed. 1998) (consolidation of claims under Fed. R. Civ. P. 42(a) may be ordered based on mere common question of law or fact "even if the claims arise out of independent transactions").

> Forsythe that the court deemed significant in refusing to consolidate the two
> groups of cases.

Id. at *2-3.  Under these circumstances, plaintiffs manifestly have failed to satisfy the more demanding relation back test.  See Mayle v. Felix, 125 S. Ct. 2562, 2570-72 (2005) (limiting relation back rule by siding with courts that have "allow[ed] relation back only when the claims added by amendment arise from the same core facts as the timely filed claims").[4]

### B.  Fed. R. Civ. P. 15(c) Does Not Extend the § 36(b)(3) 1-Year Look Back Period in the Circumstances Here

There are additional reasons that the relation back rule cannot save plaintiffs' claims.

Where, as here, the Court has held that plaintiffs' prior pleading effort (the First Amended Complaint) failed to meet the requirements for a valid complaint, there is nothing for the SAC to relate back to.  See Baldwin County Welcome Center v. Brown, 466 U.S. 147, 149 n.3 (1984) ("pleading" that failed to meet requirements for a valid complaint was "not an original pleading that could be rehabilitated by invoking Rule 15(c)"); In re Marino, 37 F.3d 1354, 1357-58 (9th Cir. 1994).

Allowing Fed. R. Civ. P. 15(c)(2) to revive plaintiffs' failed lawsuit in these circumstances would be particularly inappropriate given the unusual nature of § 36(b)(3).  The

---

[4]   See also Brown v. Norton, No. Civ.A. 02-5556, 2005 WL 2671360, at *4-5 (D.N.J. Oct. 17, 2005) (explaining that Mayle "required an identity of facts at a fairly specific level" and that, to relate back, an amended complaint "must be supported by facts of the same time and type as in the original pleading"; under this standard, amended complaint alleging that employer failed to pay wages did not relate back to earlier complaint alleging various other specific forms of retaliatory conduct by employer during same general time period, even though "both the new claim and the old ones arose out of alleged discriminatory retaliation by employer"); Brever v. Federated Equity Mgmt. Co., No. 04-cv-855, at 3, 8-9 (W.D. Pa. Nov. 7, 2005) (copy attached as Ex. 1 to Certification II of Christopher A. Barbarisi filed herewith.) (proposed amendment that would have expanded § 36(b) claim to include advisory fees for a different time period "necessarily cover[s] fee arrangements and services that are distinct from those initially brought under review by [the original plaintiff's] claims" and, as a result, "fails to satisfy the requirements of Rule 15(c)(2)").

relation back rule of Fed. R. Civ. P. 15(c)(2) applies to statutes of limitation.  Statutes of limitation are procedural in nature.  See First United Methodist Church of Hyattsville v. United States Gypsum Co., 882 F.2d 862, 865 (4th Cir. 1989).  The look back period contained in § 36(b)(3) is not a statute of limitations but a substantive limit on liability that may be imposed under § 36(b).  See Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030, 1037-38 (2d Cir. 1992) ("There is no express time limit on bringing an action under § 36(b), but the plaintiff may collect only those damages that have accrued in the prior year."); Krinsk v. Fund Asset Mgmt. Inc., No. 85 Civ. 8428, 1986 WL 205, at *4 (S.D.N.Y. May 9, 1986) (the 1-year look back period in Section 36(b)(3) "places a substantive limit on damages rather than a procedural limitation on the time within which an action may be brought").  Accordingly, § 36(b)(3) trumps Fed. R. Civ. P. 15(c).  See ING Principal Protection Funds Derivative Litigation, 369 F. Supp. 2d 163, 170-71 (D. Mass. 2005) (pure statutes of repose and similar requirements of substantive law trump "relation back" principles); cf. Krinsk, 1986 WL 205, at *3 (equitable tolling applicable to statutes of limitations does not apply to § 36(b)(3)).  Indeed, applying Fed. R. Civ. P. 15(c) in this context would be inconsistent with the Rules Enabling Act, 28 U.S.C. § 2072, which mandates that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right."   Cf. In re Franklin Mut. Funds Fee Litig., 388 F. Supp. 2d 451, 461 n.6 (D.N.J. 2005) (interpreting Fed. R. Civ. P. 23 in a way that would loosen standing requirement would violate Rules Enabling Act).

### C.  Plaintiffs Fail to Allege Facts Addressing the Relevant Time Frame

In In re AllianceBernstein Mutual Fund Excessive Fee Litig., 2006 WL 74439 (S.D.N.Y. Jan. 11, 2006), the court dismissed plaintiffs' § 36(b) claim where plaintiffs failed to allege facts indicating the existence of excessive advisory fees during the 1-year look back period - June

2003 to June 2004 - relevant to that case.  See id. at *2 (dismissing complaint where "the statistics in … the Complaint only cover approximately four months of [the relevant] time period").  Here, other than alleging certain of the Funds' fee rates, plaintiffs appear to have included no substantive allegations addressing the Funds' fees during the relevant time period (February 2003 to February 2004).  The SAC instead focuses on compensation received by the Fund's independent directors in 2002, SAC ¶¶ 20-26, 70, the size of some of the Funds apparently as of the end of their respective fiscal years in 2000 and 2004, SAC ¶¶ 42-44, 45-48, and the expense ratios of certain Funds in 2005, SAC ¶¶ 56, 57.  Such allegations have no necessary bearing on the fees paid by the Funds in 2003, and the SAC therefore should be dismissed.  See AllianceBernstein, 2006 WL 74439, at *2 & n.3.

## II.    ICA § 17 BARS PLAINTIFFS' NOVEL ATTEMPT TO BRING A COMMON ACTION ON BEHALF OF SEVEN LORD ABBETT FUNDS

Plaintiffs' belated attempt to bring a multi-fund Gartenberg mega-case (until recently, a rare phenomenon) fails for another threshold reason: Section 17 of the Investment Company Act, 15 U.S.C. § 80a-17, forbids it.

Section 17 prohibits certain transactions involving investment companies and, among others, their "affiliated persons" as defined in § 2(a)(3) of the Act.  Most relevant for present purposes, § 17(d) and Rule 17d-1 thereunder, 17 C.F.R. § 270.17d-1, outlaw joint transactions, enterprises, and other joint arrangements that involve investment companies and their affiliated persons or the affiliated persons of such persons, acting as principal, unless prior approval has been obtained from the SEC.  These prohibitions apply here and preclude plaintiffs' attempt to litigate § 36(b) claims on behalf of all the Funds.

First, the Lord Abbett Funds on behalf of whom plaintiffs seek to sue are affiliated persons of one another.  Absent unusual circumstances not present here, funds in a complex that

share a common investment adviser are deemed to be under common control and hence affiliated under § 2(a)(3)(C).[5]

Second, the multi-fund case that plaintiffs seek to bring is a joint arrangement within the ambit of § 17(d) and Rule 17d-1. A joint enterprise or other joint arrangement or profit-sharing plan is broadly defined in Rule 17d-1(c) to include "any written or oral plan, contract, authorization or arrangement, or any practice or understanding concerning an enterprise or undertaking whereby a registered investment company…and any affiliated person…have a joint or a joint and several participation, or share in the profits of such enterprise or undertaking." See also SEC v. Talley Industries, Inc., 399 F.2d 396, 403 (2d Cir. 1968) (the phrase "joint" embraces even a loose, informal combination). SEC pronouncements confirm what is clear from a common sense application of the language of the statute and rule: that, where counsel conducts litigation jointly on behalf of a fund and one or more of its affiliates (e.g., an affiliated fund), there is a joint participation and a sharing of burdens and benefits that constitutes a proscribed joint arrangement. See, e.g., National Student Marketing Corp., SEC No-Action Letter, [1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,524, 1973 WL 11356 (Aug. 19, 1973) (in the event that a registered investment company joins with an affiliate of its investment adviser in bringing suit against an issuer that sold both parties restricted securities, an application must be filed with the SEC for approval that the arrangement is not in violation of § 17(d) of the Act); The Prudential Insurance Co. of America et al., 46 SEC Docket 881, 55 Fed. Reg. 28499-02,

---

[5]    See, e.g., Investment Company Act Release No. 25557, 77 SEC Docket 1456, 2002 WL 818297, at *3 (Apr. 30, 2002) ("[M]ost funds are today organized into complexes under the common control of an adviser (or other person), making each fund an affiliated person of all of the other funds in the complex."); Investment Company Act Release No. 10886, 18 SEC Docket 587, 1979 WL 170394, at *9 n.5 (Oct. 2, 1979). In this case, the Funds may be deemed to be under common control for the additional reasons that they have common boards of directors and that, for purposes of the litigation, they are subject to the control of plaintiffs and their attorneys.

1990 WL 333916 (Jul. 11, 1990) (notice of application to SEC seeking exemption from § 17(d) and Rule 17d-1 to enable certain affiliated funds and their adviser to jointly litigate securities law claims); 46 SEC Docket 1301, 1990 WL 311928 (Aug. 2, 1990) (SEC order allowing this exemption); AB & Co., SEC No-Action Letter, [1974-1975 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,071 (Aug. 19, 1974) (17d-1 applied where funds and their affiliates instituted, maintained, and proposed to settle litigation on a joint basis and where one litigant advanced all expenses of the litigation subject to eventual apportionment and distribution among all the parties at the conclusion of the litigation, taking into account the results thereof); Scudder Cash Investment Trust and Scudder, Stevens & Clark, Investment Company Act Release No. 13480, 1983 SEC LEXIS 891 (Sept. 1, 1983) (exemptive application to allow fund to pay part of attorneys fees in a single-fund § 36(b) case in which fund would receive a monetary benefit greater than the amount of attorneys fees it was incurring).

The prohibition of § 17(d) and Rule 17d-1 is broad and categorical.  Prior SEC approval must be obtained regardless of whether representatives of all parties or even a court believe that the joint arrangement is fair and reasonable to all participants.  See, e.g., Imperial Financial Services, Inc., 42 S.E.C. 717, 727, 1965 SEC LEXIS 239 (1965) ("The possibility that the investment company was not disadvantaged does not cure the unlawfulness of proceeding with the joint enterprises without obtaining the prior approval of this Commission as required by rule 17d-1."); Contran Corp., [1974-1975 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 80,105 (Dec. 24, 1974) (settlement of a shareholder derivative lawsuit involving a fund and its president must be approved by the SEC even though it would also have to be approved by the court as fair and reasonable to all parties, including the fund and its security holders, pursuant to Rule 23.1 of the Federal Rules of Civil Procedure); The South Bay Corp., SEC No-Action Letter, 1974 SEC No-

Act. LEXIS 935 (Dec. 4, 1974) (similar).  That the joint conduct of the litigation may offer cost savings or other advantages to the mutual funds or other participants is similarly beside the point. See, e.g., Wellman v. Dickinson, 475 F. Supp. 783, 834 (S.D.N.Y. 1979); National Student Marketing Corp., [1973 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 79,524, at 83,435 (Aug. 19, 1973).

Here, plaintiffs have failed to obtain SEC approval for their joint litigation arrangement on behalf of the Funds.  Their attempt to pursue joint litigation on behalf of the affiliated Funds is therefore prohibited by § 17(d) and Rule 17d-1.

## III.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER § 36(b)

Apart from the threshold issues already discussed, the SAC simply fails to state a § 36(b) claim under controlling Third Circuit precedent.

### A.   Pleading Standard for § 36(b) Cases

A § 36(b) plaintiff has an unusually difficult case.  He must show that "the adviser-manager [has] charge[d] a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982).

The controlling pleading standards for a § 36(b) claim are set forth in Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140 (3d Cir. 2002), which adopted Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321 (4th Cir. 2001).  See Krantz, 305 F.3d at 143.  To survive a motion to dismiss, a plaintiff "must allege facts that, if true, would support a claim that the fees at issue are excessive." Migdal, 248 F.3d at 327.  This in turn requires, among other things, "alleg[ing] sufficient facts about the services that defendants offered in return for [the fees they received]." Id.; see also Krantz, 305 F.3d at 143 ("dismissal for failure to state a claim with

respect to excessive compensation was appropriate since Plaintiff failed to allege any facts indicating that the fees received were disproportionate to services rendered").

Krantz involved a single mutual fund and Migdal involved two funds.  It is clear, however, that plaintiffs' attempt to bring a multi-fund mega-case does not relieve them of the obligation of alleging that the fee charged for a particular fund is excessive.  See Olesh v. Dreyfus Corp., No. CV-94-1664, 1995 WL 500491, at *17 (E.D.N.Y. Aug. 8, 1995) ("the injury to a fund must be examined individually – to aggregate the increase imposed on the 130 separate funds is to bury the issue of whether 'bona fide' fees are involved").  A fund-by-fund inquiry is especially important where, as here, the Funds at issue have markedly different investment objectives, vary significantly in size, and have different advisory fee schedules.

Another pleading principle is important in this case: "a plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts."  Jackson v. Marion County, 66 F.3d 151, 153 (7th Cir. 1995); accord ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994).[6]

---

[6]     In this motion to dismiss, we refer to two sets of factual materials.  The first is contained in the Certification of Christopher A. Barbarisi, dated November 16, 2004 and previously filed with the Court as part of the Lord Abbett defendants' motion to dismiss the Amended Complaint of the same date (hereinafter the "Barbarisi Cert. I").  The second set of materials is contained in the certification of Christopher A. Barbarisi dated January 21, 2006, and filed herewith (the "Barbarisi Cert. II").  The materials in the Barbarisi Certs. I and II consist of (1) copies of certain prospectuses and the statements of additional information ("SAI's") for the Funds, and (2) certain other factual information explicitly relied upon by the Complaint.  As this Court has already held, it is appropriate to consider such materials in ruling on a motion to dismiss.  See In re Lord Abbett Mutual Funds Fee Litig., --- F. Supp. 2d ---, 2005 WL 3544312, at *1 & n.2 (D.N.J. Dec. 28, 2005); In re Franklin Mut. Funds Fee Litig., 388 F. Supp. 2d 451, 460 (D.N.J. 2005).  See also In re Rockefeller Ctr. Prop., Inc. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999); Pension Benefit Guarantee Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

As demonstrated below, not only do the allegations of the SAC fail to meet plaintiffs' pleading burden, but the SAC and the documents upon which it relies affirmatively set forth facts demonstrating that plaintiffs' claims are meritless.

**B.      Plaintiffs' General Allegations Provide Little or No Logical Support for an Excessive Fee Claim**

Before engaging in the requisite Fund-by-Fund analysis, it is useful to summarize some of the general allegations in the SAC and highlight a number of general defects that pervade it.

We begin by emphasizing what this case now is (and is not) about: plaintiffs state that they are challenging the following fees paid by the Funds: (1) investment advisory fees (including administrative fees), (2) Rule 12b-1 fees (including service fees), and (3) the directors' fees.   See SAC ¶ 33.[7]   In Parts B.1-B.3 below, we discuss plaintiffs' general allegations regarding each of these three types of fees.

Plaintiffs now do not directly challenge the supposed excessive commissions and revenue sharing payments that were virtually the entire "factual" basis for the initial complaints and the First Amended Complaint.   That is understandable, because such allegations manifestly fail to state a § 36(b) claim against these defendants.   See In re Eaton Vance, 380 F. Supp. 2d 222, 238 (S.D.N.Y. 2005) ("excessive brokerage" claims may not be brought under § 36(b) because § 36(b)(3) provides that claims may be brought only under § 36(b) against the recipient of the allegedly excessive fees, and mutual fund investment adviser, distributor, and trustees were not recipients of allegedly "excessive" soft dollars and other brokerage commissions; allegations that defendants used fees for improper purposes similarly fail to state a claim under § 36(b)); Fogel v.

---

[7]      For good measure, plaintiffs insinuate that there may be other fees that they may seek to challenge.   See SAC ¶ 33 (fees identified are "without limitation").   This boilerplate must be ignored.   The most rudimentary principles of fair notice preclude any suggestion that plaintiffs can require the Court and defendants to guess what other fees plaintiffs may have in mind.

Chestnutt, 668 F.2d 100, 112 (2d Cir. 1981) (same); In re Davis Selected Mutual Funds Litigation, No. 04 Civ. 4186, 2005 WL 2509732, at *3 (S.D.N.Y. Oct. 11, 2005) (same); In re Columbia Entities Litig., Civ. No. 04-11704, 2005 U.S. Dist. LEXIS 33439, at *32 (D. Mass. Nov. 30, 2005) (same).  In a strained attempt to make it appear as though these allegations have some continuing pertinence to their current lawsuit, however, plaintiffs devote three pages of the SAC to assertions that the advisory fees were wrongfully inflated in order to "reimburse" defendants for revenue sharing payments they made and because of the increase in average daily net assets resulting from directed brokerage and defendants' distribution efforts.  See SAC ¶¶ 58-62.  Such allegations merely restate in pejorative fashion two utterly unremarkable and obvious facts: (1) that an investment adviser generally derives its resources from the fees it charges, and (2) that successful distribution efforts tend to increase fund size (and, hence, fees that are tied to fund size).  None of this alters the relevant inquiry under § 36(b), which, by asking whether the actual amount of fees received by the adviser and its affiliates is legally excessive in comparison to the services rendered, necessarily takes into account any increase in fund size and, hence, any benefit that an adviser or its affiliates receives from revenue sharing or directed brokerage.[8]  The SAC's revenue sharing allegations thus are nothing more than a blatant and irrelevant effort to poison the well.

### 1.   Directors' Fees

In support of their claims against the Funds' directors, the SAC contains several pages of allegations concerning directors' fees.  See SAC ¶¶ 63-70.  In their separate memoranda, the

---

[8]   Cf. Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414, 1980 SEC Lexis. 444, at *31 (Oct. 8, 1980) ("To the extent that such profits are 'legitimate' or 'not excessive', the adviser's distribution expenses are not an indirect use of fund assets.... Profits which are legitimate or not excessive are simply those which are derived from an advisory contract which does not result in a breach of fiduciary duty under section 36 of the [1940] Act.").

independent trustees persuasively demonstrate why these allegations fail.  We agree with (and incorporate by reference herein) those arguments.

But the § 36(b) claim against defendant Robert S. Dow (the only so-called "interested" director in the case and the sole director we represent) is frivolous for an even more fundamental reason: in contrast to the independent trustees, plaintiffs do not and cannot allege that Mr. Dow received any directors' fees or other compensation from the Funds or their shareholders.[9] Manifestly, § 36(b) gives plaintiffs no right to challenge the compensation Mr. Dow receives from the Funds' investment adviser since it allows recovery only of excessive fees "***paid by such registered investment company***, or by the security holders thereof." 15 U.S.C. § 80a-35(b) (emphasis added).

### 2.      Rule 12b-1 Fees

Assuming *arguendo* that plaintiffs can challenge Rule 12b-1 fees in a § 36(b) action,[10] plaintiffs' attempt to do so here fails.  Apart from the SAC's few Fund-specific allegations (discussed separately below in Part III.C), plaintiffs' attack on the Funds' 12b-1 distribution fees relies principally on two assertions: (a) that plaintiffs and the Funds did not receive "any benefits" as a result of the 12b-1 plans because certain Funds increased in size but nonetheless had higher expense ratios, see, e.g., SAC ¶¶ 53-54, and (b) that the 12b-1 distribution fees assessed against the retail classes of shares (Classes A, B, C, and P) exceeded the distribution

---

[9]      This is clear from the Funds' public filings.  The Lord Abbett All Value Fund Statement of Additional Information March 1, 2003, at 11 (Barbarisi Cert. I Ex. 20) discloses: "None of the officers listed below [Robert S. Dow is among those listed] have received compensation of the Trust"; see also Lord Abbett All Value Fund Statement of Additional Information March 1, 2004, at 19, Barbarisi Cert. I Ex. 22, at 19 ("No director/trustee of the funds associated with Lord Abbett and no officer of the funds received any compensation from the funds for acting as a director/trustee or officer.").

[10]      Part IV below demonstrates that, as a matter of law, Rule 12b-1 fees are categorically excluded from the scope of § 36(b).

fees that apply to Class Y that are available to certain institutional investors and others. See, e.g., SAC ¶¶ 35, 55-57. These assertions reflect either plaintiffs' fundamental misunderstanding, or intentional distortion of, the nature and permissible purpose of Rule 12b-1 fees. We discuss each of these two contentions in turn.

> **a.     Plaintiffs' Allegations of Impermissible Rule 12b-1 Fees Are Irrelevant in a § 36(b) Action**

Assuming *arguendo* that a § 36(b) claim can be used to attack 12b-1 fees, a plaintiff seeking to do so must state a claim that the distribution fee received by a fund underwriter or other party subject to § 36(b) is disproportionate to the distribution services rendered.[11]

Conversely, as courts have repeatedly held in addressing substantially identical allegations in other actions filed by these plaintiffs' attorneys, § 36(b) does not encompass a claim that a 12b-1 plan is of insufficient or no benefit to the fund due to supposed failures to achieve economies of scale or otherwise. See, e.g., In re Eaton Vance Mut. Funds Fee Litig., 403 F. Supp. 2d 310, 315 (S.D.N.Y. 2005) (rejecting plaintiffs' argument that a § 36(b) claim was stated by allegations that "plaintiffs received no benefit from fees that were put to allegedly improper use" and that plaintiffs paid "something for nothing"; allowing plaintiffs to proceed on such allegations "stretches the reach of § 36(b) too far, because any allegation of improper use of fees that does not benefit the plaintiffs would be impermissibly swept into the purview of § 36(b)"); In re Goldman Sachs Mutual Funds, No. 04 Civ. 2567, 2006 WL 126772, at *9 & n.24 (S.D.N.Y. Jan. 17, 2006) (adopting analysis of Eaton Vance court and stating: "plaintiffs respond that if no economies of scale were achieved, then the Rule 12b-1 fees yielded no benefits and

---

11      See, e.g., Yameen v. Eaton Vance Distributors, Inc., 394 F. Supp. 2d 350, 358 (D. Mass. 2005) (dismissing complaint where plaintiff "fail[ed] to allege that the distribution fees are disproportionate and unrelated to the sales-related services actually provided") (citation and internal quotation marks omitted); ING Principal Protection Funds Derivative Litigation, 369 F. Supp. 2d 163, 168 (D. Mass. 2005).

therefore should have been discontinued… We find no support for the assertion that the failure

to achieve economies of scale during the period in question necessarily would require such

measures."); In re Davis Selected Mutual Funds Litig., No. 04 Civ. 4186, 2005 WL 2509732, at

*2 (S.D.N.Y. Oct. 11, 2005) (same). See also Yameen v. Eaton Vance Distributors, Inc., 394 F.

Supp. 2d 350 (D. Mass. 2005) (dismissing § 36(b) complaint alleging that mutual funds closed to

new investors could not achieve further economies of scale, thus rendering payment of 12b-1

fees improper; no § 36(b) claim stated given plaintiffs' failure to allege that the distribution

services actually provided were not sufficiently commensurate with the level of distribution

fees); ING Principal Protection Funds Derivative Litigation, 369 F. Supp. 2d 163, 168 (D. Mass.

2005) (similar).[12]

Even if plaintiffs could proceed with a § 36(b) case based on the theory that a Rule 12b-1

plan would be of no benefit to shareholders, plaintiffs have failed to plead such a case. Indeed,

plaintiffs' conclusory "no benefits" allegation is contradicted by the SAC's express and specific

acknowledgement that the Funds have a multiple class structure. See, e.g., SAC ¶¶ 35

(describing different classes of shares available to shareholders of the Funds). Such a structure

---

[12]      Cf. Pfeiffer v. Bjurman Barry & Assocs., No. 03 Civ. 9741, 2004 WL 1903075, at *3
(S.D.N.Y. Aug. 26, 2004) (denying motion to dismiss where plaintiffs alleged facts indicating
that amount of 12b-1 fees "lacked any reasonable relationship to actual expenses incurred for
promotion and distribution") (internal quotation marks omitted). Plaintiffs here do not claim that
the Funds' 12b-1 fees were not actually used to promote or distribute the Funds. To the
contrary, they affirmatively allege that the defendants' distribution efforts on behalf of the Funds were
highly successful. See, e.g., SAC ¶ 2 (noting "growth in the size of the Funds resulting from
Defendants' use of Fund assets to promote the sale of Fund shares"); SAC ¶ 53. The author of
the lone published opinion that has accepted plaintiffs' "no benefit" allegations, Forsythe v. Sun
Life Financial, Inc., --- F. Supp. 2d ---, 2006 WL 148935, at *10-11 (D. Mass. Jan. 19, 2006) (O'
Toole, J.) has expressed disagreement with the pleading standard that governs in this Circuit.
See Dumond v. Mass. Fin. Serv. Co., No. Civ.A. 04-11458, 2006 WL 149038, at *3 (D. Mass.
Jan. 19, 2006) (O'Toole, J.) (stating that "defendants rely heavily on cases that are not binding
precedent in this district," including Krantz v. Prudential Inv. Fund Mgmt. LLC, 305 F.3d 140
(3d Cir. 2002), and Migdal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321 (4th Cir. 2001), and
concluding that such cases may be "inconsistent with the applicable [pleading] standard").

has been recognized by the SEC and by the courts as perhaps the most important benefit of a Rule 12b-1 plan.  More particularly, 12b-1 plans facilitate investor choice.  See Yameen v. Eaton Vance Distributors, Inc., 394 F. Supp. 2d 350, 354 (D. Mass. 2005) (recognizing that Rule 12b-1 effectively allows investors in mutual funds "to choose between paying distribution and service charges up front and spreading them out over a period of several years"); id. at 352-53 (discussing example of multi-class mutual fund).  For example, a purchaser may elect to buy Class A shares and have an up-front sales charge or "load" deducted from his purchase.  See SAC ¶ 35; Yameen, 394 F. Supp. 2d at 352.  This money is paid to the selling broker-dealer, and the shareholder's money is invested in a share class that is charged lower 12b-1 fees than other share classes.  See SAC ¶ 35 (alleging that 12b-1 fee applicable to Class A shares is lower than those for other classes of retail shares); Yameen, 394 F. Supp. 2d at 352.  As an alternative, a purchaser may buy Class B shares and not pay an up-front load, thus 100% of the purchase price is used to buy fund shares.  Id.  The mutual fund distributor (such as Lord Abbett Distributor LLC) pays the sales commissions to the broker-dealer that would have been paid by the purchasers if they had bought Class A shares.  Id.  The fund (which has received 100% of the purchase price) then reimburses the distributor for those advanced commissions over time from 12b-1 fees.  Id.  Thus, Rule 12b-1 fees may serve as a substitute or supplement for traditional front-end sales loads and deferred sales load arrangements and permit funds to offer alternative methods for shareholders to gain access to advice from financial advisers, a practice that the SEC has approved[13] and that has been adopted by nearly all broker-sold funds in the United States.

---

[13]      In a study relied upon by plaintiffs (SAC ¶ 40), the SEC stated that Rule 12b-1 plans are "integral" to the multiple share class systems employed by many mutual funds.  See SEC Division of Investment Management, Report on Mutual Fund Fees and Expenses, Dec. 2000 ("Fee Study"), available at http://www.sec.gov/news/studies/feestudy.htm (attached hereto as Barbarisi Cert. II Ex. 2).  In 1988, the SEC considered, but ultimately declined to adopt, a

> **b.** **Plaintiffs' Suggestion that Retail Share Classes and Institutional Share Classes Should be Charged Similar Rule 12b-1 Fees is Frivolous**

Plaintiffs also allege that the existence of an institutional share class that pays no distribution fees demonstrates that the fees paid by retail classes are excessive. These allegations do not support a § 36(b) claim. Because of the relatively high expenses associated with running mutual funds, courts have repeatedly refused to allow plaintiffs to plead or prove a § 36(b) claim by relying on comparisons between the differing ***advisory fees*** charged differing types of clients. See, e.g., Gartenberg, 694 F.2d at 930 n.3 (declining to consider evidence of differences in fees charged institutional investors and mutual funds); Strougo v. BEA Associates, 188 F. Supp. 2d 373, 384 (S.D.N.Y. 2002); Batra v. Investors Research Corp., 144 F.R.D. 97, 98-99 (W.D. Mo. 1992); Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1237 (S.D.N.Y. 1990); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 974 n.38 (S.D.N.Y. 1987), aff'd, 835 F.2d 45 (2d Cir. 1987).

But even assuming *arguendo* that such comparisons could assist plaintiffs in meeting their pleading burden, plaintiffs' attempt to support a § 36(b) claim with allegations that the ***12b-1 distribution fees*** charged to retail classes (Classes A, B, C, and P) of Fund shares are higher than those charged to institutional share classes (Class Y) is utterly absurd, since the differing nature of the classes plainly demonstrates the reason for differing fee structures. The retail

---

proposal that effectively would have eliminated the ability of funds to employ Rule 12b-1 to enable them to offer share classes that are not subject to a sales load. See Payment of Asset-Based Sales Loads by Registered Open-End Management Investment Companies, Investment Company Act Release No. 16431, 53 Fed. Reg. 23258, 1988 WL 1000015, at *44 (June 13, 1988). The proposal was rejected because it would have "doom[ed] spread loads without a satisfactory replacement, forcing most spread load funds to revert to front-end loads," a result that investors "would not appreciate." Report of the Division of Investment Management of the Securities and Exchange Commission: Protecting Investors: A Half Century of Investment Company Regulation (May 1992) at 324, 327 (an excerpt from this report is included as Barbarisi Cert. I Ex. 28).

classes of shares may be purchased by numerous relatively small shareholders, each requiring individual attention from sales personnel who are compensated, at least in part, through distribution fees.  In comparison, Class Y institutional shares are sold to large accounts or accounts related to broader institutional relationships, which require no comparable individualized sales effort.  Counsel have found no instance in which the courts or the SEC have *ever* suggested that *sales charges* for institutional investors should be comparable to those for retail investors.  To the contrary, as recognized by an SEC study cited in the SAC, establishing a class of shares for institutional investors that pays a lower distribution charge is standard industry practice.  See Fee Study at 20 ("Today, the no-load category includes … certain classes of sales force distributed funds in which marketing expenses are reduced or eliminated because the class is sold only to selected groups such as institutional investors or retirement plans.").

3.     **Investment Advisory Fees**

The SAC contains two principal sets of allegations pertinent to advisory fees, one of which is patently insufficient to sustain a § 36(b) claim and another that affirmatively undermines plaintiffs' case.

a.     **Plaintiffs' Allegations Regarding Failure to Provide
Breakpoints are Insufficient to State a § 36(b) Claim**

With respect to some Funds,[14] plaintiffs first assert that the absence of "breakpoints" – asset levels above which advisory fees are reduced – supports a claim that the fees are excessive. See SAC ¶¶ 41-46.  The SAC acknowledges that there are so-called breakpoints in the advisory fees but alleges that the Funds' advisory fee schedule provides no breakpoints above a certain dollar threshold (e.g., $500 million in Fund assets).  As a result, plaintiffs allege, because the

---

[14]     As detailed in the Fund-by-Fund analysis below, plaintiffs do not make such allegations for all Funds.

assets of the Funds grew significantly beyond that threshold, the Funds were not enjoying the benefits of any economies of scale.  For example, the SAC includes this allegation about the Lord Abbett Mid-Cap Value Fund:

> Lord Abbett Mid-Cap Value Fund charges .75 of 1% for the first $200 million in assets; .65 of 1% on the next $300 million and .50 of 1% on assets over $500 million.  However, Lord Abbett Mid-Cap Value Fund has had assets over $500 million since 2000…. Since the investors received no breakpoints from the Fund's net asset increase over $500 million, the Fund's growth was enjoyed solely by the Defendants.[15]

Plaintiffs may not rest on such allegations.  "Breakpoints are not legally required to be included in the advisory contract."  Fee Study at 57 n.107.  Nor does their absence begin to suggest that a § 36(b) violation has occurred.  An adviser may share economies of scale with a fund "by appropriately fixed 'break-points' or alternatively, by means of a fee structure which, whether or not containing break-points, in effect incorporates economies of scale by virtue of a relatively low starting point which in effect subsumes economies of scale throughout."  Kalish v. Franklin Advisers, Inc., 742 F. Supp. 1222, 1239 (S.D.N.Y. 1990); Schuyt v. Rowe Price Prime Reserve Fund, Inc., 663 F. Supp. 962, 970 n.25 (S.D.N.Y. 1987) (same).

Indeed, the same Fee Study relied upon by plaintiffs found that "for funds with breakpoint or fund breakpoint-plus contracts, a *substantial proportion of their assets are not subject to any further breakpoint reductions*."  Fee Study at 31 (emphasis added); see also id.

---

[15]     SAC ¶ 44; see also SAC ¶¶ 42, 43, 45 (making "no breakpoint" allegations with respect to certain other Funds).  Plaintiffs make similar allegations regarding the overall expense ratio paid by some Funds.  See, e.g., SAC ¶¶ 47, 48.  These allegations are insufficient for the reasons discussed in the text.  They are also misleading for an additional reason: the Funds' overall expenses include payments that are not received by defendants, but instead are payments made by the Funds to unrelated third parties (such as law firms and other professional services companies).  See, e.g., Lord Abbett Bond-Debenture Fund, 2005 Semiannual Report for the six-month period ended June 30, 2005, at 27 (listing items that comprise gross expenses) (Barbarisi Cert. II Ex. 3).  As already noted, a plaintiff may not sue a defendant under § 36(b) for compensation or payments that defendant has not actually received.

at 6 ("most funds in the sample with management fee breakpoints, however, have assets above the last breakpoint"). Additionally, 19% of the 100 largest mutual funds had "[s]ingle fee contracts [that] do not employ breakpoints" *at all*. Id. at 32.

Plaintiffs' "no breakpoint" allegations thus are nothing more than a claim that some of the Funds have an advisory contract structured in a manner similar to numerous other large mutual funds, and more favorable than many. They provide no basis for even a speculative inference of excessive fees and fall woefully short of satisfying plaintiffs' burden to allege "facts indicating that the fees received were disproportionate to the services rendered." Krantz, 305 F.3d at 143.

### b. Plaintiffs' Allegations Regarding Institutional Investors Compel Dismissal

The SAC also alleges that fees paid by institutional shareholders exemplify or are equivalent to fees negotiated at arm's length, and that investors in the Funds' Class Y shares are such institutional investors. See SAC ¶¶ 4, 55-57. These allegations undermine any § 36(b) claim because the SAC also obliquely acknowledges what is clear from the Funds' public documents: that the *advisory fees* charged to Class Y shares *are exactly the same* as those charged to retail investors.[16] Plaintiffs have thus alleged that the Funds' advisory fees necessarily comport with § 36(b). See Gartenberg, 694 F.2d at 928 (fee that violates § 36(b) must be one that, inter alia, "could not have been the product of arm's-length bargaining").

---

[16]     See SAC ¶¶ 35, 56-57 (alleging that retail share expense ratios are higher than Class Y expenses by an amount reflecting the sales charges applicable to that share class). For the Court's reference, the Class Y prospectuses and SAI's for each Fund are attached hereto as Barbarisi Cert. II Exs. 4-13. Attached as Barbarisi Cert. II Ex. 14 is a chart detailing the pages of these documents and the corresponding documents for the retail share classes on which the advisory fee rate appears, and the fee schedule itself.

Plaintiffs' admissions in this regard compel dismissal of their excessive advisory fee claims.  See Bender v. Suburban Hosp., Inc., 159 F.3d 186, 192 (4th Cir. 1998).

### C.    Plaintiffs' Fund-Specific Allegations Fail to State a Claim

As discussed in the previous Part, plaintiffs' general allegations plainly fail to state a § 36(b) claim, and in fact destroy plaintiffs' ability to argue that a § 36(b) violation occurred.  As demonstrated below, moreover, plaintiffs' few Fund-specific allegations further undermine their cause.

### 1.    Lord Abbett Mid-Cap Value Fund

With respect to the Lord Abbett Mid-Cap Value Fund, plaintiffs offer no allegations addressing the nature and quality of services received by the Fund.  This failure alone requires dismissal of plaintiffs' claim concerning this Fund.  See Migdal, 248 F.3d at 327 (to survive motion to dismiss plaintiffs must "allege sufficient facts about the services that defendants offered in return for [the fees they received]").

Plaintiffs make only a few allegations relating to the Mid-Cap Value Fund, largely consisting of the boilerplate allegations disposed of above: the "no breakpoint" allegations, SAC ¶¶ 44, 48, and the misleading and irrelevant comparison between the 12b-1 distribution fees charged Class Y shares and retail share classes.  See SAC ¶¶ 56, 57.

Significantly, plaintiffs also rely on a report on the Fund from the Morningstar information service.  They first allege that Morningstar is a "well-respected mutual fund information service."  SAC ¶ 49.  They then selectively quote the following statement from a Morningstar report for the Mid-Cap Value Fund (a copy of which is attached hereto as Barbarisi Cert. II Ex. 15): "the Mid-Cap Value Fund's A shares 12b-1 fee of 0.36% 'is one of the highest

among the category's front-load option[s].'"  SAC ¶ 49; Morningstar Report (Barbarisi Cert. II. Ex. 15) at 5.

Plaintiffs' reliance on the Morningstar report completely undermines their claim concerning the Mid-Cap Value Fund and underscores that plaintiffs' general allegations have little or no bearing on whether a Fund's fees are legally excessive. ***Morningstar concludes that the fees charged for the overall services provided to the Fund are "fair."*** Id. at 7.  Morningstar also states that, while it is "disappointed that the Fund's price tag hasn't fallen more rapidly as assets have increased," ***the expense ratio is still "in the lowest quartile among front-load, mid-cap funds"*** Id. (emphasis added).

In short, the SAC and the information relied upon therein affirmatively demonstrate that the overall fees paid by the Fund were fair in comparison to the services rendered.  Under these circumstances, it is frivolous for plaintiffs to contend that they may maintain a § 36(b) action. See Gartenberg, 694 F.2d at 933 (even a fee contract that may not be "fair and reasonable" does not constitute a breach of fiduciary duty under § 36(b)).

### 2.      Lord Abbett Bond Debenture Fund

Plaintiffs' allegations regarding the Lord Abbett Bond Debenture Fund are substantially the same as those concerning the Mid-Cap Value Fund, including their reliance on a Morningstar report that destroys their case.  See SAC ¶ 49 (quoting page 5 of the Morningstar report, Barbarisi Cert. II Ex. 16); ¶¶ 43, 47, 57 (other allegations).  In this instance, while criticizing the 12b-1 fees applicable to Class A Shares and noting that the Fund's assets have long since surpassed their last advisory fee breakpoint, Morningstar nonetheless concludes that the Fund's fees are "***fair***" and that its "***expense ratio lands in the lowest quartile among front-load peers***." Barbarisi Cert. II Ex. 16 at 7 (emphasis added).

### 3.    Lord Abbett Affiliated Fund

Plaintiffs' allegations concerning the Lord Abbett Affiliated Fund are essentially the same as those regarding the Mid-Cap Value Fund and Bond Debenture Fund, except that plaintiffs omit any Fund-specific allegations based on a Morningstar report.  See  SAC ¶¶ 35, 42, 47, 53, 56.  For the reasons discussed above in Part III.B.3.a, plaintiffs' "no breakpoint" and general 12b-1 fee and advisory fee allegations fail to state (and actually undermine) a § 36(b) claim.

### 4.    Lord Abbett Growth Opportunities Fund

Plaintiffs' allegations concerning the Lord Abbett Growth Opportunities Fund, see SAC ¶¶ 45-47, 57, are similar to those regarding the Lord Abbett Affiliated Fund, with one exception: in this instance, plaintiffs modify their "no breakpoint" theme by alleging that the Growth Opportunities Fund's breakpoints are *above* the Fund's current level of average daily net assets. Plaintiffs contend that the Fund therefore has "never enjoyed any of the benefits of the economies of scale created by the increase in the Fund's net assets."  SAC ¶ 46.  This variation of the "no breakpoint" allegation fails for the same reasons as the principal iteration already discussed and also because (a) the allegation itself demonstrates that the Fund will enjoy an additional benefit from its 12b-1 distribution plans (further breakpoints), and (b) it grossly mischaracterizes the public record on which plaintiffs purport to rely because the fee schedule and breakpoints cited by plaintiffs reflect a reduction effective April 1, 2004.[17]  Thus, it is

---

[17]    As of April 1, 2003, Lord Abbett received a management fee at an annual rate of .90 of 1% of the Fund's average daily net assets. See Lord Abbett Growth Opportunities Fund Prospectus April 1, 2003 at 6, Barbarisi Cert. I Ex. 2 at 6; Lord Abbett Growth Opportunities Fund Statement of Additional Information April 1, 2003 at 19, Barbarisi Cert. I Ex. 3 at 19. Effective April 1, 2004, however, the Fund's management fees were lowered, and the management fees were those set forth in the Amended Complaint: .80 of 1% of the first 1 billion of average daily net assets, .75 of 1% of the next $1 billion, .70 of 1% of the next $1 billion, and

indisputable that the Fund has in the recent past and likely will in the near future benefit from economies of scale.

### 5.   Lord Abbett California Tax-Free Income Fund

Plaintiffs allege next to nothing about the Lord Abbett California Tax-Free Income Fund, not even their patently insufficient allegations about breakpoints and Fund size.  The SAC's only specific reference to the Fund is the allegation in ¶ 49 that "according to another Morningstar report, the California Tax-Free Income Fund's '0.99% expense ratio[] is high relative to its typically front-loaded category peer.'"  Once again, plaintiffs conveniently fail to provide the complete Morningstar report on which they rely (Barbarisi Cert. II Ex. 17) (plaintiffs' quote appears on page 5).  Morningstar ***actually concluded that the fees paid by the Fund were "fair***."  Id. at 3, 6.

Plaintiffs' lone allegation concerning the California Tax-Free Income Fund also fails for other reasons.  That a fund's overall expense ratio is higher than average cannot be the ground on which a § 36(b) claim rests.  Such an allegation does not set forth sufficient (or indeed any) "facts about the services that defendants offered in return for [the fees they received]."  Migdal, 248 F.3d at 327.  And, if this were a sufficient basis for a § 36(b) claim, plaintiffs could always plead and prove a § 36(b) case against investment advisers of nearly half of all mutual funds.

### 6.   Lord Abbett All Value Fund

As with the California Tax-Free Income Fund, plaintiffs do not offer allegations regarding this Fund's size or its breakpoints.  In the case of the All Value Fund, moreover, plaintiffs do not even proffer any allegation regarding the Fund's advisory fees.  The only Fund-

---

.65 of 1% of average daily net assets over $3 billion.  See Lord Abbett Growth Opportunities Fund Prospectus April 1, 2004 at 6, Barbarisi Cert. I Ex. 5 at 6; Lord Abbett Growth Opportunities Fund Statement of Additional Information April 1, 2004 at 20, Barbarisi Cert. I Ex. 6 at 20.

specific allegation in the entire SAC that pertains to the All Value Fund is a citation in ¶ 49 to a Morningstar report on the Fund criticizing the 12b-1 distribution fee applicable only to Class A shares.[18]

Once again, plaintiffs again have selectively quoted from and distorted the Morningstar report, a copy of which is attached hereto as Barbarisi Cert. II Ex. 18.  While noting that the Fund's Class A Rule 12b-1 fee is "higher than most of its front-load large-value rivals," (the point for which plaintiffs cite it) the Morningstar report concludes that, even taking into account the 12b-1 fee, the Fund's expense ratio "ranks in the middle third among broker-sold large-cap funds," *and that the overall fees are "fair."*  Id. at 6 (emphasis added).

### 7.    Lord Abbett America's Value Fund

Plaintiffs' allegations regarding this Fund are even thinner.  The only Fund-specific allegation regarding the America's Value Fund is that § 36(b) must have been violated because the distribution fees are higher for retail classes of shares than they are for Class Y institutional shares.  See SAC ¶ 57.  As discussed above in Part III.B.2.b, this is a non sequitur.

## IV.    SECTION 36(b)(4) REMOVES 12b-1 FEES FROM THE STATUTE

Alternatively, plaintiffs' claims based on 12b-1 fees must be dismissed because the text of § 36(b) specifically excludes from its reach the Rule 12b-1 fees that plaintiffs seek to attack.  Section 36(b)(4) expressly provides that § 36(b) "shall not apply to compensation or payments

---

[18]    Plaintiffs' failure to allege facts indicating that the Fund's overall fees are excessive is another reason requiring dismissal of the claim regarding the Lord Abbett All Value Fund. Complaints that make allegations regarding only 12b-1 fees, service payments, or other supposedly illegal, excessive, or improper payments that relate to only a discrete portion of the services provided by the investment adviser and its affiliates fail to state a § 36(b) claim.  See, e.g., Benak v. Alliance Capital Mgmt. L.P., No. Civ.A. 01-5734, 2004 WL 1459249, at *8-9 (D.N.J. Feb. 9, 2004); In re TCW/DW N. Am. Gov't Income Trust Sec. Litig., 941 F. Supp. 326, 343 (S.D.N.Y. 1996); Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 491-92 (N.D. Ill. 1999). Finally, plaintiffs' allegation that 12b-1 fees are higher than average also fails for the same reasons as the similar allegations discussed in the second paragraph of Part C.5. above.

made in connection with transactions subject to Section 17 of [the ICA], or the rules, regulations or orders thereunder, or to sales loads for the acquisition of any security issued by a registered investment company."  See Lessler v. Little, 857 F.2d 866, 874 (1st Cir. 1988) (applying § 36(b)(4) to exclude payments subject to § 17 from § 36(b)).

Payments of Rule 12b-1 distribution fees are unquestionably "payments made in connection with transactions subject to Section 17 of [the ICA], or the rules … thereunder."  The payments under contracts with fund distributors are specifically addressed and (subject to the constraints of Rule 12b-1) authorized by ICA Rule 17d-3.[19]  See 12b-1 Adopting Release, 45 Fed. Reg. at 73898 ("[t]he Commission also is adopting [Rule 17d-3] to exempt from the requirement of prior Commission approval, to the extent necessary, certain agreements between open-end management investment companies and their affiliated persons whereby investment company assets are used for distribution, if such agreements are entered into in compliance with the rule permitting such companies to bear their distribution expenses"); id. at 73901 ("[t]he Commission is exercising its authority under section 17(d) to permit arrangements for use of fund assets for distribution which involve covered joint transactions only if such arrangements comply with rule 12b-1").[20]

---

[19]     Absent Rule 17d-3, a 12b-1 plan would be a "joint transaction" forbidden by § 17(d) and Rule 17d-1 thereunder because:

> If a fund finances distribution, it becomes so actively and intimately involved in the distribution process that, even if it contracts with an underwriter, it cannot fairly be said to be distributing through that underwriter. Such a fund should more properly be viewed as acting as a distributor along with the underwriter.

Bearing of Distribution Expenses by Mutual Funds, Investment Company Act Release No. 11414, 45 Fed. Reg. 73898, 73902 (November 7, 1980) ("12b-1 Adopting Release") (emphasis omitted).

[20]     In this context, "subject to" is synonymous with "governed by."  See, e.g., United States ex rel. Totten v. Bombardier Corp., 286 F.3d 542, 547 (D.C. Cir. 2002) ("an entity is 'subject to'

## CONCLUSION

The Second Amended Derivative Complaint should be dismissed with prejudice.


Respectfully submitted,


KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP


By:   <u>/s/  Christopher A. Barbarisi (8716)</u>
Christopher A. Barbarisi
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
One Newark Center, Tenth Floor
Newark, NJ  07102
(973) 848-4000

Jeffrey B. Maletta
Nicholas G. Terris
Petra A. Walsh
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
1601 K Street, N.W.
Washington, DC  20006-1600
(202) 778-9000

*Counsel for the Lord Abbett Defendants*

---

a particular legal regime when it is regulated by, or made answerable under, that regime");
<u>Texaco, Inc. v. Duhe</u>, 274 F.3d 911, 918-19 (5th Cir. 2001) (natural gas became "subject to an existing contract" within the meaning of the Natural Gas Policy Act when it was "governed by" the terms of that contract).